# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| Commodity Futures Trading Commission, ) )  Plaintiff, )  v. )  WorldWideMarkets, Ltd.; TAB Networks, Inc.; Thomas Plaut; and Arthur Dembro, )  Defendants. ) | CIVIL ACTION NO:  Hon._____  Jury Trial Demanded |

## COMPLAINT

Plaintiff Commodity Futures Trading Commission ("CFTC" or "Commission") alleges as follows:

### I.  SUMMARY

1.      Between no later than May 2011 and no earlier than September 2018 (the "Relevant Period"), Defendant WorldWideMarkets, Ltd. ("WWM"), a British Virgin Islands ("BVI") company owned by Defendant TAB Networks, Inc. ("TAB") and controlled by the two companies' Chief Executive Officer ("CEO"), Defendant Thomas Plaut, operated as a retail foreign exchange dealer ("RFED") from an office in Woodcliff Lake, New Jersey.  WWM solicited customers that were not eligible contract participants ("non-ECPs" or "retail customers") from around the world to enter into retail foreign exchange ("forex") trades.

2.      However, WWM did not register with the Commission as an RFED as required under the Commodity Exchange Act ("Act" or "CEA"), 7 U.S.C. §§ 1-26, and Commission Regulations ("Regulations"), 17 C.F.R. pts. 1-190 (2021), did not comply with relevant Regulations that apply to RFEDs for the purpose of protecting customer funds, and cheated and

1

defrauded its customers by, among other things, misappropriating at least $4.7 million of customer funds.

3.      WWM was never a profitable business and as a result used customer funds—as opposed to revenue earned by the company or shareholder capital—to pay operating expenses and employee salaries, and to make cash payments to Plaut from no later than March 2012 through the end of the Relevant Period.

4.      By April 2017, WWM stopped allowing customers to withdraw funds from their forex accounts.  Despite its refusal to return customer funds, WWM continued to solicit and accept new accounts and millions of dollars' worth of new customer deposits until at least September 2018, when WWM shut down, having spent all its customers' funds.

5.      In soliciting customers to open accounts, deposit funds, and engage in forex trading activity, WWM represented at all times to every single customer that it would hold customer assets safely in segregated accounts.  WWM made this statement to customers because WWM knew it was an important factor for retail forex customers choosing among competing firms.  WWM's representation concerning the safety of customer funds, however, was false from no later than March 2012 through the end of the Relevant Period.

6.      Defendant Arthur Dembro ("Dembro") was the Chief Financial Officer ("CFO") of both WWM and TAB and was aware that WWM was stealing customers' money for substantially the entire Relevant Period.  Notwithstanding his training as a certified public accountant ("CPA"), Dembro acquiesced in WWM's scam and took active steps to help WWM divert customer funds.

7.      By engaging in this conduct and the conduct further described herein, WWM and Plaut have violated Sections 2(c)(2)(C)(iii)(I)(aa), 4b(a)(2), and 6(c)(1) of the CEA, 7 U.S.C.

§§ 2(c)(2)(C)(iii)(I)(aa), 6b(a)(2), and 9(1), and Regulations 5.2, 5.3, 5.7, 5.8, and 180.1, 17 C.F.R. §§ 5.2, 5.3, 5.7, 5.8, and 180.1 (2021). And by the conduct described herein, TAB and Dembro have violated Sections 4b(a)(2) and 6(c)(1) of the CEA, 7 U.S.C. §§ 6b(a)(2) and 9(1), and Regulations 5.2 and 180.1, 17 C.F.R. §§ 5.2 and 180.1 (2021).

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this complaint.

9.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the CFTC brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act. The CFTC also seeks civil monetary penalties and remedial ancillary relief, including restitution to defrauded clients, disgorgement, pre- and post-judgment interest, and such other equitable relief as this Court may deem necessary and appropriate.

## II.      JURISDICTION AND VENUE

10.     **Jurisdiction**. This Court has original jurisdiction over this action under 28 U.S.C. § 1331 (codifying federal question jurisdiction) and 28 U.S.C. § 1345 (providing that U.S. district courts have original jurisdiction over civil actions commenced by the United States or by any agency expressly authorized to sue by Act of Congress). In addition, Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), provides that U.S. district courts have jurisdiction to hear actions brought by the Commission for injunctive and other relief or to enforce compliance with the Act whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order thereunder.

11.     **Venue**. Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because the Defendants transacted business in this District, and certain of

the acts and practices in violation of the Act have occurred, are occurring, or are about to occur within this District, among other places.

### III.    PARTIES

12.    Plaintiff **Commodity Futures Trading Commission** is the independent federal regulatory agency charged by Congress with the administration and enforcement of the Commodity Exchange Act and Regulations promulgated thereunder

13.    Defendant **WorldWideMarkets, Ltd.** was an entity organized under the laws of the BVI and registered with the BVI Financial Services Commission ("FSC"), which in March 2011 granted WWM two regulatory licenses related to dealing in investments.  WWM was wholly owned by TAB.  WWM's headquarters and principal place of business was Woodcliff Lake, New Jersey during the Relevant Period.  WWM has never maintained an office in or conducted any business activities from the BVI.  WWM's primary business model was to act as counterparty to forex transactions with retail customers.  WWM has never been registered with the Commission in any capacity.

