**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,**<br><br> **Plaintiff,**<br><br> **v.**<br><br> **WORLDWIDEMARKETS, LTD; TAB NETWORKS, INC; THOMAS PLAUT; and ARTHUR DEMBRO,**<br><br> **Defendants.** | Civ. No. 21-20715 (KM) (LDW)<br><br>**OPINION** |

<u>**KEVIN MCNULTY, U.S.D.J.:**</u>

Plaintiff Commodity Futures Trading Commission ("Commission") brings the instant action against Defendants WorldWideMarkets, Ltd. ("WWM"), TAB Networks, Inc. ("TAB"), Thomas Plaut ("Plaut"), and Arthur Dembro ("Dembro") (together, the "Defendants") seeking civil penalties, injunctive, and other equitable relief, for violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 1 *et seq.*, and its implementing regulations.

Now before the Court is Dembro's motion (DE 24) to dismiss the Complaint (DE 1) for failure to state a claim pursuant to Fed. R. Civ. P.12(b)(6),[1] in which WWM, Plaut, and TAB join. (*See* DE 28, 29.) For the

---

[1]     Certain citations to record are abbreviated as follows:

"DE" = Docket entry number in this case

"Compl." = The Commission's Complaint (DE 1)

"Mot." = Dembro's Memorandum in Support of Motion to Strike and Dismiss (DE 24-1)

"Opp." = The Commission's Opposition to Dembro's Motion to Strike or Dismiss (DE 30)

"Reply" = Dembro's Reply in Support of Motion to Strike and Dismiss (DE 33)

reasons stated herein, Dembro's motion is **GRANTED** in part and **DENIED** in part.[2]

## I. SUMMARY

### A. Factual Allegations

This action concerns an allegedly fraudulent scheme perpetrated by the Defendants, using WWM as a vehicle to defraud thousands of its customers. The Commission alleges that WWM and TAB, at the direction of Plaut and with the substantial assistance of Dembro, (1) misappropriated over $4 million in WWM customer funds and (2) falsely misrepresented to WWM customers that their funds would be held in segregated accounts.

#### 1. Organization of WWM and TAB

Between May 2011 through at least September 2018 (the "Relevant Period"), WWM, a British Virgin Islands ("BVI") entity owned by TAB, operated as a retail foreign exchange ("forex") dealer[3] in Woodcliff Lake, New Jersey. (Compl. ¶¶ 1, 13, 37.) Specifically, WWM served as the counterparty to leveraged forex transactions with retail customers. (*Id.* ¶ 37.) WWM executed these transactions on a principal basis, meaning that WWM was the buyer for all customer sales and the seller for all customer purchases. (*Id.* ¶ 39; *see also* Opp. at 4.)

The Commission alleges that Plaut, as owner and CEO of WWM and TAB, "controlled all aspects of [the companies'] business activities." (Compl. at ¶¶ 1, 15, 26.) Dembro served as CFO of WWM and TAB, in which capacity he allegedly (1) "performed accounting and financial reporting functions for the

---

[2]   Also pending before the Court are two unopposed motions to vacate entry of default filed by (1) WWM and Plaut (DE 26) and (2) TAB (DE 27), which will be granted, as will the request of WWM, Plaut, and TAB to join in Dembro's motion to dismiss.

Dembro originally moved to strike the Complaint pursuant to Fed. R. Civ. P. 11, rejecting the Commission's assertion that ECF credentials were sufficient as a signature under L.R. 5.2(12)(a). (Mot. at 10-11; *see also* DE 28 at 1; DE 29 at 1.) Dembro has since withdrawn that motion to strike.

[3]   A "retail forex exchange dealer" is defined as "any person that is, or that offers to be a, the counter party to a retail forex transaction." 17 C.F.R. § 5.1(h)(1).

companies" and (2) was "aware of all aspects of the companies' financial dealings." (*Id.* ¶¶ 6, 16, 90.)

In January 2011, WWM entered into a technology agreement (the "Technology Agreement") with its corporate parent, TAB. (*Id.* ¶ 27.) Pursuant to that Technology Agreement, TAB maintained a public-facing website that included information about WWM's management, regulatory licenses and compliance, and the purported benefits of trading with WWM. (*Id.* ¶ 40.) The Commission alleges that although WWM and TAB were nominally separate companies, there was minimal functional difference between them, and they operated as a common enterprise. (*Id.* ¶ 28.) For example:

- WWM and TAB shared an office in Woodcliff Lake, New Jersey;
- TAB employees performed work for WWM's benefit;
- WWM and TAB shared technology resources, such as the same server (located in New Jersey) and software development and IT resources;
- most TAB employees had both "@tabnetworks.com" and "@worldwidemarkets.com" email addresses;
- many individuals on WWM's management team received paychecks from TAB;
- WWM financial accounting records reflected financial information related to TAB;
- WWM routinely transferred funds to TAB's bank account, despite the two companies maintaining separate accounts;
- TAB used funds from WWM bank accounts to pay its operating expenses, employee salaries, vendor invoices, and cash payments to Plaut.

(*Id.*)

### 2. WWM's Business Model and Operations

To open an account with WWM, a prospective customer was required to (1) complete a customer account agreement (the "Account Agreement") from WWM's website and (2) submit it electronically to WWM. (*Id.* ¶ 41.) The Account Agreement specified the terms between WWM and its customers; and according to the Complaint, did not materially change during the Relevant Period. (*Id.*)

3

Once successful in opening an account, customers downloaded WWM's "front-end" software application—*i.e.*, trading platform—from WWM's website and installed it on either their computer or a mobile device. (*Id.* at ¶ 42.) WWM's trading platform allowed customers to view prices circulated by WWM from its New Jersey-based servers, submit orders to WWM, and receive trade confirmations from WWM after the transactions were executed. (*Id.* at 42, 43.) If a customer wanted to consummate a trade, the customer sent an electronic order to WWM's servers, located in New Jersey (*Id.* ¶ 44); if the price term of the customer's order was sufficiently close to WWM's current pricing, WWM executed the trade in New Jersey and sent an electronic trade confirmation back to the customer. (*Id.* ¶ 45.)

### 3. WWM's Alleged Misappropriation of Customer Funds

WWM's primary source of revenue was "spread" revenue. (*Id.* ¶ 49.)[4] Although WWM categorized this spread revenue as trading profit-and-loss ("PnL"), it did not maintain a market-neutral book by engaging in hedging activity; consequently, WWM's PnL included both spread revenue and actual profits and losses related to its customers' trading activity. (*Id.*) The Commission claims that WWM was never profitable, and that from 2012 through 2016, WWM's expenses exceeded its revenues by over $7 million. (*Id.* ¶ 50.) In April 2017, WWM stopped allowing customers to withdraw funds from their accounts. (*Id.* ¶¶ 4, 64, 67.)

According to the Commission, WWM misappropriated customer funds to pay for its operating expenses. During the Relevant Period, WWM purportedly maintained at least five foreign bank accounts located in the Cayman Islands, BVI, Mauritius, and Jersey. (*Id.* at ¶ 53.) To fund their customer accounts, WWM customers transferred money to one or more of these foreign accounts. (*Id.* ¶ 54.) The Complaint alleges that every month, beginning in March 2012,

---

[4]     The "spread" generally refers "to the difference between two prices, rates, or yield." Relevant to this Opinion, the "bid-ask spread" refers "to the gap between the bid (from buyers) and the ask (from sellers) prices" of a security or asset, such as a stock, bond, or commodity. https://www.investopedia.com/terms/s/spread.asp

WWM transferred customer funds from its foreign bank accounts to TAB's bank account located in the United States.[5] Between the start of the Relevant Period and December 2012, deposits into TAB's bank account consisted primarily of (1) capital contributions from TAB shareholders and (2) transfers from WWM. (*Id.* ¶ 56.) After December 2012, however, the Commission alleges that "substantially all deposits into TAB's bank account were composed … of transfers from WWM's bank accounts." (*Id.* ¶ 57.)

In 2015, pursuant to a mandate by the BVI Financial Services Commission ("FSC"), WWM hired an external accounting firm to perform a certified financial audit (the "2015 Audit"). (*Id.* ¶ 59.)[6] While the 2015 Audit stated that from January 1, 2012 through December 21, 2015, WWM made over $3 million in "net advances to TAB," the audit allegedly did not disclose that these "net advances" were made up of WWM *customer* funds. (*Id.* ¶¶ 59, 61.) Dembro purportedly served as WWM's point of contact for the external auditor and drafted key portions of the allegedly misleading 2015 Audit. (*Id.* ¶ 60.)