14.    Defendant **TAB Networks, Inc.** was a Delaware corporation.  TAB is an acronym composed of the first initial of the first names of the three founding shareholders—the "T" stands for "Thomas [Plaut]."  At all relevant times, TAB's headquarters and principal place of business was WWM's Woodcliff Lake, New Jersey office.  TAB performed all management, accounting, software development, information technology, and back office functions for WWM, which was TAB's only customer.  For June 2012 through the end of the Relevant Period, TAB was owned and controlled by Defendant Plaut.  TAB has never been registered with the Commission in any capacity.

15.     Defendant **Thomas Plaut** is a resident of Saddle River, New Jersey.  Plaut owned WWM and TAB and controlled all aspects of WWM's and TAB's business activities as the companies' CEO.  Plaut worked out of WWM's Woodcliff Lake, New Jersey office.  Plaut has spent his entire professional career in the financial services industry.  Between 2002 and 2009, Plaut was registered with the Commission as an associated person and principal while associated with a futures commission merchant that acted as a counterparty to retail forex transactions.

16.     Defendant **Arthur Dembro** is a CPA and resident of New York, New York.  Dembro was the Chief Financial Officer of WWM and TAB and performed accounting and financial reporting functions for the companies.  Dembro worked out of WWM's Woodcliff Lake, New Jersey office.  For part of the Relevant Period, Dembro was also a licensed Financial and Operations Principal for an SEC-registered broker dealer that was associated with TAB.  Dembro has never been registered with the Commission in any capacity.

## IV.     LEGAL FRAMEWORK

**Provisions Applicable to RFEDs**

17.     Section 2(c)(2)(C)(i)(I) of the Act, 7 U.S.C. § 2(c)(2)(C)(i)(I), provides that the Commission has jurisdiction over certain agreements, contracts, and transactions in foreign currency that are entered into on a leveraged or margined basis by non-ECPs.[1]  Put differently, the CFTC has jurisdiction over leveraged retail forex transactions.  *See also* 7 U.S.C. §§ 2(c)(2)(C)(ii)(I) ("[retail forex transactions] . . . shall be subject to . . . [section 4b of the CEA]"); 2(c)(2)(C)(iv) ("[Section 6b of the CEA] shall apply to [any retail forex transaction] as if [the retail forex transaction] were a contract of sale of a commodity for future delivery");

---

[1] All sections of the CEA and Regulations cited in this document have been materially the same for the entire Relevant Period.  Many of the applicable legal provisions contain exceptions or exemptions that are not relevant to the allegations and claims in this complaint.

2(c)(2)(C)(vii) ("This Act applies to and the Commission shall have jurisdiction over an account . . . that is offered for the purpose of trading, or that trades, any agreement, contract, or transaction in foreign currency described in clause (1) [i.e., a retail forex transaction].").

18.     Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), states that any person that solicits or accepts orders for retail forex transactions must register with the Commission.

19.     Part 5 of the Regulations, 17 C.F.R. Pt. 5 (2021), addresses off-exchange foreign currency transactions.

20.     Regulation 5.1(h)(1), 17 C.F.R. § 5.1(h)(1) (2021), defines an RFED as any person that offers to be the counterparty to a retail forex transaction.  Regulation 5.3(a)(6), 17 C.F.R. § 5.3(a)(6) (2021), requires RFEDs to register with the Commission.

21.     Among other regulatory requirements, an RFED must:

    a.   maintain adjusted net capital equal to or in excess of $20,000,000, pursuant to Regulation 5.7(a)(1)(i), 17 C.F.R. § 5.7(a)(1)(i) (2021)[2];

    b.   calculate its total retail forex obligation and shall at all times hold [certain permitted liquid assets] equal to or in excess of the total retail forex obligation at one or more qualifying institutions in the United States or [in Canada, France, Italy, Germany, Japan, or the United Kingdom], pursuant to Regulation 5.8(a), 17 C.F.R. § 5.8(a) (2021); and

    c.   refrain from directly or indirectly, in or in connection with any retail forex transaction:  cheating or defrauding or attempting to cheat or defraud any person; or willfully deceiving or attempting to deceive any person by any means whatsoever, pursuant to Regulation 5.2, 17 C.F.R. § 5.2 (2021).

---

[2] The term "net capital" means the "amount by which current assets exceed liabilities."  Regulation 1.17(c)(1), 17 C.F.R. § 1.17(c)(1) (2021).  The term "adjusted net capital" is defined in Regulation 1.17(c)(5), 17 C.F.R. § 1.17(c)(5) (2021), and generally means the entity's net equity or net worth, as computed under U.S. generally accepted accounting principles ("GAAP"), less illiquid assets (such as property, plant, and equipment), and further reduced by capital charges to cover the potential market risks of the highly liquid assets.