Finally, in 2014, WWM created an affiliate in the United Kingdom named WorldWide Markets Online Trading ("WWMOT"), which was registered with the United Kingdom's Financial Conduct Authority ("FCA"). (*Id.* ¶ 72.) WWMOT's sole business was to execute forex transactions with retail customers—albeit on a smaller scale than WWM, having, at most, twenty customers. (*Id.*) Plaut owned and controlled WWMOT, while Dembro served as the "compliance officer" on the board. (*Id.*) The Commission claims that after June 2017, WWM customer deposits accounted for over 99% of deposits into WWMOT's bank account. (*Id.* ¶ 73.) Further, in connection with WWMOT "winding down" its

---

[5]     The Complaint asserts that TAB "maintained at least one bank account with a United States bank for the entire Relevant Period." *Id.* at ¶51.

[6]     The 2015 Audit was not completed, however, until at least January 2017. Id. at ¶ 60.

operations in early 2018, Dembro allegedly directed WWMOT's use of WWM customer funds to close out WWMOT customer accounts. (*Id.* ¶¶ 74-75.)

### 4. WWM's Alleged Misrepresentations to Customers

The Commission claims that "at all times during the Relevant Period," WWM represented to customers and introducing brokers ("IBs") that WWM customer funds were safely held in segregated bank accounts. (*Id.* ¶ 76.) These statements were made to every WWM customer who opened a forex trading account and appeared in several locations, including:

- WWM's Account Agreement: "We will hold Customer funds on the Customer's behalf in a regulated bank account. This account will be segregated from [WWM's] money and assets, in accordance with [BVI FSC] guidelines";

- WWM's website: "[WWM] is licensed with and regulated by the [BVI FSC] …. The regulations of the BVI FSC require that customer assets are identified, accounted for, and appropriately segregated";

- a WWM marketing presentation used to recruit IBs: WWM "ensure[d] the highest level of security for its customers' funds" and represented that WWM was a "[f]ully regulated firm and highly accountable management mean[t] safety of funds"; and

- oral representations by Plaut to WWM employees, IBs, and prospective customers that WWM held customer funds in segregated accounts.

(*Id.*) Moreover, WWM sales employees allegedly "asked Dembro to provide information concerning the safety of customer funds and the use … of segregated accounts to hold customer assets." (*Id.* ¶ 82.) In response, Dembro allegedly directed these employees to insert language into WWM promotional materials, stating that "customer assets must be kept in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank and disclosed to the bank as customer funds." (*Id.* ¶¶ 83-84.)

### B. Procedural Background

The Commission filed the Complaint (DE 1) against the Defendants on December 27, 2021. Because Plaut, WWM, and TAB (but not Dembro) failed to answer or otherwise respond to the Complaint, the Clerk entered default against those three parties on February 15, 2022.

On February 25, 2022, Dembro filed the motion to dismiss that is the subject of this Opinion (DE 24). Around two weeks later, on March 7, 2022, WWM, Plaut, and TAB filed motions (DE 26, 27) to vacate the Clerk's entry of default pursuant to Fed. R. Civ. P. 55(c), which were unopposed.[7] That same day, (1) WWM, Plaut and TAB also filed motions (DE 28, 29) to join in Dembro's motion to dismiss (DE 24) and (2) the Commission filed its opposition (DE 30) to the motion to dismiss. On March 21, 2022, Dembro filed his reply brief (DE 33). The motion to dismiss is thus fully briefed and ripe for decision.

## II.   STANDARD OF REVIEW

Federal Rule of Civil Procedure 8(a) does not require that a pleading contain detailed factual allegations but "more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The allegations must raise a claimant's right to relief above a speculative level, so that a claim is "plausible on its face." *Id.* at 570. That standard is met when "factual content [] allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Rule 12(b)(6) provides for the dismissal of a complaint if it fails to state a claim. The defendant bears the burden to show that no claim has been stated. *Davis v. Wells Fargo*, 824 F.3d 333, 349 (3d Cir. 2016). I accept facts in the complaint as true and draw reasonable inferences in the plaintiff's favor. *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (en banc).

## III.   DISCUSSION

### A. Timeliness

No specific statute of limitations governs civil suits brought by the Commission with respect to the CEA. Therefore, the parties agree that 28 U.S.C. § 2462 provides the relevant statute of limitations. Section 2462 states:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or

---

[7]   The Commission agreed that it would not oppose the motions to vacate entry of default, so long as WWM, Plaut, and TAB responded to the Complaint on or before March 11, 2022. *See* DE 26-1 at 2; DE 27-1 at 2.

forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

28 U.S.C. § 2462.

Defendants raise two timeliness arguments. (*See* Mot. at 19-23; DE 28 at 2; DE 29 at 1.) First, Defendants contend that Count II must be dismissed in part, to the extent it encompasses conduct occurring before August 15, 2011, the effective date of the relevant provisions, Section 6(c) of the CEA and 17 C.F.R. § 180.1. (Mot. at 19-21; *see also* Prohibition on the Employment or Attempted Employment of Manipulative and Deceptive Devices and Prohibition on Price Manipulation, 76 Fed. Reg. 41398 (July 14, 2011).) Because the Complaint's Relevant Period begins on May 2011, around four months prior to the Section 6(c) and Regulation 180.1 effective date, Defendants argue that Count II must be dismissed to the extent it attempts to reach conduct that occurred before August 15, 2011. (Mot. at 19-21.)

Defendants also argue that the Complaint should be dismissed as to *all conduct* before December 27, 2016, in light of Section 2462's five-year limitations period. (*See* Mot. at 21-23; DE 28 at 2; DE 29 at 1.) Because the Commission filed this action on December 27, 2021, Defendants contend, a claim based on any alleged conduct before December 27, 2016 is untimely. (Mot. at 21-23.)

The Commission's response is threefold. First, the Commission clarifies that it "does not intend to assert Count II … over conduct that occurred before [Rule 180.1(a)] was implemented in July 2011." (Opp. at 22 n. 12.) Second, because the Complaint alleges a Relevant Period running through at least September 2018, the Commission argues that a Rule 12(b)(6) dismissal is inappropriate, as any noncompliance with the limitations period is not apparent on the face of the Complaint. (Opp. at 22; *see also Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (finding that a motion to dismiss

may not raise the statute of limitations, an affirmative defense, if the bar "is not apparent on the face of the complaint").) Third, the Commission claims that is has plausibly alleged fraudulent concealment as to pre-December 27, 2016 conduct, thus tolling the statute of limitations. (Opp. at 20, 23-26.)[8]

### 1. Consideration of Limitations Defense at Pleading Stage

The Court will consider Defendants' limitations arguments at the pleading stage. While timeliness arguments are typically affirmative defenses, courts "may dismiss a complaint for failure to state a claim if the allegations in the complaint, taken as true, show that relief is barred by the applicable statute of limitations." *SEC v. Cohen*, 332 F. Supp. 3d 575, 587 (E.D.N.Y. 2018) (citing *Jones v. Bock*, 549, U.S. 199, 215 (2007)). Indeed, this principle is consistent with the longstanding rule in this Circuit that a party may assert a limitations defense on a motion to dismiss if "the time alleged in the statement of a claim shows that the cause of action has not been brought within the statute of limitations." *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002) (citing *Hanna v. U.S. Veterans' Admin. Hosp.*, 514 F.2d 1092, 1094 (3d Cir. 1975).)

### 2. Applicability of Section 2462 to Commission's Requested Relief

As previously established, Section 2462 applies only to actions to enforce "fine[s], penalt[ies], [and] forfeiture[s]." 28 U.S.C. § 2462. The Commission primarily seeks four forms of relief: (1) civil monetary penalties; (2) a permanent injunction enjoining the Defendants from violating the CEA and restraining Defendants from various trading activities; (3) disgorgement of "all benefits received … including pre-judgment and post-judgment interest"; and (4) full restitution. (Compl. ¶¶ 8-9.)

---

[8]     The Commission also submits that it "intends to conduct discovery concerning WWM's efforts to conceal its fraud, obfuscate the nature of its operations, and outright lie to its customers and regulators." DE 30 at 22.

Two Supreme Court decisions analyzing the intersection of Section 2462 and remedies requested in civil agency actions are particularly relevant to this matter.