**Derivative Liability Under the Act**

22.     Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2,

17 C.F.R. § 1.2 (2021), provide that the "act, omission, or failure of any official, agent, or other

person acting for any . . . corporation . . . within the scope of his employment or office, shall be

deemed the act, omission, or failure of such . . . corporation . . . as well as such official, agent, or

other person."

23.     Section 13(a) of the Act, 7 U.S.C. § 13c(a), provides:  "Any person who commits,

or who willfully aids, abets, counsels, commands, induces or procures the commission of, a

violation of any of the provisions of this Act, or any of the regulations or orders issued pursuant

to this Act, or who acts in combination or concert with any person in such violation, or who

willfully causes an act to be done or omitted which if directly performed or omitted by him or

another would be a violation of the provisions of this Act or any of the rules, regulations, or

orders may be held responsible for such violation as a principal."

24.     Section 13(b) of the Act, 7 U.S.C. § 13c(b), provides that any "person who,

directly or indirectly, controls any person who has violated the Act, or regulations promulgated

thereunder, may be held liable for such violations to the same extent as the controlled person if

the controlling person did not act in good faith or knowingly induced, directly or indirectly, the

acts constituting the violation."

## V.     FACTS

**Organization and Registration of WorldWideMarkets and TAB Networks, Inc.**

25.     In November 2010, Plaut and his long-time business partner, Executive 1,

organized WWM in the BVI with the intent to act as counterparty to retail forex transactions.

26.     In May 2011, Plaut and Executive 1, who together were the sole shareholders of WWM, sold all their outstanding shares of WWM to TAB.  In June 2012, Plaut bought a controlling stake in TAB from TAB's owners pursuant to an agreement that called for Plaut to purchase newly issued TAB stock and assume all TAB's outstanding liabilities.  After that transaction, Plaut controlled all aspects of WWM and TAB.

27.     TAB and WWM entered into a "technology agreement" in January 2011 (the "Technology Agreement").  The Technology Agreement does not contain any price terms.  The Technology Agreement is the only contract between WWM and TAB.

28.     Even though they were nominally separate companies, there was little functional difference between WWM and TAB and they operated as a common enterprise.  For example:

   a.  the two entities shared the same office in Woodcliff Lake, New Jersey;

   b.  all TAB personnel performed work for the benefit of WWM;

   c.  TAB and WWM shared technology resources, including software development and IT resources and the use of the same servers located in a facility in New Jersey;

   d.  most TAB employees had an "@tabnetworks.com" email address as well as an "@worldwidemarkets.com" email address;

   e.  many of the individuals featured as the management team in WWM's marketing materials received their paychecks from TAB;

   f.  to the extent WWM created financial accounting records, those records reflected financial information purportedly related to TAB;

   g.  although WWM and TAB maintained separate bank accounts, as described below, WWM transferred money to TAB's account on a regular basis;

   h.  TAB used money it received from the WWM bank accounts to pay operating expenses associated with WWM's forex dealer business, such as employee salaries and vendor invoices, and also to make cash payments to Plaut;

29.    WWM was TAB's only customer, but TAB never created any invoices describing services provided to WWM or amounts owed by WWM pursuant to the Technology Agreement.

30.    TAB's computer servers, which it shared with WWM, were located in Secaucus, New Jersey.

31.    WWM structured its off-shore registration and affiliation with TAB to create, in the words of TAB's Chief Legal Officer, a "regulatory wall" for the purpose of attempting to avoid Regulations that apply to RFEDs.  WWM sought to avoid the requirement to maintain at least $20,000,000 in adjusted net capital because WWM did not have $20,000,000.

32.    Despite its organization, WWM never maintained an office in or conducted any business activities from the BVI.  Consistent with its strategy of regulatory avoidance, however, WWM listed only a BVI address as its office location in marketing materials and other public-facing sources of information, such as the WWM website.

33.    The BVI address WWM represented as its office location was actually the address of WWM's registered agent.  WWM's registered agent did not conduct any business activities for WWM although it may have from time to time received WWM's mail, which it would then forward to WWM in New Jersey.

34.    In addition to its Woodcliff Lake, New Jersey headquarters, WWM maintained a satellite office in Dubai that was staffed with between two and four WWM employees whose duties focused on interacting with introducing brokers ("IBs").

35.    WWM did not maintain levels of adjusted net capital required of RFEDs.

36.    WWM did not hold assets equal to its retail forex obligation in segregated accounts located in the United States or money center country.

**WorldWideMarkets' Business Model and Operations**

37.     WWM's primary line of business involved offering to be and acting as the counterparty to leveraged retail forex transactions.  WWM offered other financial products, such as "contracts for difference," but those other products accounted for only a minor portion of WWM's revenues.

38.     WWM's first customer trade was executed on May 9, 2011.  During the Relevant Period, WWM had over 14,000 retail forex customers.

39.     WWM executed trades only on a principal basis.  Accordingly, when a customer purchased $1,000,000 notional value of a particular foreign currency pair, the customer would have long exposure and WWM would have equivalent short exposure.