On February 27, 2013, the Supreme Court held in *Gabelli v. SEC*, 568 U.S. 442 (2013), that the "discovery rule"[9] is inapplicable to SEC actions seeking *civil penalties*, also governed by Section 2462's limitations period. *Id.* at 454. Chief Justice Roberts provided three main reasons for not extending the discovery rule to "Government enforcement actions for civil penalties." First, the "discovery rule exists in part to preserve the claims of victims who do not know they are injured and who reasonably do not inquire as to any injury"; by comparison, a Government enforcement action is the product of the agency's duty to investigate potential violations of the law. Second, "the discovery rule helps to ensure that the injured receive recompense," whereas civil penalty actions are intended to punish. Third, "[d]etermining when the Government, as opposed to an individual, knew or reasonably should have known of a fraud presents particular challenges for the courts." *Id.* at 450-454.

Nonetheless, Justice Roberts "distinguished the discovery rule, which governs when a claim accrues," from doctrines like fraudulent concealment, which "toll the running of an applicable limitations period when the defendant takes steps beyond the challenged conduct itself to conceal the conduct from the plaintiff." *Id.* at 447 n.2 (emphasis added). Because the SEC disclaimed reliance on fraudulent concealment, and the Court did not directly address it, the door it remained an open question whether an agency could invoke tolling based on fraudulent concealment. *See id.*; *see also SEC. v. Wyly*, 950 F. Supp. 2d 547, 555 (S.D.N.Y. 2013).[10]

---

[9] Pursuant to the discovery rule, "the statute of limitations for a particular claim does not accrue until that claim is discovered, or could have been discovered with reasonable diligence, by the plaintiff." *Id.* at 447 (citing *SEC v. Gabelli*, 653 F.3d 49, 59 (2d Cir. 2011.)

[10] Although *Gabelli* was decided in the context of an SEC enforcement action, the Supreme Court's analysis was centered on the language of Section 2462. Consequently, at least one court has expressed that "[n]othing in *Gabelli* suggests that

Around four years later, on June 5, 2017, the Supreme Court held that "SEC disgorgement constitutes a penalty," bringing it within the scope of Section 2462's limitations period. *See Kokesh v. SEC,* 137 S. Ct. 1635, 1642, 1645 (2017). Justice Sonia Sotomayor defined a "penalty," for purposes of Section 2462, as a "punishment, whether corporal or pecuniary, imposed and enforced by the State, for a crime or offen[s]e against its laws." *Id.* at 1642. That definition of "penalty" was guided by two principles. First, "whether a sanction represents a penalty turns in part on 'whether the sought to be redressed is a wrong to the public, or a wrong to the individual.'" *Id.* Second, "a pecuniary sanction operates as a penalty only if it is sought 'for the purpose of punishment, and to deter others from offending in like manner'—as opposed to compensating a victim for his loss." *Id.* (quoting *Huntington v. Attrill*, 146 U.S. 657, 667 (1892)).

*Kokesh* provided three reasons to treat SEC disgorgement as a penalty. First, the Court observed that the SEC pursues disgorgement "as a consequence for violating ... public laws"—*i.e.*, offenses against the United States, as opposed to private individuals. *Id.* at 1643. Second, the SEC seeks disgorgement primarily "'to deter violations of the securities laws by depriving violators of their ill-gotten gains,'" a goal which the Court characterized as largely punitive. *Id.* (quoting *SEC v. Fischbach Corp*, 133 F.3d 170, 175 (2d Cir. 1997)); *see also id.* at 1643-44.) Third, "SEC disgorgement is [often] not compensatory," because some disgorged profits are paid to victims, while "other funds are disbursed to the United States Treasury." *Id.* at 1644. Accordingly, although SEC disgorgement sometimes "serves compensatory goals," the Court concluded that it is a penalty as it "'cannot be said to solely serve a remedial purpose.'" *Id.* at 1645 (quoting *Austin v. United States*, 509 U.S. 602, 610 (1993).)

---

[its] reasoning does not apply to ... the [Commission's] claims for civil penalties." *See CFTC v. Reisinger*, No. 11 C 8567, 2013 WL 3791691, at *7 (N.D. Ill. July 18, 2013).

The Court applies the principles from *Gabelli* and *Kokesh* to analyze Section 2462's applicability to the relief requested by the Commission here.

      *i.*   *Civil Monetary Penalties*

As previously stated, the Supreme Court in *Gabelli* did not directly decide whether an agency could invoke fraudulent concealment to toll Section 2462's statute of limitations for civil penalties. *Gabelli*, 568 U.S. 477 n. 2; *see also Wyly*, 950 F. Supp.2d at 555. Here, the Commission asks this Court to decide that question in the affirmative, asserting that it has sufficiently alleged fraudulent concealment for conduct occurring before December 27, 2016. (Opp. at 23-26.) In the Third Circuit, equitable tolling under the doctrine of fraudulent concealment requires three elements: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of his or her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to his or her lack of reasonable due diligence in attempting to uncover the relevant facts." *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006). Moreover, allegations of fraudulent concealment must "state with particularity the circumstances constituting fraud or mistake" under Fed. R. Civ. P. 9(b)'s heightened pleading standard for fraud. *See Byrnes v. DeBolt Transfer, Inc.*, 741 F.2d 620, 625 (3d Cir. 1994).

Assuming arguendo that the Commission has established the first two elements of fraudulent concealment, the Complaint lacks facts bearing on the Commission's due diligence in uncovering Defendants' alleged wrongdoing. Notably, the Commission does not allege when the Commission discovered the fraudulent scheme; nor does the Commission allege that it was ignorant of Defendants' alleged fraud up until five years or less before filing the Complaint. Finally, the Complaint is bereft of allegations suggesting that Commission acted diligently in filing the Complaint once it had notice of Defendants' alleged fraud.

The Court therefore finds that the Commission has not adequately pled fraudulent concealment, and Section 2462's five-year statute of limitations is

not tolled for the Commission's civil monetary penalty claim. However, this dismissal is without prejudice to a properly supported motion to amend the complaint to plead facts that would remedy the deficiencies identified here.

### ii. Injunctive Relief

On the other hand, Section 2462 does not bar the Commission's claims for injunctive relief based on conduct occurring before December 27, 2016. Under 7 U.S.C. § 13a-1, this Court has the authority to grant equitable relief including injunctive relief, restitution, and disgorgement. As to injunctive relief, 7 U.S.C. § 13a-1(b) provides that "[u]pon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond."

The Third Circuit recently held, with regard to SEC injunctive relief under 15 U.S.C. § 78u(d), that properly issued injunctions, valid as to scope, are not penalties subject to Section 2462's statute of limitations. *SEC v. Gentile*, 939 F.3d 549, 566 (3d Cir. 2019). The Court of Appeals rejected the *Gentile* petitioner's argument that *Kokesh*'s definition of "penalty" equally applied to the disputed SEC injunction: a "prohibiti[on] [on] future lawbreaking and participation in penny stock offerings." *Id.* at 554. In rejecting this argument, the Third Circuit noted that it was undisputed that the SEC's action was to enforce what *Kokesh* defined as "public laws." *Id.*; *see also Kokesh*, 137 S. Ct. at 1643. Thus, whether the SEC injunction constituted a penalty turned on whether the requested remedies were "imposed for punitive reasons." *Gentile*, 939 F. 3d at 554.

The Third Circuit provided three reasons why the disputed SEC injunction was not properly regarded as punitive.

First, the Court noted that federal courts' equity jurisdiction "mirrors that of the High Court of Chancery in England … when Congress passed the first Judiciary Act." *Id.* at 555 (citing *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund, Inc.*, 527 U.S. 308, 318 (1999)). Statutory injunction provisions, such as Section 78u(d), therefore are "governed by the same 'established principles' of equity that have developed over centuries of practice," absent a

13

clear statement by Congress to the contrary. *Id.* at 556 (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). Therefore, petitioner's argument that SEC injunctions are penalties, ran contrary to the "historic injunctive process," which "was designed to deter, not to punish." *Id.* at 556 (citing *Hecht*, 321 U.S. at 329.)

Second, the Court observed that enforcement agencies pursuing statutory injunctions are required "to show [a] risk of harm"—otherwise such a preventive injunction serves no lawful purpose. *Id.* at 556 (citations omitted). A "properly issued and framed injunction" therefore can be fairly said to "serve a remedial purpose" because the focus of the injunction "is to forestall future violations." *Id.* (citing *United States v. Or. State Med. Soc'y*, 343 U.S. 326, 333 (1952)); *see also Kokesh*, 137 S. Ct. at 1645. Third, after surveying case law and the history surrounding Section 78u(d), the Court found strong support for its view that a properly issued and framed SEC injunction is not a penalty governed by Section 2462's statute of limitations. *Id.* at 558-559.