40.     Pursuant to the Technology Agreement, TAB maintained a public-facing website that included information about WWM's management, WWM's regulatory licenses and compliance (including fraudulent statements about the segregation of customer funds, as described below), and the benefits of trading with WWM.

41.     To open an account, a prospective customer was required to complete a customer account agreement, made available on the WWM website, and submit it to WWM electronically. The WWM customer account agreement described the terms on which WWM dealt with its forex customers.  All WWM customers agreed to the terms of the WWM customer account agreement.  There were no material changes to the WWM customer account agreement during the Relevant Period.

42.     Customers would download a "front-end" software application—which is also called a trading platform—from the WWM website and install it on their own computers or mobile devices.  The WWM trading platform allowed customers to view prices disseminated by

WWM, submit orders to WWM, and receive trade confirmations back from WWM following executed transactions.

43.     WWM continuously disseminated prices on various forex pairs from its servers in New Jersey to its customers around the world.  WWM called this "streaming" prices.  WWM determined its pricing based on reference prices disseminated by competitors and data vendors.

44.     If a customer wished to trade, the customer sent an electronic order to buy or sell a particular forex pair at a particular price that WWM streamed, for a particular notional value (i.e., $10,000 worth of a forex pair) to WWM's server in New Jersey.

45.     When WWM received customer orders in New Jersey, it automatically evaluated the order to determine whether the price term was close to WWM's current price feed.  If the customer order's price term was sufficiently close to WWM's current price feed, WWM would then execute the customer trade in New Jersey and send an electronic trade confirmation back to the customer.

46.     WWM solicited customers through two main channels:  IBs and web-based marketing.  The majority of WWM's forex customers were introduced to WWM by IBs.

47.     IBs that introduced customers to WWM were located around the world, but primarily in the Middle East and in China.  Similarly, WWM's customers were located around the world, but primarily in the Middle East and China.

48.     RFEDs generate revenue by capturing the "spread" on customer trades.  In financial markets, the spread means the difference between the bid and ask prices.  A bid price is the price at which a buyer is willing to buy.  An ask price is the price at which a seller is willing to sell.  In the forex markets, the width of the spread is measured in hundredths of percentage points (one one-hundredth of a percentage point is also called a basis point, known in the forex

industry as a "pip").  RFEDs attempt to capture the spread by continuously buying any particular forex pair at the bid price and selling any particular forex pair at the ask price.

49.     WWM's largest source of revenue was spread revenue.  WWM categorized its spread revenue as trading profit-and-loss ("PnL").  Because WWM did not attempt to maintain a market-neutral book by engaging in hedging activity, its trading PnL included both spread revenue and also actual profits and losses it sustained in connection with its customers' trading activity.

50.     WWM was never a profitable company.  According to its accounting records, WWM's expenses exceeded its revenue during the 2012–2016 time period by more than $7 million.

51.     Because WWM was not a financially successful company and did not generate sufficient revenue to pay its operating expenses, WWM misappropriated its customers' money to continue to operate.  As described in greater detail below, beginning no later than March 2012, every month (usually multiple times per month) WWM transferred customer funds from WWM's bank accounts abroad to TAB's bank account in the United States.  TAB then used WWM's customer funds to pay vendor invoices and employee salaries and benefits, and to make cash distributions to Plaut.

**WWM and TAB Bank Accounts and Financial Accounting**

52.     TAB maintained at least one bank account with a United States bank for the entire Relevant Period.

53.     WWM maintained at least five different bank accounts for varying time periods during the Relevant Period; these were located in the Cayman Islands, BVI, Mauritius, and Jersey.

54.     To fund their accounts, WWM's forex customers transferred money to one or more of the WWM bank accounts.  WWM customers did not transfer money to the TAB bank account.

55.     WWM's bank accounts had no substantial sources of funds other than WWM customer deposits.  Withdrawals from WWM's bank accounts were substantially composed of (i) transfers to TAB's bank account and (ii) customer withdrawals.

56.     Between the start of the Relevant Period and December 2012, two sources of funds accounted for primarily all deposits into TAB's bank account:  (i) capital contributions from TAB shareholders and (ii) transfers from WWM's bank accounts.

57.     After December 2012, substantially all deposits into TAB's bank account were composed only of transfers from WWM's bank accounts.

58.     Withdrawals from TAB's bank account during the Relevant Period were composed substantially of (i) payments associated with TAB's and WWM's operating expenses, (ii) TAB employee payroll and benefits, and (iii) cash distributions to TAB shareholders, primarily to Plaut.

59.     Annual financial audits were required by the BVI FSC.  WWM underwent a certified financial audit by an external accounting firm in 2015.  WWM's auditors created an audit report in connection with the 2015 audit, which states in part:

> During the period January 1, 2012 through December 31, 2015, [WWM] made net advances to [TAB] in excess of payments of management fees and direct expense reimbursements totaling $3,613,627.  As of December 31, 2015, [WWM] is owed $3,937,889 by [TAB] which comprises due from [TAB] . . . .