The Third Circuit's reasoning in *Gentile* requires this Court to reject untimeliness arguments as the Commission's claim for injunctive relief. Like 15 U.S.C. § 78u(d), 7 U.S.C. § 13a-1(b), governing Commission injunctions, is a statutory injunction provision. Therefore, Section 13a-1(b) is governed by the same equity principles "developed over centuries of practice," unless Congress states otherwise, which it has not done. *Gentile*, 939 F.3d at 555.

Further, nothing in the provisions governing Commission injunctions suggest that Congress was "departing from the rule that injunctions are issued to prevent harm rather than punish past wrongdoing." *Id.* at 557; *see also Kokesh*, 137 S. Ct. at 1645. Section 13a-1 provides that: "[w]henever it shall appear to the Commission that any registered entity or other person has engaged, is engaged, or is about to engage in" a CEA violation, the Commission may bring a suit "to enjoin such act or practice, or to enforce compliance," provided that no such injunction or restraining order for a CEA violation "shall

be issued ex parte by said court." 7 U.S.C. § 13a-1(a).[11] Additionally, the Court may only grant an injunction or restraining order "[u]pon a proper showing." 7 U.S.C. § 13a-1(b).

I find no indication of Congressional intent to depart from traditional equitable principles, for example by permitting a Commission injunction to "issue automatically on a finding of past violations or without a proper showing of the likelihood of future harm." *Gentile*, 939 F.3d at 557. Moreover, Section 13a-1(b) includes "open-ended" language suggestive of traditional equitable discretion. *Id.*; *see also* 7 U.S.C. § 13a-1(b) ("Upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without bond.") Finally, the Court observes that its holding here is consistent with out-of-circuit decisions which have described CEA injunctive relief as "remedial in nature [and] designed to prevent injury to the public and to deter illegal conduct." *CFTC v. Gramalegui*, No. 15-CV-02313-REB-GPG, 2018 WL 4610953, at *30 (D. Colo. Sept. 26, 2018) (citing *CFTC v. Trimble*, No. 11-CV-02887-PAB-KMT, 2013 WL 317576, at *7 (D. Colo. Jan. 28, 2013)); *see also CFTC v. Hunt*, 591 F.2d 1211, 1219 (7th Cir. 1979).

Consistent with *Gentile*, Defendants are not foreclosed from challenging the issuance and framing of any prospective injunction under Section 13a-1(b). If the sought injunction is not "supported by a meaningful showing of actual risk of harm," the Court must deny injunctive relief "as a matter of equitable

---

[11]     Section 13a-1(a) makes an exception to the general prohibition against ex parte restraining orders and/or injunctions with respect to an order prohibiting

> any person from destroying, altering or disposing of, or refusing to permit authorized representatives of the Commission to inspect, when and as requested, any books and records or other documents or which prohibits any person from withdrawing, transferring, removing, dissipating, or disposing of any funds, assets, or other property, and other than an order appointing a temporary receiver to administer such restraining order and to perform such other duties as the court may consider appropriate[.]

7 U.S.C. § 13a-1(a)

discretion"—but not because it is time barred under Section 2462. *Gentile*, 939 F.3d at 562; *see also Wyly*, 950 F. Supp. 2d at 558 ("[T]he primary purpose of the injunction [under the securities laws] cannot be to penalize—it must be to protect against future harm. As such, the statute of limitations question merges with the substantive requirements for obtaining an injunction under the securities laws—if the substantive claim is viable, then it is, by definition, not subject to a statute of limitations.") Indeed, if the Commission has adequately stated a claim for relief, the Court is tasked with making such a determination *after* the record has been properly developed. *Gentile*, 939 F.3d at 564 (citations omitted).

Accordingly, the Court finds that (1) the Commission's claim for injunctive relief is not time-barred under Section 2462 and (2) it is premature to determine whether prospective injunctive relief is warranted in the context of this motion to dismiss.

### iii.    Disgorgement and Restitution

Finally, with respect to conduct occurring before December 27, 2016, the Court finds that it is premature to dismiss the Commission's claim for disgorgement and restitution as time-barred. 7 U.S.C. § 13a-1(d)(3)(A) provides that the Court may impose "restitution to persons who have sustained losses proximately caused by [violations of the CEA] (in the amount of such losses)." And 7 U.S.C. § 13a-1(d)(3)(B) states that the Court may impose equitable remedies including "disgorgement of gains received in connection with [violations of the CEA]."

The Court acknowledges that both Commission disgorgement and restitution are remedies imposed by the "court as a consequence for violating public laws"—satisfying the first principle identified in *Kokesh* for determining whether a sanction constitutes a penalty. *See Kokesh*, 137 S. Ct. at 1643. Neither party, however, has briefed the issue of how Commission disgorgement or restitution "operates in practice," *Gentile*, 939 F.3d at 557, and whether these remedies appear to satisfy the second *Kokesh* principle: whether these

16

remedies are only "sought 'for the purpose of punishment, and to deter others from offending in like manner,'—as opposed to compensating a victim for his loss." *Kokesh*, 137 S. Ct. at 1642. Finally, the issue of whether a proposed remedy is a penalty subject to Section 2462 is a "fact-intensive inquiry," particularly ill-suited for a motion to dismiss. *Reisinger*, No. 11 C 8567, 2013 WL 3791691 at *8 (citing *SEC v. Alexander*, 248 F.R.D. 108, 115-16 (E.D.N.Y. 2007)).

In summary, I hold as follows with respect to Defendants' timeliness arguments: (1) Count II is dismissed as to conduct occurring before August 15, 2011, the effective date of the relevant provisions; (2) the Commission's claim for civil monetary relief is dismissed as untimely as to conduct occurring before December 27, 2016; (3) the motion to dismiss the Commission's claims for injunctive relief, disgorgement, and restitution as untimely is denied.

### B. Extraterritoriality

According to Defendants, the CEA does not apply extraterritorially and consequently, the Commission has not plausibly alleged a domestic basis for its claims under Section 4b and 6(c) of the CEA (Counts I and II). (*See* DE Mot. at 11-17; *see also* DE 28 at 1; DE 29 at 1.) While agreeing that the CEA does not apply extraterritorially, the Court finds that the Commission has plausibly alleged a domestic application of the statute.

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010) (citing *EEOC v. Arabian American Oil Co.*, 499 U.S. 244, 248 (1991) (quotation marks omitted).) Therefore, "[w]hen a statute gives no clear indication of extraterritorial application, it has none." *Id.*

In analyzing extraterritoriality, the Court performs a two-step analysis to determine (1) whether the statute has an extraterritorial effect, and if not, (2) whether the focus of the plaintiff's claim consists in foreign conduct:

> At the first step, the Court asks whether the presumption against extraterritoriality has been rebutted—that is, whether the statute

gives a clear, affirmative indication that it applies extraterritorially. The Court asks this question regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction. If the statute is not extraterritorial, then at the second step the Court determines whether the case involves a domestic application of the statute, which is done by looking to the statute's "focus." If the conduct relevant to statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016).

### 1. Step One: Extraterritorial Scope of the CEA

Although the CEA "is silent as to [its] extraterritorial reach," the cases have generally found that the statute is "primarily concerned with domestic conditions." *Loginovskaya v. Batratchenko,* 764 F.3d 266, 272 (2d Cir. 2014); *see also Prime Int'l Trading, Ltd. v. BP P.L.C.*, 937 F.3d 94, 102-103 (2d Cir. 2019) (finding that Sections 22, 6(c)(1) and 9(a)(2) lack a clear statement of extraterritorial effect); *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 66 (2d Cir. 2018) (applying *Morrison*'s "domestic transactions" test to CEA claims); *CFTC v. Garofalo*, No. 10 C 2417, 2010 WL 11245430, at *5 (N.D. Ill. Dec. 21, 2010). Consistent with such precedent, neither party argues that the CEA applies extraterritorially. Lacking direct Third Circuit guidance, I agree with and adopt the reasoning of the cases cited above.