60.     Dembro was the auditors' point of contact at WWM and drafted key portions of the 2015 audit report.  The 2015 audit report was not completed until at least January 2017, and

Dembro continued to provide substantive feedback on draft reports until the document was finalized.

61.     Despite WWM's systematic misappropriation of customer funds, described in greater detail below, the 2015 audit report does not disclose that the source of funds used to make the referenced "net advances" to TAB was WWM's customer funds.

**In 2017, WorldWideMarkets Stopped Paying Customer Withdrawal Requests and Ultimately Went Out of Business**

62.     When WWM customers wished to withdraw money from their accounts, they submitted a withdrawal form via the company's website.  WWM/TAB personnel received the withdrawal request at a dedicated email inbox.  WWM/TAB processed customer withdrawals in the manner the customer deposited funds.  For example, if a customer deposited funds with a credit card, withdrawn funds would be sent back to the same credit card account.

63.     At numerous times throughout WWM's existence, including as early as 2015, WWM/TAB failed to process customer withdrawal requests in a timely manner due to insufficient cash balances in the WWM bank accounts.

64.     In approximately April 2017, WWM/TAB's Chief Operating Officer directed a WWM/TAB employee to stop processing withdrawal requests.

65.     Plaut was aware that WWM was not honoring all customer withdrawal requests.

66.     In June 2017, most of WWM/TAB's employees were laid off with the exception of some staff who were necessary to keep the business operational.  Some WWM/TAB employees, such as Dembro and the Chief Operating Officer, continued to perform tasks related to business continuity and continued to receive regular payments from TAB after June 2017 in return for the work they performed on WWM/TAB's behalf.

67.     After approximately April 2017, WWM received numerous customer complaints asking why they were unable to withdraw their money from their WWM accounts.  WWM/TAB did not respond truthfully to these complaints, in an effort to conceal the fraud and misappropriation.

68.     Although it had laid off most of its staff and was not honoring customer withdrawal requests, WWM continued to accept new customer accounts and deposits and continued to operate its trading platform between June 2017 and approximately September 2018.

69.     At some point after September 2018, WWM stopped paying invoices from the company that hosted its servers.  Without its servers, WWM was not able to continue business operations.

70.     As of March 25, 2018, at least 1,300 WWM retail forex customers had an account balance of at least $100.  And as of that date, the aggregate account equity of those 1,300 customers exceeded $3.3 million.

71.     WWM and TAB never attempted to properly wind down their failed retail forex business and did not file for bankruptcy.

**WorldWideMarkets' United Kingdom Affiliate**

72.     In 2014, WWM created an affiliate in the United Kingdom named WorldWideMarkets Online Trading ("WWMOT").  WWMOT was registered with the United Kingdom's Financial Conduct Authority ("FCA").  Plaut owned and controlled WWMOT. Dembro was the "compliance officer" for and a board member of WWMOT.  The staff and management of WWMOT was composed only of WWM/TAB personnel.  WWMOT's only business was to enter into forex transactions with retail customers.  WWMOT was much smaller than WWM and only had, at most, 20 customers.

73.    From mid-June 2017 (when WWM's last bank account closed) through the date WWM stopped operating, WWM used WWMOT's bank account, which was located in the United Kingdom.  Consistent with WWM and TAB's practice, after mid-June, 2017 the only substantial source of deposits into TAB's bank account were transfers from WWMOT's bank account.  And after mid-June, 2017, WWM customer deposits accounted for over 99 percent of the deposits into the WWMOT bank account.

74.    WWMOT wound down its operations in early 2018.  As part of the WWMOT wind-down, WWMOT closed its customers' accounts and transferred their account balances back to them.  To complete the wind-down and transfer of WWMOT customer balances back to WWMOT customers, WWMOT used money that had been misappropriated from WWM customers.

75.    As WWMOT's compliance officer, Dembro directed the WWMOT wind-down and knew, or was reckless in not knowing, that WWMOT used money that had been misappropriated from WWM customers to make WWMOT's customers whole.

**WWM Falsely Represented That Customer Funds Would Be Held Safely in Segregated Accounts**

76.    WWM represented at all times during the Relevant Period to both IBs and customers that customer funds were held safely in segregated bank accounts.  These statements were made to every single customer that opened a forex trading account with WWM and appeared in numerous locations, including:

   a.  WWM's customer account agreement:  "We will hold Customer funds on the Customer's behalf in a regulated bank account.  This account will be segregated from [WWM's] money and assets, in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines";

   b.  WWM's public-facing website:  "[WWM] is licensed with and regulated by the British Virgin Islands Financial Services Commission ('BVI FSC') . . . . The

16

regulations of the BVI FSC require that customer assets are identified, accounted for, and appropriately segregated";

c.   a marketing presentation used by WWM to recruit IBs:  WWM "ensure[d] the highest level of security for its customers' funds" and represented that WWM was a "[f]ully regulated firm and highly accountable management mean[t] safety of funds";

d.   oral representations by Plaut to WWM employees, IBs, and prospective customers that WWM held customer funds in segregated bank accounts.