### 2. Step Two: Whether the Acts Relevant to the "Focus" of the CEA Claims are Domestic or Foreign

I move on to step two: determining whether the Commission's claims exceed the CEA's domestic territorial scope. That analysis requires that I consider (1) the "focus" of the CEA causes of action, and (2) whether the acts relevant to that focus occurred domestically or abroad. *RJR Nabisco*, 579 U.S. at 337.

Here, the Commission brings claims under Sections 4b(a)(2) and 6(c)(1) of the CEA and their implementing regulations. (Compl. ¶¶ 93-105.) Section 4b(a)(2) makes it unlawful

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> > A. to cheat or defraud or attempt to cheat or defraud the other person;
> >
> > ...
> >
> > C. Willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract[.]

7 U.S.C. § 6b(a)(2)(a), (c). Section 6(c)(1) makes it unlawful "for any person … to use or employ, … in connection with any swap, or a contract of sale of any commodity, … any manipulative or deceptive device." 7 U.S.C. § 9(1). Several courts, citing the similarity between the CEA and the Securities Exchange Act ("SEA"), have found that the CEA, like the SEA, is "transaction" focused.[12] Indeed, both parties, albeit at varying levels, ask the Court to assess the transactions underlying the Complaint to determine whether the Commission has sufficiently alleged a domestic application of Sections 4b and 6(c) of the

---

[12]   *See In re N. Sea Brent Crude Oil Futures Litig.*, 256 F. Supp. 3d 298, 308 (S.D.N.Y. 2017) ("[g]iven the noted similarity between the [Securities] Exchange Act and the CEA, … the commodities transaction giving rise to the private right of action is the relevant transaction for purposes of *Morrison*'s test."); *CFTC v. Garofalo*, No. 10 C 2417, 2010 WL 11245430, at *5 (N.D. Ill. Dec. 21, 2010) (stating that the CEA and Securities Exchange Ct are "primarily concerned with the regulation of domestic exchanges" and concluding "that *Morrison*'s transactional test should … be applied under the CEA."); *cf. Loginovskaya* , 764 F.3d at 280 (Lohier, J. dissent) (comparing Section 4b of the CEA, targeting fraudulent conduct "in connection with any order to make, or the making of, an contract of sale of any commodity," with Section 10(b) of the SEA, targeting the use of an manipulative or deceptive device "in connection with the purchase or sale of any security registered on a national securities exchange.")

CEA.[13] Likewise, I find that the "focus" of the relevant CEA claims consists of the subject forex transactions.

Courts assessing CEA claims brought by either (1) the Commission under Section 6c, 7 U.S.C. § 13a-1(a),[14] or (2) private plaintiffs under Section 22, 7 U.S.C. § 25(a)(1), have applied *Morrison*'s "transactional test": in which a transaction will be considered domestic if (1) the transaction occurred on a domestic exchange or (2) the transaction itself is domestic.[15] The Commission has not alleged that any of the relevant trades were made on a domestic exchange, so I address only the second test: whether the transaction itself is domestic.

In determining whether a transaction is "domestic," the Third Circuit, in the context of a Section 10(b) claim under the SEA, has expressed that courts

---

[13]    *Compare* Mot. at 13-14 (*Morrison* established a transactional test for sufficient allegations that an [a]ct is not extraterritorial.... [However,] [a] domestic transaction is [only] 'necessary' to invoke the CEA, but is not sufficient on its own") *with* Opp. at 16 ("Courts analyzing extraterritoriality of statutes and regulations that address conduct 'in or in connection with' certain kinds of transactions have applied a test that turns on the location of the transaction.")

[14]    Providing that:

> Whenever it shall appear to the Commission that any registered entity or other person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future delivery or any swap, the Commission may bring an action in the proper district court of the United States or the proper United States court of any territory or other place subject to the jurisdiction of the United States, to enjoin such act or practice, or to enforce compliance with this chapter, or any rule, regulation or order thereunder[.]

[15]    *Morrison*, 561 U.S. at 267; *see also Myun-Uk Choi*, 890 F.3d at 66 (stating that *Morrison*'s "domestic transactions" test applies to the CEA); *Loginovskaya*, 764 F.3d at 271 (expressing that "courts have looked to securities laws ... [in] interpreting similar provisions of the CEA" and applying *Morrison*'s "domestic transaction test" to CEA causes of action) (citation omitted); *Garofalo*, No. 10 C 2417, 2010 WL 11245430, at *6 (stating that given the similarities between "the Securities Exchange Act and the CEA ... that *Morrison*'s transactional test should be applied under the CEA.")

should consider "not … the place where the deception originated, but [the place where] purchases and sales of securities" occurred. *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015) (citing *Morrison*, 561 U.S. at 266.) Accordingly, The Third Circuit and other courts have interpreted this to mean that the "transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States."[16] Facts establishing "irrevocable liability" include the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Georgiou*, 777 F.3d at 136 (citing *Absolute Activist*, 677 F.3d at 69, 70).

Here, the Commission plausibly alleges that the forex trades between WWM and its customers were "domestic transactions" under *Morrison*. As alleged in the Complaint, WWM is a market maker based in Woodcliff Lake, New Jersey.[17] In order to execute a trade on WWM's software application, WWM's customers were allegedly required to send electronic orders to WWM's server in New Jersey. (Compl. ¶¶ 42, 44.) Moreover, WWM is alleged to have (1) received orders, (2) executed trades, and (3) sent electronic trade confirmations to customers from its New Jersey office. (*Id.* ¶ 45.) These allegations reasonably

---

[16]      *Georgiou*, 777 F.3d at 135 (citing *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 69 (2d Cir. 2012)*; see also SEC v. Morrone*, 997 F.3d 52, 60 (1st Cir. 2021) ("We agree with the reasoning of the Second, Third, and Ninth Circuits and hold that a transaction is domestic under *Morrison* if irrevocable liability occurs in the United States."); *Stoyas v. Toshiba Corp.*, 896 F.3d 933, 949 (9th Cir. 2018) ("We are persuaded by the Second and Third Circuits' analysis and therefore adopt the irrevocable liability test to determine whether the securities were the subject of a domestic transaction.")*; Quail Cruises Ship Mgmt. Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (allegation that closing in Florida precipitated transfer of title sufficient to satisfy *Morrison* at motion to dismiss). Facts establishing "irrevocable liability" include the "formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money." *Georgiou*, 777 F.3d at 136 (citing *Absolute Activist*, 677 F.3d at 69, 70).

[17]      Moreover, the Commission alleges that WWM was required to register as an RFED under the CEA and its implementing regulations. Compl. ¶ 2 (citing 7 U.S.C. §§ 1-26 *et seq.*; 17 C.F.R. pts. 1-190)

suggest that irrevocable liability regarding the forex trades occurred within the United States. Accordingly, the Court finds that the Commission has plausibly alleged a domestic application of Sections 4b(a)(2) and 6(c)(1) of the CEA.

Finally, the Court declines Dembro's invitation to apply the Second Circuit's holding in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE,* 763 F.3d 198 (2d Cir. 2004), in which the Second Circuit held that "a domestic securities transaction" under *Morrison* is "not alone sufficient to state a properly domestic claim under the statute." (*Parkcentral*, 763 F.3d at 215; *see also* Mot. at 14-15.) Dembro argues that under *Parkcentral,* even if the Commission has alleged some domestic activity in the Complaint, if the alleged conduct is "predominantly foreign," Counts I and II are still impermissibly extraterritorial. (*Id.*; *see also Parkcentral*, 763 F.3d at 216.)

As an initial matter, *Parkcentral* is not binding on this Court and the Third Circuit has yet to adopt or endorse its reasoning.[18] Moreover, even under the holding of *Parkcentral,* the Commission's claims are not "so predominantly foreign as to be impermissibly extraterritorial." 763 F.3d at 216. In addition to the trades themselves, the Complaint alleges that WWM and TAB shared an office in Woodcliff Lake, New Jersey (Compl. ¶ 1), in which both Plaut and Dembro worked as corporate officers. (*Id.* ¶ 16.) From this New Jersey office, Plaut allegedly "controlled all aspects of WWM's and TAB's business activities as the companies' CEO" (*Id.* ¶ 15); and Dembro, the companies' CFO, "performed accounting and financial reporting functions," and is alleged to have been involved in the development of WWM's marketing materials to prospective customers and IBs. (*Id.* ¶¶ 16, 76, 82-85.) Finally, the Commission

---

[18]    Indeed, both the First and Ninth Circuit have rejected *Parkcentral*'s holding as being inconsistent with the Supreme Court's decision in *Morrison. See Morrone*, 997 F.3d at 60 ("*Morrison* says that §10(b)'s focus is on transactions…. The Court explicitly said that, if a transaction is domestic, §10(b) applies. The existence of a domestic transaction suffices to apply the federal securities laws under *Morrison*."); *Stoyas*, 896 F.3d at 950 (stating that the "principal reason" the court did not adopt *Parkcentral* "is because it is contrary to Section 10(b) and *Morrison* itself," as the decision "carves-out 'predominantly foreign' securities fraud claims from Section 10(b)'s ambit.")

alleges that Dembro was aware that restricted funds were being transferred from WWM to TAB and repeatedly informed Plaut that these unlawful transfers were occurring. (*Id.* ¶¶ 12, 52, 76, 89-91.) The Court therefore believes that the Commission's allegations are not impermissibly foreign in nature.