77.   It was material to IBs and WWM's retail forex customers that customer funds be held safely in segregated accounts.

78.   WWM, Plaut, and Dembro all knew that the safety of customer funds and segregation of customer assets were material concerns for IBs and retail forex customers.

79.   WWM, Plaut, and Dembro all knew or were reckless in not knowing that WWM was representing to customers that WWM held customer funds safely in segregated accounts.

80.   From no later than March 2012 onward, WWM did not hold its retail forex customers' assets in segregated accounts.

81.   WWM, Plaut, and Dembro knew that WWM did not hold its retail forex customers' assets in segregated accounts from no later than March 2012 onward.

82.   When WWM was creating promotional materials to disseminate to customers and prospective customers, WWM sales personnel asked Dembro to provide information concerning the safety of customer funds and the use by WWM of segregated accounts to hold customer assets.

83.   In a response email, Dembro directed his colleagues to use specific language concerning WWM's handling of customer assets:

As a British protectorate BVI's customer protection and safety of funds rules are modeled after UK FSA [sic] rules. Specifically customer assets must be kept in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank, and disclosed to the bank as customer funds.

17

84.     The information in Dembro's email was intended to be and was incorporated into WWM's promotional materials.

85.     Even if WWM attempted to hold customer funds in segregated accounts in the company's early days, Dembro was aware no later than March 2012 that WWM did not keep customer assets "in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank" and did not take any steps to correct his previous statement or correct WWM's promotional materials (including FAQ documents and the WWM website) so they would not contain false statements.

**WWM and TAB Misappropriated Customer Funds**

86.     According to an internal accounting guide prepared by Dembro, WWM referred to customer assets as "restricted" cash.

87.     As an RFED, WWM's largest and most important source of revenue was revenue that it generated from customer trading, including spread revenue.  For example, if a customer lost $4 on a forex trade, that customer's loss would be WWM's revenue gain because WWM was the counterparty to all customer trades.  If WWM had followed the methodology reflected in Dembro's internal accounting guide, referenced above, WWM could then potentially treat that hypothetical $4 in revenue as "unrestricted" cash to which it was rightfully entitled.

88.     Critically, WWM did not attempt to limit the amounts it transferred to TAB to "unrestricted" cash.  Put differently, although Dembro was aware of this problem and brought it to Plaut's attention, WWM did not implement effective controls to avoid transferring its customers' money to TAB.

89.     TAB used the restricted customer funds it received from WWM to pay the companies' operating expenses (including employee salaries and benefits) and also to make cash

distributions to Plaut.  At a minimum, WWM transferred $4.7 million worth of restricted customer cash to TAB during the Relevant Period.

90.     Dembro was aware that restricted customer funds were being transferred from WWM to TAB because he was the companies' CFO and was aware of all aspects of the companies' financial dealings.

91.     Plaut was aware that restricted customer funds were being transferred from WWM to TAB because Dembro alerted Plaut to that fact as it was happening.

92.     By operating in this Ponzi-like manner, WWM was able to conceal its fraud from its customers (and regulators) as long as it continued to receive enough new deposits from customers that it could misappropriate to use to cover its expenses and any customer withdrawal requests.

### VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND COMMISSION REGULATIONS

**COUNT I**
**Fraudulent Misrepresentation and Misappropriation of Customer Assets**
**in Connection with Retail Forex Transactions**
**Violations of Section 4b of the Act and Commission Regulation 5.2,**
**7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b) (2021).**
**(Against WWM, TAB, Plaut, and Dembro)**

93.     The allegations in paragraphs 1–92 are re-alleged and incorporated as if fully set forth herein.

94.     During the Relevant Period, pursuant to 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b) it was unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction: to cheat or defraud or attempt to cheat or defraud any person or willfully to deceive or attempt to deceive any person by any means whatsoever.

95.     For substantially the entire Relevant Period, WWM, by and through its employees and agents, falsely represented to IBs and prospective IBs, and to retail forex customers and prospective retail forex customers, that WWM held customer assets safely in segregated bank accounts.  In fact, WWM commingled its customers' property with its and its affiliate TAB's operating accounts.  WWM's misrepresentation concerning its use of segregated accounts to hold customer assets violated 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).

96.     For substantially the entire Relevant Period, by and through its employees and agents, WWM misappropriated its customers' assets by transferring to TAB funds that exceeded revenue earned by WWM and that WWM was not permitted to use for any purpose.  WWM's misappropriation of customer assets violated 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).

97.     At all times during the Relevant Period, Defendant Plaut directly or indirectly controlled WWM and did not act in good faith or knowingly induced, directly or indirectly, WWM's fraudulent misrepresentations and misappropriation of customer assets in violation of 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Plaut is therefore liable for WWM's violation of 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).

98.     During the Relevant Period, WWM and TAB acted as a common enterprise. TAB is therefore jointly and severally liable for WWM's violations of 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).