### C. Failure to State a Claim

Section 4b(a)(2) of the CEA, 7 U.S.C. §6b(a)(2), in relevant part, makes it unlawful for

> any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
>> (A) to cheat or defraud or attempt to cheat or defraud the other person;
>>
>> ...
>>
>> (C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person ....

7 U.S.C. § 6b(a)(2)(A), (C). This provision applies to forex transactions "as if" they were futures contracts, pursuant to Section 2(c)(2)(C)(iv) of the CEA, 7 U.S.C. § 2(c)(2)(C)(iv). *See also CFTC v. Cifuentes*, No. 216CV06167ESJAD, 2018 WL 1904196, at *5 (D.N.J. Apr. 20, 2018). Accordingly, under 17 C.F.R. § 5.2(b), it is unlawful for any person to cheat, defraud, or mislead another using "the mails or any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction." *See also Cifuentes*, No. 216CV06167ESJAD, 2018 WL 1904196, at *5.

Further, Section 6(c)(1) of the CEA, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for

> any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of

> any commodity in interstate commerce, or for future delivery on or
> subject to the rules of any registered entity, any manipulative or
> deceptive device or contrivance, in contravention of such rules and
> regulations as the Commission shall promulgate

7 U.S.C. § 9(1). This provision likewise applies to forex transactions pursuant to Section 2(c)(2)(C)(ii)(I) of the CEA, 7 U.S.C. § 2(c)(2)(C)(ii)(I). 17 C.F.R. § 180.1(a) therefore makes it unlawful for "any person directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]"

To establish liability under each of these provisions, the Commission must prove three elements: "(1) the making of a misrepresentation, misleading statement, or a deceptive omission: (2) scienter; and (3) materiality." *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (citing *CFTC v. R.J. Fitzgerald & Co., Inc.*, 310 F.3d 1321, 1328 (11th Cir. 2002); *see also Cifuentes*, 2018 WL 1904196, at *5 ("Plaintiff may establish a violation of Section 4b(a)(1)(A) and (C) … by showing that Defendants made a material misrepresentation, misleading statement, or deceptive omission with scienter." (citing *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000)). A statement or omission is material if "'a reasonable investor would consider it important in deciding whether to make an investment.'" *Id.* at 447 (quoting *Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir. 1986)). Scienter is defined as "an 'intent to deceive, manipulate, or defraud,' and it may be shown either by conscious behavior or recklessness." *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 159 (3d Cir. 2009) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976)).

Finally, as the claims in Counts I and II sound in fraud, the Commission's allegations must satisfy Rule 9(b)'s heightened pleading requirements. *See LaMarco*, 2019 WL 4247632 at *3; *see also DGM Investments, Inc. v. New York Futures Exch., Inc.*, 265 F. Supp. 2d 254, 263

(S.D.N.Y. 2003). Rule 9(b) dictates that a plaintiff pleading fraud must "state with particularity the circumstances constituting fraud or mistake." The Third Circuit has interpreted this standard as requiring a plaintiff to plead "(1) a specific false representation [or omission] of material fact; (2) knowledge by the person who made it of its falsity; (3) ignorance of its falsity by the person to whom it was made; (4) the intention that it should be acted upon; and (5) that the plaintiff suffered an ascertainable loss as a result of the misrepresentation." *Alban v. BMW of N. Am., LLC*, No. CIV 09-5398 DRD, 2010 WL 3636253, at *9 (D.N.J. Sept. 8, 2010) (quoting *In re Rockefeller Ctr. Properties, Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002)). The Third Circuit, however, has also cautioned that "[c]ourts must be sensitive to the fact that application of Rule 9(b) prior to discovery 'may permit sophisticated defrauders to successfully conceal the details of their fraud.'" *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Christidis v. Pennsylvania Mortgage Trust*, 717 F.2d 96, 99-100 (3d Cir. 1983)).

### 1. Principal Violation

#### i.    *Fraud by Misrepresentation and Omission*

The Court finds that the Commission has stated a claim under Section 4b(a)(2)(A) and satisfied Rule 9(b). The Complaint alleges that during the Relevant Period, WWM represented to customers and potential customers that "it would hold customer assets safely in segregated accounts." (Compl. ¶¶ 5, 76.) During the same period, WWM required prospective customers to complete and send the Account Agreement to WWM (*Id.* ¶ 41); pursuant to this agreement, WWM represented that it would: "hold Customer funds on the Customer's behalf in a regulated bank account. This account will be segregated from [WWM's] money and assets, in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines." (*Id.* ¶ 76a.)

WWM allegedly made similar representations on its website, marketing presentations to IBs, and through its CEO, Plaut, who made these representations to "WWM employees, IBs, and prospective customers." (*See Id.*

¶¶ 76(b) (WWM's website: "The regulations of the BVI FSC require that customer assets are identified, accounted for, and appropriately segregated[.]"), 76c (WWM's marketing presentation to IBs: WWM "ensure[d] the highest level of security for its customers' funds" and represented that WWM was a "[f]ully regulated firm and highly accountable management mean[t] safety of the funds").)

The Court finds that these alleged misrepresentations were material. Indeed, the safety of customer assets and the representation that funds were purportedly held in segregated accounts was at the heart of the Account Agreement. *See CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1049 (M.D. Fla. 2019) (finding that "Defendants' misrepresentations to customers that their funds would be used for trading Forex, or their failure to inform customers that their funds were used to pay [Defendants'] business expenses and … personal expenses, are material[.]")

Finally, the Commission has sufficiently alleged that WWM made these misrepresentations with scienter. The Complaint states that while WWM was assuring customers that their funds would be held in segregated accounts, WWM was simultaneously transferring customer funds to TAB. (Compl. ¶ 54.) The Commission also alleges that after December 2012, "substantially all deposits into TAB's account were composed … of transfers from WWM bank accounts (*Id.* ¶ 57)"—despite WWM's representations to customers. Based on these allegations, in part, the Commission claims that WWM knew that customer funds were not segregated no later than March 2012. (*See id.* ¶ 81.)

The Court therefore denies Defendants' motion with respect to WWM's alleged misrepresentations in Counts I and II.

> ii.   *Fraud by Misappropriation*

The Commission also sufficiently alleges that WWM misappropriated customers' funds as asserted in Counts I and II. [19] Although

---

[19]   Contrary to Dembro's assertion, courts have found that Section 6(c) and Regulation 180.1 do reach misappropriation. *See, e.g., CFTC v. McAllister*, 2021 WL

"misappropriation" is not explicitly referenced in either Section 4b or Section 6(c), several courts have held that misappropriation constitutes "willful and blatant fraud" in violation of the CEA's anti-fraud provisions. *See CFTC v. Am. Bullion Exch. Abex, Corp.*, No. SACV101876DOCRNBX, 2014 WL 12603558, at *7 (C.D. Cal. Sept. 16, 2014) ("Misappropriation of customer funds for personal use or to pay other participants constitutes 'willful and blatant' fraud" in violation of CEA antifraud provisions); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106 (C.D. Cal. 2003) (finding that "Defendant's misappropriation of funds entrusted … for trading purposes is 'willful and blatant activity'" in violation of Section 4b(a) of the CEA); *CFTC v. Giddens*, No. 1:11-CV-2038-WSD, 2013 WL 12244536, at *9 (N.D. Ga. Jan. 31, 2013).