99.     During the Relevant Period, Dembro willfully aided, abetted, counseled, commanded, induced, or procured WWM's fraudulent misrepresentation and misappropriation of customer assets in violation of 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b) or acted in combination or concert with WWM in its fraudulent misrepresentation and misappropriation of

20

customer assets in violation of 7 U.S.C. § 6b(a)(2) and 17 C.F.R. § 5.2(b).  Pursuant to Section

13(a) of the Act, 7 U.S.C. § 13c(a), Dembro is therefore liable for WWM's fraudulent

misrepresentation and misappropriation of customer assets in violation of 7 U.S.C. § 6b(a)(2)

and 17 C.F.R. § 5.2(b).

### COUNT II
### Use of Manipulative or Deceptive Scheme to Defraud
### Violation of Section 6(c) of the Act and Commission Regulation 180.1,
### 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) (2021).
### (Against WWM, TAB, Plaut, and Dembro)

100.    The allegations in paragraphs 1–92 are re-alleged and incorporated as if fully set

forth herein.

101.    During the Relevant Period, pursuant to 7 U.S.C. § 9(1) and 17 C.F.R.

§ 180.1(a)(1),[3] it was unlawful for any person, by use of the mails or by any means or

instrumentality of interstate commerce, directly or indirectly, in or in connection with any swap,

or contract of sale of any commodity in interstate commerce, or contract for future delivery on or

subject to the rules of any registered entity, to intentionally or recklessly use or employ, or

attempt to use or employ, any manipulative device, scheme, or artifice to defraud.

102.    For substantially the entire Relevant Period, WWM, by and through its employees

and agents, engaged in a scheme to deceive its customers by making fraudulent

misrepresentations and systematically misappropriating customer assets, as described above, in

violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).

103.    At all times during the Relevant Period, Defendant Plaut directly or indirectly

controlled WWM and did not act in good faith or knowingly induced, directly or indirectly,

WWM's deceptive scheme in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).  Pursuant

---

[3] 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) apply to retail forex transactions.  *See* 7 U.S.C. § 2(c)(2)(C)(ii)(I); 17 C.F.R. § 5.25 (2021).

to 7 U.S.C. § 13c(b), Plaut is therefore liable for WWM's violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).

104.    During the Relevant Period, WWM and TAB acted as a common enterprise. TAB is therefore jointly and severally liable for WWM's violations of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).

105.    During the Relevant Period, Dembro willfully aided, abetted, counseled, commanded, induced, or procured WWM's deceptive scheme in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1) or acted in combination or concert with WWM in its deceptive scheme in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).  Pursuant to 7 U.S.C. § 13c(a), Dembro is therefore liable for WWM's deceptive scheme in violation of 7 U.S.C. § 9(1) and 17 C.F.R. § 180.1(a)(1).

### COUNT III
### Failure to Register as a Retail Forex Dealer
### Violation of Section 2(c)(2)(C)(iii)(I)(aa) of the Act, 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa), and Commission Regulation 5.3(a)(6), 17 C.F.R. § 5.3(a)(6) (2021)
### (Against WWM and Plaut)

106.    The allegations in paragraphs 1–92 are re-alleged and incorporated as if fully set forth herein.

107.    During the Relevant Period, Defendant WWM solicited or accepted orders for retail forex transactions and offered to be the counterparty to leveraged retail forex transactions from its Woodcliff Lake, New Jersey headquarters.  All forex transactions between WWM and its retail customers occurred in New Jersey.

108.    WWM did not register with the Commission as an RFED at any time during the Relevant Period, although it was required to do so.  Accordingly, WWM violated 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6).

109.     At all times during the Relevant Period, Defendant Plaut directly or indirectly controlled WWM and did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting WWM's violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6).  Pursuant to 7 U.S.C. § 13c(b), Plaut is therefore liable for WWM's violations of 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6).

**COUNT IV**
**Failure to Maintain Sufficient Adjusted Net Capital**
**Violation of Commission Regulation 5.7, 17 C.F.R. § 5.7(a)(1)(i) (2021)**
**(Against WWM and Plaut)**

110.     The allegations in paragraphs 1–92 are re-alleged and incorporated as if fully set forth herein.

111.     During the Relevant Period, RFEDs were required to maintain adjusted net capital of at least $20,000,000 pursuant to 17 C.F.R. § 5.7(a)(1)(i).

112.     WWM did not maintain adjusted net capital of at least $20,000,000 at any time during the Relevant Period.  Accordingly, WWM violated 17 C.F.R. § 5.7(a)(1)(i).

113.     At all times during the Relevant Period, Defendant Plaut directly or indirectly controlled WWM and did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting WWM's violations of 17 C.F.R. § 5.7(a)(1)(i).  Pursuant to 7 U.S.C. § 13c(b), Plaut is therefore liable for WWM's violation of 17 C.F.R. § 5.7(a)(1)(i).