The Complaint alleges that during the Relevant Period, WWM transferred $4.6 million worth of customer funds—otherwise known as "restricted cash"—to TAB's bank account. (*See* Compl. ¶¶ 86, 89.) In turn, TAB allegedly misappropriated these "restricted customer funds" to pay its operating expenses and make cash distributions to TAB shareholders, including Plaut. (*See id.* ¶¶ 58, 89.) Finally, the Commission alleges that Dembro informed

---

7541402, at *7 (W.D. Tex. Aug. 18, 2021 (finding that defendants violated Section 6(c)(1) and Regulation 180.1 by, in part, "misappropriating customer funds to pay for … operating expenses, expenses related to other business ventures, or to purchase precious metals for other … customers"); *CFTC v. Reynolds*, No. 1:19-CV-05631-MKV, 2021 WL 796683, at *5 (S.D.N.Y. Mar. 2, 2021) (finding that defendant violated Section 6(c)(1) and Regulation 180.1(a) by, in part, "misappropriat[ing] customer Bitcoin"); *CFTC v. Omega Knight 2, LLC*, No. 18-22377-CIV, 2019 WL 6796128, at *8 (S.D. Fla. Sept. 16, 2019) (Defendants' "misappropriation of customer funds violated Section 6(c)(1) … and Regulation 180.1(a)); *CFTC v. McDonnell*, 332 F.Supp.3d 641, 717 (E.D.N.Y. 2018) (finding defendant violated Section 6(c) and Regulation 180.1(a) by misappropriating funds); *CFTC v. Global Precious Metals Trading Co.*, 2013 WL 5212237, at * 5 (S.D. Fla. July 31, 2013) (finding that defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, misappropriating customer funds intended for physical precious metals purchases); *CFTC v. Leben*, No. 3:14-cv-866-TLW, 2016 WL 7354359, at *5 (D.S.C. Aug. 5, 2016) (granting summary judgment and holding that defendant violated Section 6(c)(1) of the Act and Regulation 180.1(a) by, among other things, misappropriating investor funds for personal use).

Plaut of the fact that restricted customer funds were being transferred by WWM to TAB "as it was happening." (*Id.* ¶ 92.) The Court finds that such allegations state a claim for misappropriation under Sections 4(b) and 6(c) with sufficient particularity.

### 2. Controlling Person Liability

The Complaint alleges that Plaut, at all times during the Relevant Period, "directly or indirectly controlled WWM and did not act in good faith or knowingly induced … WWM's fraudulent misrepresentations and misappropriation of customer funds" in violation of Sections 4b and 6(c) of the CEA. (*Id.* ¶¶ 97.) Pursuant to 7 U.S.C. § 13c(b),

> [a]ny person who, directly or indirectly, controls any person who has violated any provision of this chapter or any of the rules, regulations, or orders issued pursuant to this chapter may be held liable for such violation in any action brought by the Commission to the same extent as such controlled person. In such action, the Commission has the burden of proving that the controlling person did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.

To establish that an individual controlled a business for purposes of Section 13c(b) liability, the Commission must plausibly allege that "the defendant 'actually exercised general control over the operation of the entity principally liable' and 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised.'" *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002), *cert. denied*, 537 U.S. 950 (2002); *Allied Markets LLC*, 371 F. Supp. 3d at 1052.

The Commission has met this pleading burden. Specifically, the Complaint states that Plaut (1) served as both WWM and TAB's CEO; (2) from June 2012 through the Relevant Period, owned and controlled TAB, which in turn wholly owned WWM; (3) controlled all aspects of WWM's business activities; and (4) made oral representations to WWM's employees, prospective customers, and IBs that customer funds were held in segregated banking

accounts. (*See* Compl. ¶¶ 1, 13, 14.) These allegations are sufficient to allege Plaut's control of WWM for purposes of Counts I and II.

### 3. Common Enterprise Liability

The Complaint also asserts that during the Relevant Period, "WWM acted as a common enterprise" with TAB, and that therefore, TAB is "jointly and severally liable for WWM's" violations of the CEA antifraud provisions. (*Id.* ¶¶ 98, 104.) In determining whether a common enterprise exists, courts assess several factors, including (1) common control; (2) the sharing of office space and officers; (3) whether business is transacted through "interrelated companies"; (4) the commingling of corporate funds and failure to maintain separation of companies; (5) unified advertising; and (6) evidence that no real distinction existed between corporate defendants." *See Am. Bullion Exch. Abex, Corp.*, 2014 WL 12603558, at *8 (citations omitted).

According to the Commission, "TAB performed all management, accounting, software development, information technology, and back offices for WWM, which was TAB's only customer." (Compl. ¶ 14.) Moreover, although nominally different companies, the Complaint alleges that: (1) TAB and WWM shared the same office in Woodcliff Lake, New Jersey; (2) TAB and WWM shared technology resources and used the same serves located in the same facility in New Jersey; (3) most TAB employee had an "@worldwidemarkets.com" email address, in addition to their "@tabnetworks.com" email address; (4) individuals on WWM's management team received their paychecks from TAB; (5) WWM regularly transferred money to TAB's bank account, despite maintaining separate bank accounts; and (6) TAB used money transferred from WWM's bank account to pay WWM's operating expenses, including salaries and vendor invoices. (Compl. ¶ 28.)

These allegations, taken as true, are sufficient to establish a common enterprise between TAB and WWM.

### 4. Aiding and Abetting Liability

Section 13c(a) of the CEA establishes liability for any individual who (1) "willfully aids, abets, counsels, commands, induces, or procures the commission of' a violation of the rules regulations, or orders promulgated under the CEA; (2) "acts in combination or concert with any other person in any such violation"; or (3) "willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation.'" 7 U.S.C. § 13c(a); *see also CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 162 (3d Cir. 2009). In enacting Section 13c(a), Congress modeled the provision after the federal statute for criminal aiding and abetting, 18 U.S.C. § 2. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 181 (2d Cir. 2013); *In re Richardson Secs., Inc.*, CFTC No. 78-10, 1981 WL 26081, at *5 (Jan. 27, 1981) ("The section was modeled after the federal criminal aiding and abetting statute, 18 U.S.C. § 2.") Therefore, various courts have held the elements required to establish aiding and abetting liability under the CEA are parallel to those required to establish criminal liability under 18 U.S.C. § 2.[20] Those elements are that the defendant (1) "had knowledge of the principal's ... intent to commit a violation of the Act; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *See Nicholas,* 224 F.3d at 189.

In moving to dismiss the aiding and abetting allegations of Counts I and II, Dembro argues that the Complaint does not satisfy Rule 9(b)'s heightened

---

[20]     *See Wilber v. Bank of Am., N.A.*, No. SACV141771AGJPRX, 2015 WL 13919430, at *5 (C.D. Cal. Mar. 30, 2015); *CFTC v. Grossman*, No. 14-CIV-62061, 2015 WL 11197766, at *4 (S.D. Fla. Feb. 26, 2015); *see also Nicholas v. Saul Stone & Co.,* 224 F.3d 179, 189 (3d Cir. 2000); *Damato v. Hermanson*, 153 F.3d 464, 473 (7th Cir. 1998); *cf. Amaranth*, 730 F.3d at 162 ("We have not typically evaluated criminal aiding and abetting under a three-part test, however, but have .... require[d] the defendant to 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' We do not understand this traditional articulation of the standard to differ, in substance, from the standard employed by the Seventh and Third Circuits.")

pleading requirements. In particular, Dembro says, the allegations as to his "conduct or omissions … [do not] specify or imply with sufficient particularity *when* they occurred." (Mot. at 18-19) (emphasis added). Dembro also asserts that the Complaint does not satisfy *Twombly*/*Iqbal* because there are no allegations that Dembro (1) had a "specific unlawful intent" (2) or committed "an act in furtherance of the principal's objective"—elements required to state and aiding and abetting claim under the CEA. (*Id.* at 28-31.)

The Commission responds that the Complaint satisfies Rule 9(b) by alleging that Dembro[21] aided and abetted WWM's (1) misappropriation of customer funds, which occurred on "systematic and continuous basis" between March 2012 and September 2018 and (2) misrepresentations to customers concerning the segregation of their funds, which was allegedly disseminated on WWM's website and marketing materials between March 2012 and September 2018. (Opp. at 31.) Dembro allegedly aided and abetted WWM's misappropriation in three ways: (1) by creating and maintaining financial records for WWM; (2) managing the winding down of WWMOT's operations, in which WWM customer funds were diverted to close out WWMOT customer accounts; and (3) in connection with the 2015 Audit, serving as the point of contact for WWM's auditor, drafting key portions of the audit report, providing substantive feedback, and not disclosing that WWM's $3.9 million in "net advances" to TAB was made up of WWM customer funds. (*Id.* at 33-34; *see also* Compl. ¶¶ 60-61.)