**COUNT V**
**Failure to Hold Sufficient Assets in Segregated Accounts**
**Violation of Commission Regulation 5.8, 17 C.F.R. § 5.8(a) (2021)**
**(Against WWM and Plaut)**

114.     The allegations in paragraphs 1–92 are re-alleged and incorporated as if fully set forth herein.

115.     During the Relevant Period, pursuant to 17 C.F.R. § 5.8(a), RFEDs were required to hold certain kinds of assets equal to or in excess of their total retail forex obligation at a financial institution in the United States or money center country.  WWM did not hold assets equal to or in excess of its retail forex obligation at a financial institution in the United States or money center country and therefore violated 17 C.F.R. § 5.8(a).

116.     At all times during the Relevant Period, Defendant Plaut directly or indirectly controlled WWM and did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting WWM's violations of 17 C.F.R. § 5.8(a).  Pursuant to 7 U.S.C. § 13c(b), Plaut is therefore liable for WWM's violation of 17 C.F.R. § 5.8(a).

### VII.    RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1, and pursuant to its own equitable powers:

A.     Find that Defendants WorldWideMarkets, Ltd. and Thomas Plaut violated Sections 2(c)(2)(C), 4b(a)(2), and 6(c) of the Act, 7 U.S.C. §§ 2(c)(2)(C), 6b(a)(2), and 9, and Regulations 5.2, 5.3, 5.7, 5.8, and 180.1, 17 C.F.R. §§ 5.2, 5.3, 5.7, 5.8, 180.1 (2021).

B.     Find that Defendants Arthur Dembro and TAB Networks, Inc. violated 7 U.S.C. §§ 6b(a)(2) and 9(1) and 17 C.F.R. §§ 5.2(b) and 180.1.

C.     Enter an order of permanent injunction enjoining Defendants WWM and Plaut, and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 2(c)(2)(C), 6b(a)(2), and 9, and 17 C.F.R. §§ 5.2, 5.3, 5.7, 5.8, and 180.1.

D.     Enter an order of permanent injunction enjoining Defendants TAB and Dembro,

and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, who receive actual notice of such order by personal service or otherwise, from engaging in the conduct described above, in violation of 7 U.S.C. §§ 6b(a)(2) and 9 and 17 C.F.R. §§ 5.2 and 180.1.

      E.      Enter an order of permanent injunction restraining and enjoining Defendants WWM, TAB, Plaut, and Dembro and their affiliates, agents, servants, employees, successors, assigns, attorneys, and all persons in active concert with them, from directly or indirectly:

1)   Trading on or subject to the rules of any registered entity (as that term is defined by Section 1a(40) of the Act, 7 U.S.C. § 1a(40));

2)   Entering into any transactions involving "commodity interests" (as that term is defined in Regulation 1.3, 17 C.F.R. § 1.3 (2021)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

3)   Having any commodity interests traded on any Defendant's behalf;

4)   Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)   Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling of any commodity interests;

6)   Applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2021); and

7) Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2021)), agent, or any other officer or employee of any person registered, exempted from registration, or required to be registered with the CFTC except as provided for in 17 C.F.R. § 4.14(a)(9).

F.   Enter an order directing Defendants WWM, TAB, Plaut, and Dembro, as well as any third-party transferee and/or successors thereof, to disgorge, pursuant to such procedure as the Court may order, all benefits received including, but not limited to, salaries, commissions, loans, fees, revenues, and trading profits derived, directly or indirectly, from acts or practices which constitute violations of the Act and Regulations as described herein, including pre-judgment and post-judgment interest;

G.   Enter an order requiring Defendants WWM, TAB, Plaut, and Dembro, as well as any successors thereof, to make full restitution to every person who has sustained losses proximately caused by the violations described herein, including pre-judgment and post-judgment interest;

H.   Enter an order directing Defendants WWM, TAB, Plaut, and Dembro to pay civil monetary penalties assessed by the Court, in amounts not to exceed the penalty prescribed by Section 6c(d)(1) of the Act, 7 U.S.C. § 13a-1(d)(1), as adjusted for inflation pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, Pub. L. 114-74, tit. VII, § 701, 129 Stat. 584, 599–600, *see* Regulation 143.8, 17 C.F.R. § 143.8 (2021), for each violation of the Act and Regulations, as described herein;

I.   Enter an order requiring Defendants Plaut and Dembro to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2413(a)(2); and

J.   Enter an order providing such other and further relief as this Court may deem

necessary and appropriate under the circumstances.


Dated:  December 27, 2021.                    Respectfully Submitted,

                                              **COMMODITY FUTURES TRADING
                                              COMMISSION**

                                              By: */s/*
                                              Joseph C. Platt
                                              Trial Attorney
                                              jplatt@cftc.gov

                                              Joseph Konizeski
                                              Chief Trial Attorney
                                              jkonizeski@cftc.gov

                                              Scott R. Williamson
                                              Deputy Regional Counsel
                                              swilliamson@cftc.gov

                                              Commodity Futures Trading Commission
                                              525 West Monroe Street
                                              Suite 1100
                                              Chicago, IL  60661
                                              Tel: (312) 596-0700
                                              Fax: (312) 596-0714

                                              *Attorneys for Plaintiff Commodity Futures
                                              Trading Commission*