With respect to WWM's alleged misrepresentations, the Commission's theory of aiding and abetting liability is more attenuated. According to the Commission, Dembro provided information about "the safety of customer funds and the use … of segregated accounts to hold customer assets" to WWM marketing employees, which was ultimately incorporated in WWM marketing

---

[21]     According to the Complaint, as CFO of WWM and TAB, Dembro "was aware of all aspects of the companies' financial dealings." Compl. ¶ 90.

materials. (Opp. at 34-37; *see also* Compl. ¶¶ 82-84.)[22] Therefore, Dembro's alleged failure to correct these statements after becoming aware of their falsity would be sufficient to establish Dembro's intentional assistance to WMM's alleged misrepresentations. (Opp. at 35-36.)

The Court finds that the Commission has sufficiently alleged that Dembro aided and abetted WWM's misappropriation of customer funds. As previously stated, the misappropriation of funds constitutes "willful and blatant" fraud in violation of Section 4(b)(a) of the CEA. *See, e.g., CFTC v. Ramirez*, No. 4:19-CV-140, 2019 WL 4198857, at *9 (S.D. Tex. July 12, 2019); *CFTC v. Van Beuningen*, No. 1:16-CV-978-TCB, 2016 WL 9454431, at *4 (N.D. Ga. Mar. 29, 2016); *Allied Markets LLC*, 371 F. Supp. 3d at 1049. The Complaint alleges that as CFO of WWM and TAB, Dembro (1) "performed accounting and financial reporting functions" and (2) was keenly "aware of all aspects of the companies' financial dealings." (Compl. ¶¶ 15, 90.) Indeed, in his role as CFO, Dembro had knowledge that "restricted customer funds were being transferred from WWM to TAB," and alerted Plaut as those transfers were occurring. (*Id.* at ¶ 91).

Finally, the Complaint provides at least two acts taken by Dembro in furtherance of WWM's misappropriation. First, in early 2018, Dembro is alleged to have directed the winding-down of WWMOT's operations as the company's compliance officer. As part of this process, WWMOT purportedly used WWM

---

[22]     The Complaint cites an undated email, in which Dembro directed WWM marketing personnel to incorporate the following language in marketing materials:

> As a British protectorate BVI's customer protection and safety of funds ules are modeled after UK FSA [sic] rules. Specifically customer assets must be kept in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank, and disclosed to the bank customer funds.

DE 30 at 35; *see also* Compl. ¶ 83.

customer funds to close WWMOT customer accounts. (*Id.* ¶¶ 74-75.) [23] Second, Dembro allegedly played an integral role in the drafting and revising of the 2015 Audit, ultimately completed around "January 2017." (*Id.* ¶¶ 59-60.)[24] While the 2015 Audit states that WWM "advanced" nearly $4 million to TAB, the audit misleadingly failed to disclose that these "net advances" were made up of WWM customer funds—thus obscuring from the BVI FSC the failure to hold customer funds in segregated accounts as required by law. (*See* Compl. ¶ 61; *see also* DE 24-2, Ex. 1 at 11.) In short, the Complaint adequately alleges Dembro's aiding and abetting of WWM's misappropriations.

As to Dembro's alleged aiding and abetting of WWM's misrepresentations, however, I come to a different conclusion. As the Commission appears to concede, the statements Dembro made to WWM marketing employees about the company's handling of customer assets were made *before* he allegedly learned, in March 2012, that WWM did not hold customer funds in segregated accounts. (*See* Opp. at 35; Compl. ¶¶ 81-85.) Therefore, the crucial issue is whether Dembro's failure to correct his earlier statements alone is sufficient to establish aiding and abetting liability.

Here, the Commission cites *SEC v. Militano*, 773 F. Supp. 589 (S.D.N.Y. 1991), for the proposition that "inaction can provide a basis [for aiding and abetting liability] in the absence of a duty to act, ... when designed intentionally to aid the primary fraud." (*Id.* at 595; *see also* DE 30 at 35-36.) In *Militano*, John Kolb ("Kolb"), at the behest of Vincent Militano ("Militano"), opened two margin accounts at the brokerage firm where Militano worked as a registered representative; thus, obligating Kolb to pay for securities purchased from those accounts. *Militano*, 773 F. Supp. at 591. Upon opening the second account, Kolb (1) granted Militano discretionary authority to execute trades and (2)

---

[23]    According to the Complaint, by mid-June 2017, "WWM customer deposits account for over 99 percent of the deposits into the WWMOT bank account. Compl. ¶ 73.

[24]    The CFTC claims that WWM conducted the 2015 Audit pursuant to the BVI FSC's requirement that it conduct an annual financial audit. Compl. ¶ 59.

agreed to "kick back" a portion of any trading profits to Militano. *Id.* Kolb's accounts were ultimately used to purchase "hundreds of thousands of Chase Medical Group Inc. ("Chase Medical") common shares," as part of an alleged stock manipulation scheme. *Id.* Moreover, Kolb allegedly refused to pay for any securities transactions, despite (1) representing to the broker-dealer that he would pay for any purchased shares, (2) receiving several demands for payment from the broker-dealer and (3) withdrawing profits from the Chase Medical transactions. *Id.*

*Militano* held that the SEC had stated a claim for aiding and abetting liability. In rejecting Kolb's assertion that he was merely an "inactive" participant in the manipulation scheme, the Court observed that Kolb opened the margin accounts with knowledge that they were undermargined, thus violating the securities laws. *Id.* at 594. The Court also highlighted that *after* Kolb opened these accounts, even though Militano placed the disputed orders, Kolb withdrew profits and provided kickbacks to Militano. *Id.*

By comparison, it is not alleged here that Dembro's statements to WWM marketing employees were made with actual or constructive knowledge of their falsity or illegality. And, in contrast with *Militano*, the Commission has not here identified any affirmative actions taken by Dembro, *after* learning that WWM customer assets were not held in segregated accounts, suggesting an intention to deceive WWM marketing employees or otherwise aid WWM's alleged misrepresentations. Dembro's silence and passive knowledge that the segregation of customer assets were material concerns for customers, while falling far short of heroism, do not in themselves establish that his inaction "was designed to intentionally aid the primary fraud." *Militano*, 773 F. Supp. at 595; *see also SEC v. Apuzzo*, 689 F.3d 204, 216 (2d Cir. 2012) (stating that the mere inaction "on the part of the alleged aider and abetter ordinarily should not be treated as substantial assistance, except when it was designed to intentionally to aid the primary fraud.") (citing *Armstrong v. McAlpin*, 699 F.2d 79 (2d Cir. 1983).

The Commission also has not sufficiently alleged that Dembro had any affirmative "duty to disclose the material fact that WWM did not hold assets in segregated accounts." (Mot. at 36 n. 17.) As an initial matter, the Commission does not clearly state the basis for the duty and the person or persons to whom it was owed. Although Dembro purportedly failed to inform "his colleagues" that his earlier statements were false (*see id.* at 36), the Commission also alleges that Dembro informed Plaut that restricted customer funds were being transferred to TAB. (Compl. ¶ 91.) Thus Dembro put Plaut—who controlled all aspects of WWM's business—on notice that customer funds were not segregated and that WWM's representations about the safety of their assets was inaccurate. Different inferences are of course possible, but the Commission does not explain why Dembro's actions do not satisfy this purported duty or why he owed an additional duty to either (1) WWM marketing employees or (2) customers.

Accordingly, the Court finds that while the Commission has stated a claim for aiding and abetting liability as to WWM's misappropriation, it has not done so as to WWM's misrepresentations to customers.

## IV.   CONCLUSION

For the reasons set forth above, Dembro's motion to dismiss, which WWM, Plaut, and TAB join, is **GRANTED** in part and **DENIED** in part.

The motion to dismiss is granted to the following extent: Count I is dismissed as to the Commission's claim for (1) civil monetary penalties with respect to conduct occurring before December 27, 2016 and (2) Dembro's aiding and abetting liability with respect to WWM's alleged misrepresentations to customers. Count 2 is dismissed (1) with respect to conduct occurring before August 15, 2011, (2) as to the Commission's claim for civil monetary penalties with respect to conduct occurring before December 27, 2016, and (3) Dembro's aiding and abetting liability with respect to WWM's alleged misrepresentations to customers.

The motion to dismiss is otherwise denied.

A separate order will issue.

Dated: August 18, 2022

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**