<u>**NOT FOR PUBLICATION**</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

COMMODITY FUTURES TRADING
COMMISSION,

  Plaintiff,

    v.

WORLDWIDEMARKETS, LTD., *et al.*,

  Defendants.

No. 21cv20715 (EP) (LDW)

**OPINION**

**PADIN, District Judge.**

  Plaintiff Commodity Futures Trading Commission (the "CFTC") brings this action seeking civil penalties and equitable relief for alleged violations of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 1–27f, and its implementing regulations. D.E. 54 ("Amended Complaint" or "Am. Compl."). The gravamen of the CFTC's Amended Complaint is that Defendants WorldWideMarkets, Ltd. ("WWM"), TAB Networks, Inc. ("TAB"), Thomas Plaut (collectively, the "Plaut Defendants") and Arthur Dembro engaged in a Ponzi-like scheme to defraud thousands of WWM's retail foreign exchange ("forex") customers by misappropriating over $4 million in WWM customer funds and misrepresenting to WWM customers that their funds would be held in segregated accounts (Counts I and II), and that WWM failed to comply with registration and other regulatory requirements (Counts III, IV, and V). *See generally id.*

  The CFTC moves for summary judgment against all Defendants on Counts I and II of the Amended Complaint. D.E. 169 (the "CFTC's Motion for Summary Judgment" or "CFTC MSJ"). Dembro opposes and cross-moves for summary judgment on Counts I and II. D.E. 170-2[1]

---

[1] The Notice of Motion is at D.E. 170.

("Dembro's Cross-Motion for Summary Judgment" or "Dembro MSJ") (together with the CFTC MSJ, the "Summary Judgment Motions").  The CFTC opposes and replies to Dembro's Cross-Motion for Summary Judgment.  D.E. 174 (the "CFTC's Opposition to Dembro's Cross-Motion for Summary Judgment" or "CFTC Opp. to Dembro MSJ").  Dembro replies to the CFTC's Opposition to Dembro Cross-Motion for Summary Judgment.  D.E. 175 ("Dembro Reply").  The Plaut Defendants neither oppose nor join the Summary Judgment Motions.

The CFTC also moves for default judgment on the issue of liability only against the Plaut Defendants on the remaining causes of action set forth in the Amended Complaint:  Counts III, IV, and V.  D.E. 176 ("Default Judgment Motion" or "Default Mot.").  The Plaut Defendants do not oppose the Default Judgment Motion.  *See* Dkt.

The Court decides the Summary Judgment Motions and Default Judgment Motion without oral argument.  *See* Fed. R. Civ. P. 78; L. Civ. R. 78.1(b).  For the following reasons, the Court will: (1) **GRANT in part** and **DENY in part** the CFTC's Motion for Summary Judgment; (2) **GRANT in part** and **DENY in part** Dembro's Cross-Motion for Summary Judgment; and (3) **GRANT in part** and **DENY in part** the Default Judgment Motion.

## I.    BACKGROUND

### A.    Facts[2]

#### 1.    *Organization of WWM and TAB*

WWM was founded by Plaut and Robert Cortright in 2010 and organized under the laws of the British Virgin Islands ("BVI").  *See* D.E. 169-1 ("CFTC SUF") ¶ 1; Dembro MSJ at 1.  Its primary line of business involved offering to be and acting as the counterparty to leveraged retail forex transactions for customers outside the United States.  *See* D.E. 170-1 ("Dembro Response to

---

[2] The facts in this Section, and throughout this Opinion, are undisputed unless otherwise indicated.

SUF & Counterstatement") ¶ 8.  Plaut and Cortright had previously operated a forex business named FX Solutions, which was registered with the CFTC and held customer assets in a segregated account, separate from company money.  CFTC SUF ¶¶ 2–4.  WWM, however, did not register with the CFTC as a retail foreign exchange dealer ("RFED"), which is a person or entity "that is, or offers to be, the counterparty to a retail forex transaction" with retail customers.  17 C.F.R. § 5.1(h)(1); CFTC SUF ¶ 187.

In May 2011, Plaut and Cortright sold 100 percent of WWM's stock to TAB.  CFTC SUF ¶ 5.  TAB is a corporation also owned and controlled by Plaut, who served as the Chief Executive Officer ("CEO") for both companies.  *Id.* ¶ 36.  TAB performed business services for WWM through a contract called the "Technology Agreement," and WWM was TAB's only customer.  *Id.* ¶¶ 37, 39.  TAB and WWM shared (1) employees and executives, (2) office space and headquarters in Woodcliff Lake, New Jersey, and (3) technology resources such as software development, IT resources, and the same New Jersey-located computer servers.  *Id.* ¶¶ 6, 40–41.  Consistent with that sharing of resources, a January 24, 2017, audit report of WWM's financials (Ex. 20 (the "2017 Audit")) represented that transactions between WWM and TAB "were not contemplated on an arm's length basis."  *Id.* ¶ 42.

While WWM was headquartered in New Jersey, WWM's agreement with its customers (Ex. E (the "Customer Agreement")) and website did not disclose that WWM's headquarters were in New Jersey and instead represented that WWM was located in the BVI.  *See* D.E. 175-1 ("Response to Supplemental SUF") ¶ 191.  Plaut's LinkedIn profile, however, stated that WWM was headquartered in London.  *See* D.E. 174-2 ("Supplemental SUF") ¶ 192 & Ex. 45 at 4.

Dembro was hired as WWM's Chief Financial Officer ("CFO") sometime in 2011. *See* CFTC SUF ¶ 11; Dembro Reply at 8. He has a master's degree in business administration and held a CPA license through June 30, 2013. CFTC SUF ¶¶ 74–75.

### 2.    *WWM's operation*

WWM's first customer-facing forex transaction took place in May 2011. *Id.* ¶ 15. In brief, transactions between WWM and a customer on the shared WWM/TAB trading platform began when WWM disseminated prices to the customer. *Id.* ¶¶ 49–50. Next, the customer proposed price terms by clicking the "buy button" at a specific price, and then WWM/TAB's New Jersey trading platform either accepted or rejected the price terms/order based on whether it fell within the "tolerance range." *Id.* If the order was accepted, WWM filled it, and the trade was executed. *Id.* Once WWM acted on the trade by filling the order (or rejecting it), the WWM customer could not cancel or modify its order. *Id.* ¶ 56.

TAB's Chief Technology Officer Ronald Andriulli—who created and maintained TAB's trading platform on which WWM customers traded, *see id.* ¶¶ 43–48—described the trading platform and the transaction process as follows:

- "Between May 2011 and approximately April 2018, TAB's 'physical server infrastructure, which would include the web server, the order management system, the accounting system, and the database, all were on physical servers in the Equinix [New Jersey] datacenter,'" *id.* ¶ 45 (quoting Ex. GG ("Andriulli Tr.") at 93:12–20, 95:6–20);

- "The Amazon Web Services servers used by TAB after approximately April 2018 were located in the United States," *id.* ¶ 47 (citing Andriulli Tr. at 173–75)[3];

---

[3] Dembro denies this in his Response to SUF & Counterstatement ¶ 47, but he simply cites to certain lines of testimony from the page range cited by the CFTC, which the Court finds do not dispute the fact as stated by the CFTC.

- WWM/TAB "disseminated prices for forex instruments from its New Jersey servers" and once a customer "clicked buy, [the platform] would immediately send an order, a market order, to [WWM/TAB's] servers with that actual price [the customers] had [seen]. When it got to that server, there was tolerance rules that said, okay, is this bid price within the tolerance . . . and if it was within that range, [WWM/TAB] would fill the order at the prices that the user visualized," *id.* ¶¶ 49–50 (citing Ex. FF ("Andriulli Decl.") ¶ 12; then quoting Andriulli Tr. at 143);

- WWM/TAB "accepted customer forex orders by marking the order from a 'pending order to a filled status,' at which time the system created a timestamp reflecting the time of execution," *id.* ¶ 51 (quoting Andriulli Tr. at 149:7–150:10; then citing Andriulli Decl. ¶ 14);

- "Following trade executions, electronic trade confirmation messages 'were pushed out from' TAB's server in New Jersey," *id.* ¶ 54 (quoting Andriulli Tr. at 95:25–96:5; then citing Andriulli Decl. ¶ 14);

- "Timestamps reflecting order fills were created by TAB before the trade confirmation messages were disseminated to the customer," *id.* ¶ 55 (citing Andriulli Tr. 151:3–6);

- "A WWM customer could only cancel or modify an order 'before WWM acted upon it,'" *id.* ¶ 56 (quoting Ex. E); and

- "WWM forex customers 'did not have to acknowledge an execution to make it official. The just – it was all done on the server,'" *id.* ¶ 57 (quoting Andriulli Tr. at 151:21–24).

3.    *WWM's representations to customers*

WWM attracted customers by using introducing brokers and inbound marketing.  *Id.* ¶ 9. Inbound marketing consists of the use of web-based search optimization and branded web content to funnel web traffic to the WWM website with the goal of having the visitor open an account.  *Id.*

Before trading, all customers had to execute the Customer Agreement.  *Id.* ¶ 61.  The Customer Agreement provided: "We will hold Customer funds on the Customer's behalf in a regulated bank account.  *This account will be segregated from our money and assets*, in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines." *Id.*  ¶ 60 (quoting Customer Agreement § 30.1).  Dembro was familiar with the Customer Agreement, because in 2014, he wrote a letter to the BVI regulator attaching and citing to the Customer Agreement.  *See id.* ¶ 133.  Dembro also received a copy of the Customer Agreement at some point in time from WWM's Chief Legal Officer ("CLO") Ed Liva.  *Id.* ¶ 134.

WWM's website contained further representations regarding customer funds.  For one, a page titled "REGULATORY OVERSIGHT" stated: "[WWM] is licensed with and regulated by the British Virgin Islands Financial Services Commission ('BVI FSC') . . . . FSC firms are subject to strict regulatory scrutiny, including annual independent audits, annual risk assessments and compliance reporting and punitive sanctions for firms that fail to fully comply with FSC requirements.  The regulations of the BVI FSC require that *customer assets are identified, accounted for, and appropriately segregated*." *Id.* ¶ 58 (quoting Ex. II) (emphasis added).  A page titled "ADVANTAGES OF WWM," in turn, stated: "Our high standards of regulation are approved by the FCA and FSC, which allows our firm to protect clients funds in order to provide a *safe and secure* online trading experience[,]" *id.* ¶ 59 (quoting Ex. JJ) (emphasis added).  Plaut "provided the contents of the [WWM] website."  *Id.* ¶ 60

The safety of customer funds was further addressed in WWM's marketing materials, such as an "Introduction to WorldWideMarkets" pitch deck stating that WWM "ensure[d] the highest level of security for its' [sic] customers' funds . . . " and that WMM's "[f]ully regulated firm and highly accountable management mean[t] safety of funds," Ex. D at 8–9 & CFTC SUF ¶ 63.

### 4.    WWM's initial segregation of customer funds

In the early days of WWM, the company held customer funds in a segregated bank account, separate from company money.  *See* CFTC SUF ¶¶ 93–97, 121.

Dembro discussed the segregation of customer funds in an October and November 2011 email exchange with others at WWM, which began on October 28, 2011, when he received an email from WWM's CLO attaching a document titled "Steve S[4] Qs on BVI.docx" and asking him to fill out certain portions of the document.  *Id.* ¶ 89 (quoting Ex. TT).  The two questions in the attached document assigned to Dembro to fill out were: "Are customer funds segregated?" and "What is the regulatory difference between the FSA and BVI as it pertains to the customer and the safety of funds?"  *Id.* ¶ 91 (quoting Ex. TT).  On November 2, 2011, Dembro responded to the email, writing: "Based on reading through the requirements I think we are in compliance with the requirements.  Customer funds are segregated into customer only accounts and those accounts are kept separate from operating funds."  *Id.* ¶ 93 (quoting Ex. MM).  Dembro testified that he "definitely read some of the requirements" he referenced in this email.  *Id.* ¶ 94.  Dembro then sent another email in the thread on November 3, 2011, writing, in relevant part:

> Bill/Ed use the paragraph below for Steve's FAQ . . . [:] As a British protectorate BVI's customer protection and safet of funds rules are modeled after the UK FSA rules.  Specifically customer assets must be kept in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank, and disclosed to the bank as customer funds.  WWM maintains customer funds at Scotia Bank, a NYSE registered institution that is the third largest Bank in Canada.

---

[4] "Steve S" was WWM's Chief Business Development Officer—a senior sales leader.  *Id.* ¶ 90.

*Id.* ¶ 95 (quoting Ex. MM).[5]   The next day, on November 4, 2011, WWM's Chief Marketing Officer William (Bill) O'Leary informed Dembro that the "BVI vs FSA document" would be disseminated on the "Middle East forums (and possibly [WWM's] website)." *Id.* ¶ 97 (quoting Ex. UU).  The "BVI vs FSA document" stated, *inter alia*, that (1) "customer assets must be kept in segregated accounts, identified to individual customers, on deposit at a BVI regulator approved bank, and disclosed to the bank as customer funds; [(2)]WWM's customer funds are appropriately segregated, accounted for, and held at two separate financial institutions (Scotia Bank and First Caribbean); [(3)] Customer money is not mixed with other money; and [(4)] Broker must ensure that any customer account that it maintains is separate from any of the broker's own bank accounts." *Id.* (citing Ex. UU).

### 5. *WWM's transfers to TAB*

But, in approximately March 2012, TAB began to transfer funds from its WWM bank accounts to TAB's bank account. *See* CFTC SUF ¶¶ 102–03, 124.  These transfers consisted at least in part of customer funds because WWM's bank accounts had no substantial sources of funds other than WWM customer deposits. *Id.* ¶ 102.[6]   Between May 2011 and December 2012, substantially all deposits into TAB's bank account consisted of either capital contribution from TAB shareholders or transfers from WWM's bank accounts. *Id.* ¶ 103.  And after December 2012, substantially all deposits into TAB's bank account consisted of transfers from WWM's bank accounts. *Id.* ¶ 104.  Dembro referred to WWM's April 2012 transfers of customer funds from WWM to TAB as a "customer debit bridge" in a presentation he sent to Plaut on May 16, 2012.

---

[5] Dembro testified that the statements he wrote were "true and accurate" at the time he made them. *Id.* ¶ 121 (quoting Ex. L ("Dembro Tr.") at 268:15–269:3).

[6] Dembro purports to dispute this fact, but the information he cites does not reference any other source of funds in WWM's bank accounts (it simply notes that Plaut "invested significant sums of his own money into WWM's parent, [TAB]"). *See* Response to CFTC SUF ¶ 102 (citing Ex. 1).

*Id.* ¶ 125.  In that presentation, Dembro stated: "Transfers out of the BVI accounts during the period examined [April 1, 2012, to April 30, 2012] are $812,233."  *Id.* ¶ 126 (quoting Ex. DDD). From January 1, 2012, through December 31, 2015, WWM transferred at least $3.6 million in money consisting, at least in substantial part, of customer money.  *See id.* ¶ 128 (citing 2017 Audit). Plaut was the person at WWM who gave "the green light for the money movement" from WWM's bank accounts to TAB's bank account.  Dembro Tr. 209:6–210:23; *see* CFTC SUF ¶¶ 137–39.

Withdrawals from TAB's bank account, in turn, were primarily composed of (1) payments associated with WWM's and TAB's operating expenses, (2) TAB employee payroll and benefits, and (3) cash distributions to TAB shareholders, primarily to Plaut.  CFTC SUF ¶ 105.  Dembro himself caused checks to be paid out of TAB's bank account to pay invoices for WWM's operating expenses.  *Id.* ¶ 130.

Consistent with those transfers, both Plaut and Dembro testified that WWM did not hold customer funds in segregated accounts.  *See id.* ¶ 66 (citing Dembro Tr. at 266:3–7 ("customer assets were not fully segregated in accounts") and Ex. NN ("Plaut Tr.") at 125:2–4 ("There is no segregated account . . . .")).

These transfers were reflected in the 2017 Audit, which covered the time period of January 1, 2012, through December 31, 2015.  *See id.* ¶ 157.  But the witness testifying on behalf of WWM's auditor suggested that the 2017 Audit did not disclose the *source* of the transfers—the nearly $4 million worth of "advances" of (primarily customer cash) from WWM to TAB.  *See* CFTC SUF ¶ 156.[7]  Dembro's exact role in the audit is disputed, but he testified that he "worked

---

[7] Dembro disputes that the auditor in fact testified that the 2017 Audit did not disclose that customer funds were the sources of the advances.  *See* Dembro MSJ at 33–34.  For the reasons set forth *infra* n.33, the Court leaves the task of interpreting this testimony to the jury.

. . . very closely with [the auditor]" on the report and drafted some footnotes (which comprise a significant percentage of the report).  CFTC SUF ¶¶ 155–56.

The 2017 Audit was created in in response to a letter from the BVI regulator's seeking information regarding the annual audits WWM was required to prepare and had failed to complete on an annual basis.  *See id.* ¶¶ 148–52.  WWM had, however, once before hired an auditor to audit WWM's financials—an audit completed by January 2013.  *See* Dembro SUF ¶ DA (citing Ex. 18 ("2013 Audit")).

### 6. *WWM's difficulties*

WWM experienced financial difficulties.  According to WWM's own records, its expenses exceeded its revenues by more than $7 million from 2012 through 2016.  CFTC SUF ¶ 17.  In approximately April 2017, WWM stopped processing customer requests to withdraw funds from WWM.  *Id.* ¶ 19 (citing *e.g.*, Ex. K (declaration from former TAB employee stating that WWM's Chief Operations Officer directed her to stop processing withdrawal requests); Dembro Tr. 325:23–326:6 (explaining that "customers were beginning to have trouble . . . with their funds right around that . . . April-May [2017] period")).  WWM's Chief Operations Officer Justin Liva characterized this time period as the "implosion," when he wrote to Plaut and Dembro in April 2018, "It has been a year since implosion and it doesn't seem like we're going anywhere." *Id.* ¶ 20 (quoting Ex. O).

WWM continued to solicit customer's money after the implosion.  *Id.* ¶ 21 (citing, *inter alia*, Ex. P (where a prospective customer asked to fund an account via bank wire transfer in March 2018 and WWM responded that it was not accepting wire transfers but was accepting transfers via credit/debit card and other methods)).

7.    *The CFTC's knowledge of WWM's activities*

WWM did not submit financial reports or report its undercapitalization to the CFTC.  *See* CFTC Opp. to Dembro MSJ at 29.  RFEDs registered with the CFTC are required to submit financial reports and a Director of Compliance Examinations at the National Futures Association opined that indications of significant undercapitalization would likely lead to further inquiry by the CFTC.  *See* Supplemental SUF ¶ 189 & Ex. DDDD ¶ 16.

A search of the CFTC's email records revealed that CFTC email addresses received 1,929 emails mentioning various terms related to WWM between January 1, 2011, and October 31, 2017, but the CFTC investigator who conducted that search declared under the penalty of perjury that none of those emails contained information related to potential fraud or regulatory violations.  *See* D.E. 174-1 ("Response to Dembro's SUF") ¶ EI; Supplemental SUF ¶¶ 205–207 (citing Ex. KKKK ¶¶ 5–7).

The following public information regarding WWM was available at various times over the course of WWM's operation, listed here from oldest to newest:

- A Facebook page titled "WorldWideMarket – Arabic" available as of January 2012, seemingly containing no relevant information in English, Ex. 48; Response to SUF & Counterstatement ¶ AK;

- Several posts on "www.forexpeacearmy.com" dated July 2013,  April 2014, and May 2014, stating, *inter alia*: "They [WWM] give you very good prices, specially [sic] during news. But when you want to withdraw your profits, they cancel your account and all your trades . . . and, after a long wait, they finally give you back your initial money (not your profits)[,]" Ex. 43; Response to SUF & Counterstatement ¶ AC;

11

- Several posts on "www.myfxbook.com" dated February 2012 through April 2014, stating, *inter alia*: "Everything is ok (good prices for a news spike trading) until you try to withdraw your profits... then they cancel all your trades without any explanation and, after two months, they give you back your initial money (not your profits that you earned). They don't answer your emails[,]" Ex. 46; Response to SUF & Counterstatement ¶ AG;

- Several posts on "www.forexfactory.com" dated July 2016, stating, *inter alia*, that WWM was a "Scam Dirty Broker" because after a customer had made a profit, "after [a] few hours they removed my profit and send me deposit back[,]" Ex. 42; Response to SUF & Counterstatement ¶ AB;

- A Facebook group called "WorldWideMarkets WWM – SCAM" with posts from 2016, containing one post stating, "I . . . was shocked by the decision of yours which was confiscating all the profits I made thus far[,]" Ex. 47; Response to SUF & Counterstatement ¶ AH;

- WWM press releases dated June 4, 2013, and June 5, 2014, titled "WorldWideMarkets Online Trading, an online forex broker, announces social media resources for forex traders," and "WorldWideMarkets Online Trading, Traditionally a Fixed Spread Forex Broker, Adds a Variable Spread Product," Ex. 49; Response to SUF & Counterstatement ¶ AL; and

- A post on "www.fraudalerts.nu" dated March 22, 2018, which, *inter alia*, states: "THE ADDRESS [WWM] LIST[S] IS SIMPLY AN OFFSHORE "COMPANY REGISTRARS" OFFICE AND 'WORLDWIDE' APPEARS TO HAVE NO PHYSICAL PRESENCE IN THE BVI AND ALL OFFICERS OF THE COMPANY APPEAR TO BE BASED IN THE UNITED STATES" and "After depositing Hundreds of Thousands into a trading account

with WorldWide Markets, in July 2017 Worldwide Markets stopped honoring my requests to withdraw cash. They stopped communicating, stopped answering telephone calls, and stopped responding to my emails. They effectively disappeared off the radar," Ex. 44; Response to SUF & Counterstatement ¶¶ AD–AF.

The CFTC received two referrals of information about WWM from the United States Securities and Exchange Commission ("SEC"), the first on or about October 30, 2017, and the second on or about November 1, 2018. Supplemental SUF ¶ 207.

### B.    Procedural History

The CFTC filed this action against Defendants on December 27, 2021. D.E. 1 ("Complaint"). The Plaut Defendants were served with the Complaint on January 10, 2022, D.Es. 11–13, but did not timely answer or otherwise respond to the Complaint, so the Clerk of Court entered default as to the Plaut Defendants on February 15, 2022, *see* Dkt.

Dembro, for his part, waived service on December 27, 2021, D.E. 9, and timely moved to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) on February 25, 2022, D.E. 24 ("Motion to Dismiss Complaint"). On March 7, 2022, the Plaut Defendants filed unopposed motions to vacate the Clerk's entries of default. D.Es. 26 & 27. That same day, the Plaut Defendants also filed unopposed motions to join in Dembro's Motion to Dismiss Complaint. D.Es. 28 & 29. After the Motion to Dismiss Complaint was fully briefed, the Hon. Kevin McNulty, U.S.D.J., entered an opinion and order (1) granting Plaut and WWM's and TAB's motions to vacate the Clerk's entries of default, (2) granting Plaut and WWM's and TAB's motions to join Dembro's Motion to Dismiss Complaint, and (3) granting in part and denying in part the Motion to Dismiss Complaint. D.Es. 37 ("Opinion on Motion to Dismiss Complaint") & 38.

In his Opinion on Motion to Dismiss Complaint, Judge McNulty addressed three categories of arguments: (1) whether the action was timely, (2) whether the CFTC had plausibly alleged a domestic application of the CEA, and (3) whether the CTFC had sufficiently stated claims against Defendants. *See id.*

Beginning with timeliness, Judge McNulty first dismissed Count II of the Complaint "as to conduct occurring before August 15, 2011, the effective date" of Section 6(a) of the CEA and implementing Regulation 180.1 (the section and regulation under which Count II is brought). *Id.* at 17. He then found that the five-year statute of limitations set forth in 28 U.S.C. § 2462 applied to—and barred—the CFTC's claim for civil monetary penalties against Defendants for conduct occurring before December 27, 2016 (five years prior to the filing of the Complaint), rejecting the CFTC's argument that § 2462 should be tolled based on Defendants' fraudulent concealment of their alleged unlawful activity. *Id.* at 12–13. He did, however, only dismiss the civil monetary penalty claim *without prejudice* to the CFTC amending its Complaint to plead facts supporting equitable tolling under a fraudulent concealment theory. *Id.* at 13. Judge McNulty further held that § 2462 did not bar the CFTC's claims for injunctive relief based on conduct occurring pre-December 27, 2016, because injunctive relief is not the type of punitive remedy covered by § 2462. *Id.* at 13–16. Closing out the timeliness issues, Judge McNulty found that it was premature to dismiss the CFTC's claims for disgorgement and restitution as time-barred under § 2462 because the parties had not briefed how those remedies operated in practice, preventing him from determining whether they were punitive remedies subject to § 2462. *Id.* at 16–17.

Judge McNulty then turned to the parties' arguments regarding extraterritoriality, ultimately determining that, while the CEA does not apply extraterritorially, the CFTC had plausibly alleged a domestic basis for its claims under the CEA. *Id.* at 17–23. Applying Supreme

Court and Third Circuit precedent, Judge McNulty found that the CFTC had plausibly alleged "that the forex trades between WWM and its customers were 'domestic transactions'" because the CFTC had set forth facts "suggest[ing] that irrevocable liability regarding the forex trades occurred within the United States." *Id.* at 21–22. Judge McNulty therefore declined Defendants' invitation to dismiss the CEA's claims as impermissibly foreign in nature. *Id.*

Judge McNulty finally addressed Defendants' arguments that the CFTC had failed to state a claim against them. *Id.* at 23–34. He held that the CFTC had stated claims for fraud by misrepresentation and omission and for fraud by misappropriation against the Plaut Defendants under both Counts I and II of the Complaint, finding that the CFTC had alleged principal violations by WWM, as well as controlling person liability against Plaut and common enterprise liability against TAB. *Id.* at 25–29. As to Dembro, however, Judge McNulty determined that the CFTC had stated a claim for aiding and abetting WWM's fraud by misappropriation under Counts I and II but had failed to state a claim for aiding and abetting WWM's fraud by misrepresentation and omission under those same counts. *Id.* at 30–35. Judge McNulty came to this conclusion because he found that the CFTC had only alleged that Dembro had failed to correct statements that later became untrue and that this alleged failure to correct earlier statements was insufficient to establish aiding and abetting liability. *Id.* at 33–35. Consistent with this conclusion, Judge McNulty dismissed Counts I and II to the extent they alleged Dembro's aiding and abetting liability with respect to WWM's alleged misrepresentations. *Id.* at 35.

Shortly after Judge McNulty issued his Opinion on Motion to Dismiss Complaint, Dembro filed a motion for a certificate of appealability, seeking the certification of an interlocutory appeal on the question of "whether the activities of Defendants were outside the territorial jurisdiction of this Court under the [CEA] because they were 'predominantly foreign' pursuant to" a Second

Circuit decision. D.E. 40 ("Motion for Certificate of Appealability"). After Defendants answered the Complaint, D.Es. 41, 43–44, 46, Judge McNulty issued an opinion and order denying Dembro's Motion for Certificate of Appealability, D.E. 47 ("Denial of Motion for Certificate of Appealability"). In short, Judge McNulty held that, while the question of whether a transaction is domestic under the CEA was "of indisputable importance to the case," Dembro had "failed to show a 'substantial ground for difference of opinion' [in the Third Circuit] warranting the certification of Dembro's proposed question." *Id.* at 8.

Dembro's Motion for Certificate of Appealability having been resolved, the CFTC filed (with Defendants' consent) its Amended Complaint on October 5, 2022. *See* D.E. 53. Dembro moved to dismiss the Amended Complaint on October 18, 2022. D.E. 60 ("Dembro's Motion to Dismiss Amended Complaint"). Plaut, WWM, and TAB filed a separate motion to dismiss on November 2, 2022. D.E. 64 ("Plaut Defendants' Motion to Dismiss Amended Complaint") (together with Dembro's Motion to Dismiss Amended Complaint, "Motions to Dismiss Amended Complaint").

While the Motions to Dismiss Amended Complaint were pending, the parties commenced discovery. *See* D.E. 62. Shortly before depositions were to begin in January 2023, Plaut's counsel sought to stay the action indefinitely due to Plaut's health. D.E. 72. Plaut's counsel, as well as counsel for TAB and WWM, then moved to withdraw as counsel for their respective clients because their clients had not paid their legal fees. D.Es. 82 & 84. The Hon. Leda D. Wettre, U.S.M.J., accordingly stayed discovery on February 17, 2023, pending the resolution of those motions to withdraw, D.E. 85—which she ultimately granted on March 29, 2023. D.E. 90. Since the motions to withdraw as counsel were granted, no lawyers have appeared for WWM, TAB, or Plaut, nor has Plaut attempted to defend the case *pro se*. *See* Dkt. The Clerk of Court accordingly

entered default as to WWM and TAB on May 2, 2023, for failure to retain substitute counsel. *See* D.E. 93; Dkt.

On June 5, 2023, Judge McNulty issued an opinion and order denying Defendants' Motions to Dismiss Amended Complaint on statute of limitations grounds. D.E. 97 ("Opinion on Motions to Dismiss Amended Complaint"). Judge McNulty first rejected Defendants' argument that, under Supreme Court precedent, fraudulent concealment is not a basis for tolling the statute of limitations set forth in 28 U.S.C. § 2462, concluding that Defendants had read the applicable Supreme Court precedent too broadly. *Id.* at 5–8. Judge McNulty therefore turned to whether the CFTC had adequately pled fraudulent concealment in its Amended Complaint and determined that it had in fact done so, including with respect to Dembro. *Id.* at 8–13. Finally, Judge McNulty held that CFTC's disgorgement claims fell within the ambit of 28 U.S.C. § 2462 but its restitution claims did not. *Id.* Per Judge McNulty, the disgorgement claims were not, however, subject to dismissal because the CFTC had successfully pled fraudulent concealment. *Id.* at 17. In short, Judge McNulty found that none of the CFTC's claims were subject to dismissal on timeliness grounds because (1) the CFTC's restitution claims did not fall under the ambit of § 2462 (nor did their claims for injunctive relief, per the Opinion on Motion to Dismiss Complaint) and (2) while the CFTC's disgorgement claims were subject to the statute of limitations in § 2462 (as were their claims for monetary penalties, per the Opinion on Motion to Dismiss Complaint), the doctrine of fraudulent concealment could serve to toll the statute of limitations set forth in § 2462 and the CFTC had sufficiently alleged fraudulent concealment at that juncture. *See id.*

After the denial of Defendants' Motions to Dismiss Amended Complaint, discovery resumed, *see* D.E. 96, and Dembro answered the Amended Complaint, D.E. 98 ("Dembro's

Answer").  Upon the CFTC's request, D.E. 99, the Clerk of Court entered default as to Plaut on

July 13, 2023, for failure to answer the Amended Complaint.  *See* Dkt.

On November 19, 2023, this action was reassigned to the undersigned.  D.E. 113.  Dembro

and the CFTC subsequently completed discovery in March 2024.  *See* D.Es. 126 & 133.  The

CFTC initially filed its motion for default judgment on Counts III, IV, and V on April 25, 2024,

D.E. 136 ("Initial Default Judgment Motion"), and, the next day, filed its motion for summary

judgment on Counts I and II, D.E. 138.  On May 31, 2024, Dembro cross-moved for summary

judgment and opposed the CFTC's motion for summary judgment.  D.E. 140 (together with D.E.

138, the "Initial Summary Judgment Motions").  The Initial Summary Judgment Motions were

fully briefed by July 15, 2024.  *See* D.E. 147.  Shortly thereafter, however, this Court determined

that was unable to decide the Initial Summary Judgment Motions due to Dembro's improper

responsive statement of material facts and supplemental statement of disputed material facts—

which, *inter alia*, contained numerous evidentiary objections about which Dembro's counsel had

not met and conferred with the CFTC.  D.E. 147.  The Court accordingly administratively

terminated the Initial Summary Judgment Motions and Initial Default Judgment Motion (because

it found that it could not decide the Initial Default Judgment Motion until it had decided the Initial

Summary Judgment Motions) and provided instructions on how the parties could remedy the issues

it had identified.  *Id.*

After the parties met and conferred and Judge Wettre resolved several of Dembro's

evidentiary objections, the parties briefed the remaining evidentiary objections.  *See* D.Es. 148–

56, 160–67.  The undersigned ultimately overruled Dembro's remaining evidentiary objections,

holding that (1) evidence from as far back as 2011 was relevant to Dembro's liability under the

CEA and (2) Federal Rule of Evidence 1002 (the best evidence rule) did not render inadmissible

a declaration regarding the CFTC's search for records relevant to Dembro's statute of limitation arguments.  D.E. 168 ("Order Overruling Evidentiary Objections").  The Court further set a briefing schedule for re-filing the summary judgment and default judgment motions.  *Id.*

Consistent with that schedule, the CFTC filed its Motion for Summary Judgment on the issue of liability only against all Defendants on Counts I and II of the Amended Complaint on March 3, 2025, along with its SUF and first set of exhibits, D.Es. 169-2–4 (Exs. A–PPP).  That same day, Dembro filed his Cross-Motion for Summary Judgment, as well as his Response to SUF & Counterstatement and his first set of exhibits, D.Es. 170-3–23 (Exs. 1–20), 171–73 (Exs. 21– 67).  The CFTC then filed its Opposition to Dembro Cross-Motion for Summary Judgment, in addition to its Response to Dembro's SUF, Supplemental SUF, and final set of exhibits, D.E. 174-3 (Exs. QQQ–RRR).  Dembro, in turn, filed his Reply, Response to Supplemental SUF, and a final exhibit, D.E. 175-3 (Ex. 68).  The Plaut Defendants have neither opposed nor joined the Summary Judgment Motions.  *See* Dkt.

On March 3, 2025, the CFTC also moved for default judgment on the issue of liability only against the Plaut Defendants on Counts III, IV, and V.  Default Judgment Motion.  In support of its Default Judgment Motion, the CFTC submitted a declaration from its counsel, Joseph Platt.  D.E. 176-1 ("Platt Declaration" or "Platt Decl.").  The Plaut Defendants have not opposed the Default Judgment Motion.  *See* Dkt.

## II.    SUMMARY JUDGMENT MOTIONS

The CFTC moves for summary judgment against all Defendants on Counts I and II of the Amended Complaint and Dembro opposes and cross-moves for summary judgment on Counts I and II.  For the following reasons, the Court will (1) **GRANT in part** and **DENY in part** the

CFTC's Motion for Summary Judgment and (2) **GRANT in part** and **DENY in part** Dembro's Cross-Motion for Summary Judgment.

### A.    Legal Standard

A court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson*, 477 U.S. at 248).

The movant bears the initial responsibility to establish the basis for the motion for summary judgment and to identify the portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmoving party bears the burden of proof on an issue, the moving party's initial burden can be met simply by "pointing out to the district court . . . that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

After the moving party has met its initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Under Rule 56, a court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Blair v. Scott Specialty Gases*, 283 F.3d 595, 608 (3d Cir. 2002), as are unsworn statements in memoranda and unsupported statements in pleadings, *Schoch v. First Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990).

**B.    Analysis**

The CFTC and Dembro each move for summary judgment on numerous issues bearing on Defendants' liability as to Counts I and II, including Dembro's statute of limitations defense, extraterritoriality, and the substantive analysis of the CFTC's fraud claims against each Defendant. As set forth in further detail below, the Court finds that (1) CFTC's claims for restitution are not time-barred, (2) there is a genuine dispute as to whether Defendants fraudulently concealed their conduct and thus as to whether the five-year statute of limitations bars the CFTC's claims for monetary penalties and disgorgement as to acts prior to December 27, 2016, but no genuine dispute that Dembro has not established the existence of storm warnings, (3) the CFTC has established, as a matter of law, that its claims constitute a domestic application of the CEA, (4) WWM is liable for its misrepresentations related to customer funds and misappropriation of those same funds as alleged in Counts I and II, (5) TAB is liable for WWM's violations under the common enterprise theory of liability, (6) Plaut is liable for WWM's violations as WWM's controlling person, and (7) there is a genuine dispute as to each of the elements applicable to the CFTC's aiding and abetting claims against Dembro.

The Court will accordingly **GRANT in part** and **DENY in part** the CFTC's Motion for Summary Judgment, as well as **GRANT in part** and **DENY in part** Dembro's Cross-Motion for Summary Judgment.

### 1. *Statute of limitations*

Both Dembro and the CFTC argue that they are entitled to summary judgment on Dembro's affirmative statute of limitations defense. *See, e.g.*, CFTC MSJ at 38–40; Dembro MSJ at 14–22. Dembro, for his part, asserts that 28 U.S.C. § 2462 bars the CFTC's claims for civil penalties, disgorgement, and restitution based on events occurring prior to December 27, 2016, and therefore that he is entitled to summary judgment on those portions of those claims. *See* Dembro MSJ at 14.[8]    The CFTC, in turn, asks the Court to affirm Judge McNulty's prior legal rulings in his Opinion on Motions to Dismiss Amended Complaint and further find that it has established the elements of fraudulent concealment as a matter of law such that it is entitled to summary judgment on Dembro's statute of limitations defense. *See* CFTC Opp. to Dembro MSJ at 27–40.

28 U.S.C. § 2462 provides that:

> Except as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when

---

[8] Dembro also moves for summary judgment on claims in Count II based on events occurring before "the August 15, 2011[,] effective date" of Section 6(a) of the CEA and implementing Regulation 180.1 (the section and regulation under which Count II is brought)." *Id.* at 13-14. Judge McNulty has already dismissed Count II of the Complaint "as to conduct occurring before August 15, 2011, the effective date" of Section 6(a) of the CEA and implementing Regulation 180.1. Opinion on Motion to Dismiss Complaint at 17. The CFTC does not ask the Court to disturb this dismissal, nor does the Court see a need to do so. To the extent Dembro is arguing that the CFTC should be prohibited from offering evidence of conduct prior to August 15, 2011, in support of its claims regarding conduct that occurred after the date, however, the Court re-iterates its holding in its Order Overruling Evidentiary Objections that such evidence is relevant because it "goes to the mechanics of the alleged scheme, Defendants' scienter, or relevant background and context for the scam." Order Overruling Evidentiary Objections at 7. For the avoidance of doubt, the Court accordingly holds that the CFTC is not prohibited from offering on either timeliness or relevance grounds evidence of Defendants' conduct prior to August 15, 2011, in support of its claims regarding conduct that occurred after the date.

> the claim first accrued if, within the same period, the offender or the property is found within the United States in order that proper service may be made thereon.

In his Opinion on Motions to Dismiss Amended Complaint, Judge McNulty held that § 2462 applies to the CFTC's claims for civil penalties and disgorgement but not to its claims for injunctive relief and restitution. *Id.* at 13–17. Dembro now asks the Court to revisit Judge McNulty's ruling with respect to restitution and find instead that § 2462 bars the CFTC's restitution claims for conduct prior to December 27, 2016. Dembro MSJ at 21–22. The Court declines to do so and will accordingly **DENY** Dembro's Cross-Motion for Summary Judgment as to the CFTC's restitution claim. The Court will, however, **GRANT** the CFTC summary judgment as to the third element of the fraudulent concealment inquiry—whether the CFTC exercised reasonable due diligence in attempting to uncover facts relevant to Defendants' wrongdoing, but will not grant either the CFTC or Dembro summary judgment as to the first two elements of the fraudulent concealment inquiry because Dembro has demonstrated that there is a genuine dispute as to those elements. The overall question of whether the CFTC's claims for monetary relief and disgorgement based on wrongdoing prior to December 27, 2016, should be dismissed as time-barred is therefore a question for a jury.

### a.    Restitution

As noted *supra*, Judge McNulty held, as a matter of law, that the CFTC's claims for restitution are not subject to the five-year statute of limitations set forth in § 2462. Opinion on Motions to Dismiss Amended Complaint at 14–17. Dembro urges the Court to reconsider that ruling. *See* Dembro MSJ at 21–22. The Court will not.

As an initial matter, while neither of the parties have raised it, the Court finds that the law of the case doctrine applies here and that it counsels rejecting Dembro's attempt to re-litigate Judge McNulty's legal ruling regarding the applicability of § 2462 to restitution claims under the CEA.[9]

"The law of the case doctrine directs courts to refrain from re-deciding issues that were resolved earlier in the litigation." *Pub. Int. Rsch. Grp. of New Jersey, Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 116 (3d Cir. 1997). The doctrine "promotes finality and judicial economy" by "prevent[ing] courts from entertaining endless appeals on the same issue" and has "developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." *Id.* (quoting 18 Charles A. Wright, Arthur R. Miller, Edward Cooper, Federal Practice and Procedure § 4478 at 788 (1981)). While the doctrine "does not limit a federal court's power," it does "direct[] its exercise of discretion." *Id.* (citing *Arizona v. California*, 460 U.S. 605, 619 (1983)). Accordingly, and as relevant here, "[a]lthough [the doctrine] does not limit the power of trial judges from reconsidering issues previously decided by a predecessor judge from the same court or from a court of coordinate jurisdiction, it does recognize that as a matter of comity a successor judge should not lightly overturn decisions of h[er] predecessors in a given case." *Fagan v. City of Vineland*, 22 F.3d 1283, 1290 (3d Cir. 1994). Consistent with the principles underlying the doctrine, the Supreme Court has held that "as a rule courts should be loath[] to [revisit their prior decisions in a case] in the absence of extraordinary circumstances . . . ." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 817 (1988). The Third Circuit has further instructed that those extraordinary circumstances warranting revisitation of a prior ruling

---

[9] The Court notes that its discussion of the law of the case doctrine is relevant to many of the issues in this Opinion as both Dembro and the CFTC ask the Court to revisit several holdings from Judge McNulty's prior opinions in this matter. The Court will apply the analysis set forth *infra* to all issues to which it determines the doctrine applies.

exist where "(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and would create manifest injustice." *In re City of Philadelphia Litig.*, 158 F.3d 711, 718 (3d Cir. 1998).

Here, Dembro has failed to show that Judge McNulty's holding in his Opinion on Motions to Dismiss Amended Complaint that, as a matter of law, the CFTC's claims for restitution are not subject to the five-year statute of limitations set forth in § 2462 "falls into any of the categories of extraordinary circumstances which would free [the Court] from the constraints of the law of the case doctrine." *Id.* As a preliminary matter, Dembro references Judge McNulty's initial denial of Defendants' Motion to Dismiss Complaint with respect to restitution on the ground that it was premature. *See* Dembro MSJ at 21. But the relevant (and operative) previous holding in this case is Judge McNulty's holding in his Opinion on Motions to Dismiss Amended Complaint described above, which he made as a matter of law and which did not state that ruling on the applicability of § 2462 was premature. *See* Opinion on Motions to Dismiss Amended Complaint at 14–17. In any event, Dembro's argument that Judge McNulty was incorrect that restitution claims under the CEA are not penalties within the ambit of § 2462 falls far short of extraordinary circumstance required to revisit the ruling. Dembro has not shown that any new evidence is available nor that a supervening law has been announced since Judge McNulty's ruling. Dembro has further failed to establish that Judge McNulty's ruling was clearly erroneous. The Court need not set forth Judge McNulty's persuasive analysis in full here, but, to summarize, Judge McNulty (1) used the Supreme Court's decision in *Kokesh v. SEC*, 581 U.S. 455 (2017) as a starting point for his analysis and drew from this decision applying § 2462 to SEC enforcement actions the animating principle that "a pecuniary sanction operates as a penalty if it is sought for the purpose of punishment, and to deter others from offending in like manner rather than to compensate victims," Opinion on

Motions to Dismiss Amended Complaint at 14 (quoting *Kokesh*, 581 U.S. at 462); (2) considered the Third Circuit's precedential opinion in *SEC v. Gentile*, 939 F.3d 549 (3d Cir. 2019), which found that "injunctions pursuant to SEC enforcement actions are not 'penalties' subject to § 2462's statute of limitations" because injunctions serve "remedial" purposes, Opinion on Motions to Dismiss Amended Complaint at 14 (citing *Gentile*, 938 F.3d at 556); (3) reviewed out-of-circuit case law considering the application of § 2462 specifically to restitution claims under the CEA (rather than in the similar, but distinct, SEC enforcement context) and agreed with a court in the Southern District of Florida's determination that restitution payments under the CEA operate differently than disgorgement payments under the same because the "CEA requires restitution to be paid to victims, not the U.S. Treasury, and is limited to the amount of loss sustained by the victims," *id.* at 15–17 (citing, *inter alia*, *CFTC v. S. Tr. Metals, Inc.*, No. 14-22739, 2017 WL 10440763, at 4 (S.D. Fla. July 6, 2017), *report and recommendation adopted*, 2017 WL 3835692 (S.D. Fla. Sept. 1, 2017)); (4) distinguished a Third Circuit case recognizing that "in some cases, civil restitution 'serves a deterrent function'" by explaining that "[t]he regulatory scheme of the CEA suggests a certain division of labor between disgorgement and restitution: the disgorgement remedy is intended to punish and deter, while the restitution remedy serves to compensate," *id.* at 16 (quoting *United States v. Lane-Labs-USA Inc.*, 427 F.3d 219, 229–30 (3d Cir. 2005); and (5) based on the foregoing, concluded that restitution claims under the CEA are not penalties and that they are therefore not subject to § 2462's statute of limitations, *id.* at 17.

The Court is persuaded by Judge McNulty's comprehensive analysis. The Court therefore finds Dembro's citation—without elaboration—of *Gentile*, *Kokesh*, and a case discussing disgorgement—not restitution—decided after Judge McNulty's ruling, *United States v. Jumper*,

74 F.4th 107 (3d Cir. 2023),[10] insufficient to establish that Judge McNulty's thorough analysis of the nature of restitution as a form of relief was clearly erroneous. The Court will accordingly **DENY** Dembro's Cross-Motion for Summary Judgment as to CFTC's restitution claim.

    b.    <u>Monetary penalties and disgorgement</u>

The Court now turns to the parties' arguments regarding the CFTC's claims for monetary penalties and disgorgement.[11]

The Court first notes that Dembro and the CFTC both agree (at least implicitly) that the CFTC's claims for civil monetary relief and disgorgement are subject to § 2462's statute of limitations. *See* Dembro MSJ at 21–22; CFTC Opp. to Dembro MSJ at 27–40 (declining to challenge Judge McNulty's ruling that § 2462 applies to its disgorgement claims). The Court will accordingly follow the parties' lead and will not disturb Judge McNulty's able ruling that the CFTC's claims for civil monetary relief and disgorgement are penalties falling within § 2462's ambit. *See* Opinion on Motion to Dismiss Complaint at 13–15; Opinion on Motions to Dismiss Amended Complaint at 13–17.

Because § 2462's five-year statute of limitations therefore applies to the CFTC's claims for monetary penalties and disgorgement as to conduct prior to December 27, 2016 (five years before the filing of the Complaint), the CFTC argues that the doctrine of fraudulent concealment

---

[10] In *Jumper*, the Third Circuit discussed *Koresh* in holding that disgorgement in the SEC enforcement context was a civil penalty within the meaning of § 2462 rather than a criminal punishment to which the Double Jeopardy Clause would apply. *See id.* at 111–14. Civil restitution was not at issue. *See id.*

[11] Dembro does not dispute that the CFTC's claims for injunctive relief are not subject to § 2462 and are therefore not time-barred. *See* Dembro MSJ at 14–22.

operates to toll § 2462 for those claims. *See* CFTC MSJ at 38.[12] As Judge McNulty has explained—and neither Dembro nor the CFTC dispute,

> [i]n the Third Circuit, equitable tolling under the doctrine of fraudulent concealment requires three elements: "(1) that the defendant actively misled the plaintiff; (2) which prevented the plaintiff from recognizing the validity of his or her claim within the limitations period; and (3) where the plaintiff's ignorance is not attributable to his or her lack of reasonable due diligence in attempting to uncover the relevant facts."

Opinion on Motion to Dismiss Complaint at 12 (quoting *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 509 (3d Cir. 2006)). Applying this test to the Complaint, Judge McNulty found that the Complaint "lack[ed] facts bearing on the [CFTC's] due diligence in uncovering Defendants' alleged wrongdoing" such that the CFTC had "not adequately pled fraudulent concealment . . . and [§] 2462's five-year statute of limitations [was] not tolled for the [CFTC's] civil monetary penalty claim," but noted that the "dismissal [was] without prejudice to a properly supported motion to amend the complaint to plead facts that would remedy the deficiencies" he had identified. *Id.* at 12–13. Upon consideration of the CFTC's subsequent Amended Complaint, Judge McNulty held that the CFTC had, at that point, sufficiently pled facts to support its fraudulent concealment theory. Opinion on Motions to Dismiss Amended Complaint at 8–13.

The CFTC now asks this Court to find, as a matter of law, that the elements of fraudulent concealment (on which it bears the burden of proof) are undisputably met such that it is entitled to

---

[12] While Dembro had previously disputed that fraudulent concealment is even a cognizable basis for tolling § 2462's statute of limitations, *see* Opinion on Motions to Dismiss Amended Complaint at 5–8, it is not entirely clear whether Dembro challenges Judge McNulty's determination that the fraudulent concealment is applicable here. *See* Dembro MSJ at 17 (obliquely, and in merely two sentences, asserting that the discovery rule (which determines when a claim begins to accrue) does not apply here). In any event, this Court agrees with Judge McNulty's reasoning on this threshold issue and adopts his holding that, under applicable Supreme Court and Third Circuit precedent, the CFTC "may invoke fraudulent concealment as a basis for tolling the limitations period set forth in § 2462." *See* Opinion on Motions to Dismiss Amended Complaint at 5–8.

summary judgment on Dembro's statute of limitations defense. *See* CFTC MSJ at 38–40; CFTC Opp. to Dembro MSJ at 28–40. Dembro, on the other hand, asks the Court to conclude that the CFTC had not presented evidence of fraudulent concealment sufficient to toll the statute of limitations and therefore that he is entitled to summary judgment on the portions of the CFTC claims for monetary relief and disgorgement. *See* Dembro MSJ at 15–21.

As explained in more depth *infra*, the Court concludes that the CFTC is entitled to summary judgment as to the third element of fraudulent concealment (whether the CFTC exercised reasonable due diligence in attempting to uncover facts relevant to Defendants' wrongdoing) but that Dembro has demonstrated that there is a genuine dispute as to the first two elements of fraudulent concealment, precluding the Court from deciding at this stage of the proceedings whether § 2462's statute of limitations should be tolled under a fraudulent concealment theory.

        i.     First and second elements: Active misleading preventing recognition of claims

Starting with the question of whether Dembro actively misled the CFTC preventing the CFTC from recognizing the validity of its claims within the limitations period (the first two elements of fraudulent concealment), the Court holds that a reasonable jury could answer the question in the either the affirmative or the negative.[13]

---

[13] As an initial matter, the Court finds that there is no genuine dispute that the CFTC first became aware of information related to the claims in this case on or around October 30, 2017 (outside the limitations period), when it received a referral from the SEC with information about WWM. *See* Supplemental SUF ¶¶ 205–07. While Dembro attempts to suggest that the CFTC could have recognized the validity of its claims within the limitations period based on the existence of 1,929 emails mentioning various terms related to WWM received by CFTC email addresses between January 1, 2011, and October 31, 2017, *see supra* Section I.A.7 (citing Dembro SUF ¶ EI), Dembro has not presented any evidence rebutting a CFTC's investigator's sworn declaration averring that none of those emails contained information suggesting potential fraud or regulatory violations, nor has Dembro attempted to take any discovery on this issue, *see id.*; Response to Dembro's SUF ¶ EI; Supplemental SUF ¶¶ 205–207 (citing Ex. KKKK ¶¶ 5–7). The Court accordingly agrees with

In doing so, the Court applies the law of the case doctrine to Judge McNulty's legal ruling that "acts of concealment carried out by the other defendants may be imputed to Dembro," Opinion on Motions to Dismiss Amended Complaint at 12–13, and finds that it militates adopting it here because Dembro has not established any extraordinary circumstances warranting revisiting that ruling.[14]

The Court therefore looks to the acts of WWM (as well as Plaut and TAB) in reaching its conclusion that the CFTC has adduced sufficient evidence suggesting that Dembro actively misled the CFTC, thus preventing the CFTC from recognizing the validity of his claims, to survive Dembro's Motion for Summary Judgment. Specifically, the Court finds that the CFTC has brought forward evidence from which a reasonable jury could—but not necessarily would—conclude that WWM intentionally evaded the CEA's regulatory requirements by, *inter alia*, failing to register as a retail forex dealer, thereby preventing the CFTC from uncovering the fraudulent nature of WWM's business and concealed its New Jersey headquarters, which, in turn, hindered victims from complaining to the CFTC rather than foreign regulators.

With respect to WWM's failure to register, the CFTC has, for instance, submitted evidence showing that: (1) WWM was required to register as an RFED with the CFTC, *see infra* Section III.B.2.a; (2) WWM did not register as an RFED with the CFTC, *see* Supplemental SUF ¶ 187; (2)

---

the CFTC that there is no genuine dispute that the CFTC first learned of information relating to the claims at issue here on or about October 30, 2017.

[14] Dembro wholly fails to engage with Judge McNulty's analysis of the application of the fraudulent concealment doctrine where a defendant is alleged to have aided and abetted fraud and, instead (as Dembro is here), and, instead, simply argues that the acts of the other Defendants "are irrelevant to the CFTC's claim of fraudulent concealment by" Dembro. *See* Dembro MSJ at 19. Without more, the Court is not compelled to conclude that Judge McNulty's ruling is clearly erroneous or that any other extraordinary circumstance is present here.

Plaut was aware that retail forex dealers registered with the CFTC, *see* CFTC SUF ¶¶ 1–4; (3) WWM did not submit financial reports or report undercapitalization to the CFTC, *see* CFTC Opp. to Dembro MSJ at 29; and (4) RFEDs registered with the CFTC are required to submit financial reports and any indications of significant undercapitalization would likely lead to further inquiry by the CFTC, *see* Supplemental SUF ¶ 189 & Ex. DDDD ¶ 16.  A jury could reasonably infer from these facts that WWM intentionally failed to register as an RFED and that this intentional failure misled the CFTC, preventing the CFTC from recognizing prior to October 30, 2017, that it had claims against Defendants.  But a jury could also, on the other hand, reasonably find these facts insufficient to, for instance, establish that CFTC would have uncovered the WWM's fraudulent scheme had WWM registered such that the CFTC was not necessarily prevented from recognizing the claims because of any misleading acts.  Summary judgment is therefore inappropriate.

And with respect to the headquarters issue, the CFTC has adduced facts showing that: (1) WWM was headquartered in New Jersey, *see* Response to SUF & Counterstatement ¶ 7; (2) WWM's customer agreement and website represented that WWM was located in the BVI and did not disclose that WWM's headquarters was in New Jersey, *see* Response to Supplemental SUF ¶ 191; (3) Plaut's LinkedIn profile falsely stated that WWM was headquartered in London, *see* Supplemental SUF ¶ 192 & Ex. 45 at 4; and (4) there is no evidence that a license application WWM submitted to the BVI Financial Services Commission listing WWM's headquarters as being in New Jersey was ever publicly disseminated, Dembro SUF ¶ EB & Supplemental SUF ¶ 193.  From these facts, a reasonable jury could find that WWM concealed its New Jersey headquarters such that customers did not complain to the CFTC, which, in turn, prevented the CFTC from learning information relevant to its claims.  On the flip side, a jury could reasonably determine that publicly available information regarding the location of the WWM's officers (in

the United States), *see* Ex. 45 (Plaut's LinkedIn profile disclosing his location as New Jersey), undermines an inference of fraudulent concealment.

Because the Court finds that these facts adequately show that WWM's conduct was directed at the CFTC, Dembro's argument that the acts fraudulently concealing violations must be directed at the CFTC is beside the point. *See* Dembro MSJ at 19–20. While it is true that the CFTC also argues that Defendants further concealed their fraudulent scheme through its "Ponzi-like operation" and by misleading foreign regulators and ignoring customers but does not contend that these acts were specifically directed at the CFTC, *see* CFTC Opp. to Dembro MSJ at 30–32, the Court nevertheless finds evidence of those acts relevant to the fraudulent concealment inquiry *writ large*, as it strengthens the inference that the other acts specifically directed at the CFTC were intended to conceal misconduct. Similar logic applies to acts undertaken after the CFTC first learned of the potential misconduct on or around October 30, 2017, as continued concealment could, in turn, strengthen the inference that such concealment is fraudulent. *See In re Glumetza Antitrust Litig.*, 611 F. Supp. 3d 848, 863 (N.D. Cal. 2020) ("[D]efendants' continued concealment of [a contractual] provision strengthens the inference that the original omission was deliberate. Such deliberate, material omission supports an inference of fraudulent concealment."). The Court will accordingly reject Dembro's contention that acts after October 30, 2017, as well as acts not obviously directed at the CFTC, are irrelevant to the fraudulent concealment inquiry. *See* Dembro MSJ at 19–20.

ii.    Third element: Due diligence/storm warnings

Having determined that a jury could reasonably side with either Dembro or the CFTC on the first two elements of the fraudulent concealment test, the Court proceeds to the third element: whether the CFTC's ignorance was attributable to its lack of reasonable due diligence in

attempting to uncover the relevant facts. "In determining whether a plaintiff exercised due diligence, the Court must consider: (1) whether the plaintiffs knew or should have known of the possibility of fraud because there were sufficient storm warnings on the horizon, and, (2) whether, if there were such warnings, plaintiffs exercised due diligence to recognize them and to determine their origin and the extent of the fraud." Opinion on Motions to Dismiss Amended Complaint at 10-11 (quoting *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 317 (D.N.J. 2004)). Storm warnings "are essentially any information or accumulation of data 'that would alert a reasonable person to the probability that misleading statements or significant omissions had been made.'" *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 507 (3d Cir. 2006) (quoting *Mathews v. Kidder, Peabody & Co.*, 260 F.3d 239, 252 (3d Cir. 2001)). But as the Third Circuit has specified, "simply stating that a smattering of evidence hinted at the possibility of some type of fraud does not answer the question whether there was 'sufficient information of possible wrongdoing . . . to excite storm warnings of culpable activity[.]'" *In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 543 F.3d 150, 164 (3d Cir. 2008) (quoting *Benak ex rel. All. Premier Growth Fund v. All. Cap. Mgmt. L.P.*, 435 F.3d 396, 400 (3d Cir. 2006)), *aff'd sub nom. Merck & Co. v. Reynolds*, 559 U.S. 633 (2010). Dembro does not dispute that he has the burden to establish the existence of storm warnings. *See* Dembro MSJ at 16; *Cetel*, 460 F.3d at 507. Having reviewed Dembro's proffered evidence of storm warnings, the Court concludes that Dembro has not brought forth sufficient evidence of storm warnings to survive the CFTC's Motion for Summary Judgment on this third element of the fraudulent concealment test.

Dembro's argument regarding the existence of storm warnings has two main components. *First*, Dembro points to a few posts on Internet fora, a Facebook page, a Facebook group, two press releases, and Plaut's LinkedIn profile, and suggests that that those materials constitute either

"significant customer complaints about WWM" or "significant social media websites disclos[ing] [WWW's] operation and its principal officer, Thomas Plaut." *See* Dembro MSJ at 18–19.  And *second*, Dembro notes that the CFTC "had robust worldwide programs for monitoring FOREX fraud" and that a CFTC investigator was generally aware of at least two of the websites on which customer complaints about WWM were posted. *See* Dembro Reply at 8–9.  But, as the CFTC convincingly argues, this evidence falls short, as a matter of law, of establishing that there were storm warnings that would have reasonably alerted the CFTC of WWM's wrongdoing. *See* CFTC Opp. to Dembro MSJ at 33–39.

For one, none of Dembro's storm warnings dated before October 30, 2017, are "directly applicable" to the alleged wrongdoing here: that Defendants misrepresented to WWM customers that their funds would be held in segregated customer accounts and misappropriated WWM customer funds by failing to hold those funds in those segregated accounts. *See DeBenedictis v. Merrill Lynch & Co.*, 492 F.3d 209, 218 (3d Cir. 2007).  The forum posts (Exs. 42–44, 46; Response to SUF & Counterstatement ¶¶ AB–AG) and the Facebook group (Ex. 47; Response to SUF & Counterstatement ¶ AH) do not relate to WWM's failure to segregate customer funds nor its misrepresentations regarding the same, but rather WWM allegedly returning customers' initial deposits to them and refusing to pay customers the profits of their trades. *See supra* Section I.A.7; *see, e.g.*, Ex. 43 ("They [WWM] give you very good prices, specially [sic] during news. But when you want to withdraw your profits, they cancel your account and all your trades . . . and, after a long wait, they finally give you back your initial money (not your profits).").  As for the Facebook page, there is no evidence of any customer complaints on that page nor anything relevant to this action. *See supra* Section I.A.7 (citing Ex. 48 ("WorldWide Market – Arabic" Facebook page)). And neither of the two press releases nor Plaut's LinkedIn Profile contain any information that

would put the CFTC on notice regarding the fraudulent scheme at issue. *See supra* Section I.A.7 (citing Ex. 49 (press releases) & Ex. 45 (Plaut's LinkedIn Profile)). The only document Dembro has brought forward that directly relates to the fraud here is dated March 22, 2018—more than five months *after* the date the CFTC first became aware of the fraud (October 30, 2017). *See* Ex. 44 at AJD18823. Because none of these materials presented by Dembro are directly applicable to the CFTC's fraud claims against Defendants, they do not—and cannot—constitute storm warnings.

In any event, even if these materials were directly applicable to the CFTC's fraud claims against Defendants, the Court further agrees with the CFTC that these materials would not rise to the level of a storm warning as they are not widely disseminated or reliable.[15] Dembro has not identified a single case where a court has found a few scattershot posts on Internet fora and a Facebook group sufficient to alert a plaintiff of possible wrongdoing. *See* Dembro MSJ; Dembro Reply. Consistent with Dembro's failure identify any such case, the Third Circuit has found storm warnings present based on publicly available information where, for instance, the conduct at issue (a mutual fund's commission structure) was disclosed in a defendant's registration statements and articles in publications like *USA Today*, *Time Magazine*, and the *Wall Street Journal*, plus press releases from the National Association of Securities Dealers, warned readers of the illegality of that type of commission structure. *DeBenedictis*, 492 F.3d at 215–17; *see also, e.g.*, *Benak*, 435 F.3d at 397 n.1, 403 (finding inquiry notice where there were numerous news articles in publications such as the *New York Times*, the *Wall Street Journal*, and *Fortune* leading up to, during, and in the aftermath of Enron's highly-publicized bankruptcy). Anonymous posts on

---

[15] It is for this reason that, to the extent Dembro is arguing that these materials were storm warnings as to the CFTC's claims against the Plaut Defendants regarding WWM's failure to register as an RFED with the CFTC and comply with other regulatory requirements and/or that these claims not brought against him are sufficiently related to the fraudulent scheme, the Court holds that the materials do not rise to the level of storm warnings.

Internet fora and Facebook are a far cry from the reliable and widely disseminated news reports the Third Circuit has found sufficient to alert a plaintiff to facts directly applicable to the wrongdoing at issue.  In fact, the Third Circuit has even found the existence of numerous articles and reports (including a *New York Times* article), a medical journal article, a Federal Drug Administration warning letter, and several lawsuits discussing issues relevant to misrepresentations regarding a drug insufficient to establish the presence of storm warnings for those claims.  *See In re Merck*, 543 F.3d at 168–72 (reversing district court's dismissal of claims on statute of limitation grounds because it disagreed with district court's conclusion that defendant had established the existence of storm warnings as a matter of law).  The Court is not aware of any cases in this Circuit finding Internet posts like the ones to which Dembro points here sufficient to alert a plaintiff to a possibility of wrongdoing.[16]  This case does not warrant being the first.

---

[16] The Court did, however, identify a case where a court in this District rejected a defendant's arguments (in a case alleging that the defendant had misled the plaintiff into purchasing municipal bonds funding a monorail) that the plaintiff knew or should have known of the existence of facts giving rise to its claims based on (1) the plaintiff's knowledge that reports other than a report bullish on the monorail's economic viability existed, (2) an "internet article" from a consultant who had written a less bullish report on the same, (3) articles from the Las Vegas Review-Journal, the *Associated Press*, the *Los Angeles Times*, and the *Guardian* referencing that consultant's more negative report, and (4) various sources of information regarding the plaintiff's actual knowledge of issues with the monorail.  *Lord Abbett un. Income Fund, Inc. v. Citigroup Glob. Markets, Inc.*, No. 11-555, 2017 WL 5515912, at *1, *3, *14–16 (D.N.J. Aug. 4, 2017).  The court "question[ed] whether, considering the types of publications [the "internet article" authored by the consultant and news articles] were, their existence necessarily would have triggered an investigation into [d]efendant's alleged fraudulent scheme," and ultimately held that—even in combination with the other material to which the defendant had pointed the court—the articles did not constitute storm warnings as a matter of law and therefore that the defendant was not entitled to summary judgment on statute of limitations grounds.  *Id.* at *15–16.  The plaintiff in *Lord Abbett* had not itself moved for summary judgment on the storm warnings issue, so the court did not have the occasion to consider whether to affirmatively grant summary judgment to plaintiff on this issue (as this Court does here), but the *Lord Abbett* court's decision not to credit an "internet article"—which this Court notes was written, and attributed to, an expert consultant, unlike the forum posts at issue here—is instructive.

36

Dembro's assertions that the CFTC had "robust worldwide programs for monitoring FOREX fraud" and that a CFTC investigator was generally aware of at least two of the websites on which customer complaints about WWM were posted, *see* Dembro Reply at 8–9, do not militate a different conclusion. Dembro's suggestion that the CFTC had a robust program for monitoring forex fraud is based on materials like CFTC's announcement of a national campaign to protect customers from financial fraud and the existence of an "Investor Advisory entitled 'Foreign Currency Trading Fraud.'" *See id.* at 8 (citing Response to SUF & Counterstatement ¶¶ AM–AR)). The CFTC's subjective awareness of the general existence of financial (and even specifically forex) fraud does not require finding that a reasonable person or entity like the CFTC would have been alerted to the possibility that *Defendants* were engaging in the fraudulent conduct at issue here. Nor does one CFTC investigator's general awareness of two of the fora on which customer complaints regarding WWM's conduct unrelated to the claims here require finding as such. As the CFTC correctly suggests, it would be unreasonable to require plaintiffs like the CFTC to comprehensively search the Internet, or even fora related to its mandate, to attempt to uncover any potential wrongdoing. *See* CFTC Opp. to Dembro MSJ at 39. And, in any event, the Court has already determined that the forum posts are not sufficiently directly applicable to the claims at issue here, *see supra*, which further limits any conceivable relevance of the CFTC's subjective awareness of the Internet fora. *Mathews*, 260 F.3d at 252 ("The existence of storm warnings is a totally objective inquiry.").

The Court accordingly finds that Dembro has not adduced sufficient facts establishing the existence of storm warnings to survive the CFTC's Motion for Summary Judgment on the same. And to the extent reasonable due diligence for the CFTC requires more than monitoring for storm warnings, the Court further finds that the CFTC's promulgation of requirements for participants

in the retail forex market (including the registration and other regulatory requirements at issue in Counts III, IV, and V), *see* 17 C.F.R. Part 5, and the very same notices regarding the risk of forex fraud Dembro attempts to characterize as storm warnings, *see* Dembro Reply at 8 (citing Response to SUF & Counterstatement ¶¶ AP–AR)), sufficient to constitute reasonable due diligence. The CFTC is therefore entitled to summary judgment on the due diligence element of the fraudulent concealment inquiry,[17] though, as explained *supra* Section II.B.1.b.i, neither Dembro nor the CFTC is entitled to summary judgment on the question of whether Dembro actively misled the CFTC preventing the CFTC from recognizing the validity of its claims within the limitations period (the other two elements of fraudulent concealment).

### 2. Extraterritoriality

Both Dembro and the CFTC maintain that summary judgment is appropriate on the question of whether CFTC has demonstrated a domestic application of the CEA here, with Dembro asserting that the CFTC has not done so and the CFTC arguing that it has.

Judge McNulty aptly summarized the fundamentals of an extraterritoriality analysis as follows:

"It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction

---

[17] Dembro's argument that the CFTC "unduly delayed filing suit until long after it says it learned of WWM" and therefore "did not exercise due diligence in prosecuting these claims," Dembro MSJ at 20–21, is meritless. As Judge McNulty has already explained, "[t]his is a misinterpretation of the due diligence requirement" because "[a]ll that the [CFTC] must show is that its lack of awareness of the fraud is not attributable to its failure to uncover the fraud with reasonable diligence" and then, if the other elements of fraudulent concealment are also met, the CFTC has "five years from that date to file its complaint." Opinion on Motions to Dismiss Amended Complaint at 12 n.3. As a case Judge McNulty quoted in making this ruling aptly put it, "[i]t is irrelevant whether [plaintiff] was diligent in pursuing its possible claims after [it had notice of them] . . . , because no due diligence is required within the limitations period." *Id.* (quoting *Conmar Corp. v. Misui & Co. (USA)*, 858 F.2d 499, 505 (9th Cir. 1988) (citation modified)). Dembro's quibbles with the conduct of the litigation after the CFTC filed its complaint, *see* Dembro MSJ at 20–21, are similarly—and as a matter of logic—irrelevant to the due diligence statute of limitations inquiry.

of the United States." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010). Therefore, '[w]hen a statute gives no clear indication of extraterritorial application, it has none." *Id.* In analyzing extraterritoriality, the Court performs a two-step analysis to determine (1) whether the statute has an extraterritorial effect, and if not, (2) whether the focus of the plaintiff's claim consists in foreign conduct . . . .

Opinion on Motion to Dismiss Complaint at 17. Judge McNulty held at the first step that the CEA does not apply extraterritorially—a holding neither Dembro nor the CFTC challenges. *Id.* at 17. He then held, at the second step, that the "focus" of the CFTC's claims are forex trades between WWM and its customers and that those trades are "domestic transactions" because the CFTC's allegations "suggest[ed] that irrevocable liability regarding the forex trades occurred within the United States." *Id.* at 17–21.

At this stage of the proceedings, the CFTC argues, in essence, that the undisputed facts it has now adduced have borne out Judge McNulty's initial determination at the motion to dismiss stage that its allegations suggested that the relevant forex trades are domestic conduct such that the Court should find, as a matter of law, that the application of the CEA to that conduct is appropriate. *See* CFTC MSJ at 8–11. Dembro, for his part, "persists in his argument" that Judge McNulty applied the incorrect test to determine whether the conduct at issue is domestic at the second step, while also arguing that the conduct is not domestic under the test adopted by Judge McNulty. *See* Dembro MSJ at 9–12 & n.5. Considering these arguments and the evidence brought forward by the parties, the Court applies the same test as Judge McNulty did and finds that the CFTC has established, as a matter of law, that its claims constitute a domestic application of the CEA and therefore that the CFTC is entitled to summary judgment on the issue of extraterritoriality.

The Court will, as an initial matter, once again decline Dembro's invitation to revisit a legal ruling by Judge McNulty. In both his Opinion on Motion to Dismiss Complaint and his

Denial of Motion for Certificate of Appealability, Judge McNulty addressed and rejected Dembro's argument that the correct standard for determining whether a transaction is domestic is the one set forth in *Parkcentral Global Hub Ltd. v. Porsche Automobile Holdings SE*, 763 F.3d 198 (2d Cir. 2004): that "'a domestic securities transaction' under *Morrison* is 'not alone sufficient to state a properly domestic claim under the statute'" and that conduct that "is 'predominantly foreign'" is "impermissibly extraterritorial." Opinion on Motion to Dismiss Complaint at 22 (quoting *Parkcentral*, 763 F.3d at 215–16). Dembro has not raised in his single footnote urging the Court to revisit this holding any new evidence or supervening law, nor has he established that it is "clearly erroneous and would create manifest injustice." *See In re City of Philadelphia Litig.*, 158 F.3d at 718; Dembro MSJ at 10 n.5. As was the case when Judge McNulty issued his Opinion on Motion to Dismiss Complaint, *Parkcentral* remains "not binding on this Court and the Third Circuit has [still] yet to adopt or endorse its reasoning." *See* Opinion on Motion to Dismiss Complaint at 22. In fact, "the Third Circuit, which binds this Court, has spoken. The Third Circuit standard applied by [Judge McNulty] holds that 'a transaction is domestic when the parties incur irrevocable liability to carry out the transaction within the United States or when title is passed within the United States.'" Denial of Motion for Certificate of Appealability (quoting *United States v. Georgiou*, 777 F.3d 125, 135 (3d Cir. 2015)). Under the law of the case doctrine, the Court will accordingly apply the same Third Circuit standard and not the non-binding *Parkcentral* one (as it would even if Judge McNulty had not already ruled on the issue).

Applying that standard, the Court finds that irrevocable liability for the forex transactions between WWM and its customers was incurred within the United States, such that the transactions are domestic under *Morrison*. "Facts that demonstrate 'irrevocable liability' include the 'formation of the contracts, the placement of purchase orders, the passing of title, or the exchange

40

of money.'"  *Georgiou*, 777 F.3d at 136 (quoting *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012)).  "In other words, irrevocable liability attaches "when the parties to the transaction are committed to one another," or when "in the classic contractual sense, there was a meeting of the minds of the parties."  *Williams v. Binance*, 96 F.4th 129, 136 (2d Cir. 2024) (quoting *Absolute Activist*, 677 F.3d at 68), *cert. denied sub nom. Binance v. Anderson*, 145 S. Ct. 1048 (2025).[18]

Here, the CFTC has established through undisputed facts that irrevocable liability for transactions between WWM and its customers was incurred in the United States.  Dembro does not genuinely dispute the testimony of CFTC TAB's Chief Technology Officer Ronald Andriulli—who created and maintained TAB's trading platform on which WWM customers traded, *see* CFTC SUF ¶¶ 43–48—that:

- "Between May 2011 and approximately April 2018, TAB's 'physical server infrastructure, which would include the web server, the order management system, the accounting system, and the database, all were on physical serves in the Equinix [New Jersey] datacenter,'" *id.* ¶ 45 (quoting Andriulli Tr. at 93:12–20, 95:6–20);

- "The Amazon Web Services servers used by TAB after approximately April 2018 were located in the United States," *id.* ¶ 47 (citing Andriulli Tr. at 173–75)[19];

---

[18] Dembro argues that "[i]f some Second Circuit precedent is to be followed, all should be." Dembro Reply at 3.  The Court disagrees.  For one, the Third Circuit's precedential decision in *Georgiou* itself discusses Second Circuit precedent.  *See infra*.  And, more to the point, the well-developed Second Circuit caselaw both pre- and post-*Parkcentral* addressing when "irrevocable liability" attaches is instructive regardless of whether the Second Circuit in the specific circumstances in *Parkcentral* found that more than irrevocable liability was needed for the conduct at issue there to be sufficiently domestic.  In other words, *Parkcentral* does not somehow supersede the Second Circuit cases coming after (or before) it that helpfully elucidate the meaning of irrevocable liability.

[19] *See supra* n.3.

- WWM/TAB "disseminated prices for forex instruments from its New Jersey servers" and once a customer "clicked buy, [the platform] would immediately send an order, a market order, to [WWM/TAB's] servers with that actual price [the customers] had [seen]. When it got to that server, there was tolerance rules that said, okay, is this bid price within the tolerance . . . and if it was within that range, [WWM/TAB] would fill the order at the prices that the user visualized," *id.* ¶¶ 49–50 (citing Ex. FF ("Andriulli Decl.") ¶ 12; then quoting Andriulli Tr. at 143);

- WWM/TAB "accepted customer forex orders by marking the order from a 'pending order to a filled status,' at which time the system created a timestamp reflecting the time of execution," *id.* ¶ 51 (quoting Andriulli Tr. at 149:7–150:10 and citing Andriulli Decl. ¶ 14);

- "Following trade executions, electronic trade confirmation messages 'were pushed out from' TAB's server in New Jersey," *id.* ¶ 54 (quoting Andriulli Tr. at 95:25–96:5 and citing Andriulli Decl. ¶ 14);

- "Timestamps reflecting order fills were created by TAB before the trade confirmation messages were disseminated to the customer," *id.* ¶ 55 (citing Andriulli Tr. 151:3–6);

- "A WWM customer could only cancel or modify an order 'before WWM acted upon it,'" *id.* ¶ 56 (quoting Ex. E); and

- "WWM forex customers 'did not have to acknowledge an execution to make it official. The just – it was all done on the server,'" *id.* ¶ 57 (quoting Andriulli Tr. at 151:21–24).

These undisputed facts demonstrate that WWM and its customers had a meeting of the minds in New Jersey when TAB/WWM's trading platform (operated on New Jersey servers) filled a customer's order. To put a finer point on this, the trades occurred as follows: (1) the customer

proposed price terms when it clicked the "buy button," and (2) then, WWM's *New Jersey-based* trading platform either accepted or rejected the price terms/order based on whether it fell within the "tolerance range," and, if accepted, the order was filled and the trade was executed. And, once WWM acted on the trade by filling the order (or rejecting it), the WWM customer could not cancel or modify its order. Further, once the customer had placed the order and WWM had acted on it by filling and executing it, the trade execution was "official"; the customer did not have to acknowledge the execution for it to be "official." Accordingly, the point at which WWM and its customers irrevocably committed to one another occurred in New Jersey when the customer's ordered was filled/executed.[20]  *See Giunta v. Dingman*, 893 F.3d 73, 81 (2d Cir. 2018) (finding irrevocable liability at the point at which individual was "contractually obligated and . . . could not, on his own accord, revoke" an agreement).

Dembro's suggestion that trades did not become effective until the confirmation message reached the customer and the transaction populated in the customer's trade blotter, *see* Dembro MSJ at 11, does not compel a different conclusion. As explained above, there is no dispute that a customer could not cancel or modify its order once WWM acted on a trade. That a customer did not see a transaction in his/her trade blotter does not mean that the trade was revocable up until that point. In any event, the Court is persuaded by the Second Circuit's observation that "irrevocable liability may attach in more than one location and at more than one time, because there is always more than one side of any given transaction." *Williams*, 96 F.4th at 137 (citation modified). Accordingly, even if irrevocable liability also attached outside the United States when

---

[20] The Court further notes that it is not only TAB/WWM's servers/trading platform that were located in New Jersey. New Jersey is also where TAB and WWM's shared headquarters was located, where Plaut, Dembro, and the rest of the WWM executive team primarily worked, and where WWM transferred customer cash to TAB's account located in the United States. *See* CFTC SUF ¶¶ 6–7; CFTC MSJ at 9.

foreign persons outside the United States placed their purchase orders, money was exchanged, and/or customers received trade confirmations, *see* Dembro MSJ at 11–12, the Court has found that irrevocable liability, at minimum, also occurred in the United States such that the trades at issue are domestic.

The Court therefore holds that the CFTC has established, as a matter of law, that its claims constitute a domestic application of the CEA and, in turn, that the CFTC is entitled to summary judgment on the issue of extraterritoriality.

### 3.    Substantive analysis of claims

Having addressed the statute of limitations and extraterritoriality issues, the Court moves on to the substance of Counts I and II.  The CFTC brings Counts I and II against WWM for making fraudulent misrepresentations regarding customer assets and misappropriating those customer assets, against Plaut as a controlling person of WMM, and against TAB because it was in a common enterprise with WWM.  Am. Comp. ¶¶ 118–23, 125–29.  The CFTC also brings Counts I and II against Dembro for aiding and abetting WWM's misappropriation.[21]  Am. Compl. ¶¶ 124, 130.

More specifically, Count I alleges violations of 7 U.S.C. § 6b(a)(2) and its implementing regulation, 17 C.F.R. § 5.2(b).  7 U.S.C. § 6b(a)(2), in relevant part, makes it unlawful:

> for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or swap, that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market—
>
> (A) to cheat or defraud or attempt to cheat or defraud the other person; . . .
>
> (B) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution

---

[21] As explained *infra* Section II.B.3.d, the Court will not revisit Judge McNulty's dismissal of Counts I and II to the extent they alleged Dembro's aiding and abetting liability with respect to WWM's alleged misrepresentations.  *See* Opinion on Motion to Dismiss at 35.

> of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . . .

7 U.S.C § 6b(a)(2)(A), (C).  As Judge McNulty has previously explained:

> This provision applies to forex transactions "as if" they were futures contracts, pursuant to . . . 7 U.S.C. § 2(c)(2)(C)(iv).  *See also CFTC v. Cifuentes*, No. [16-6167], 2018 WL 1904196, at *5 (D.N.J. Apr. 20, 2018).  Accordingly, under 17 C.F.R. § 5.2(b), it is unlawful for any person to cheat, defraud, or mislead another using "the mails or any means or instrumentality of interstate commerce, directly or indirectly, in or in connection with any retail forex transaction."  *See also Cifuentes*, . . . 2018 WL 1904196, at *5.

Opinion on Motion to Dismiss Complaint at 23.

> Count II alleges violations of 7 U.S.C. § 9(1), which, in relevant part, makes it unlawful:

> for any person, directly or indirectly, to use or employ, or attempt to use or employ, in connection with any swap, or a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of such rules and regulations as the [CFTC] shall promulgate . . . .

And, like 7 U.S.C § 6b(a)(2), 7 U.S.C. § 9(1) applies to forex transactions pursuant to 7 U.S.C. § 2(c)(2)(C)(ii)(I).  The implementing regulation, 17 C.F.R. § 180.1(a)(1) accordingly, in relevant part, makes it "unlawful for any person, directly or indirectly, in connection with any swap, or contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) [u]se or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud[.]"

Both fraud by misrepresentation and fraud by misappropriation are actionable under the aforementioned sets of statutory provisions and regulations.  *See, e.g.*, *CFTC v. S. Tr. Metals, Inc.*, 894 F.3d 1313, 1325 (11th Cir. 2018) (explaining that, in the context of a fraud by misrepresentation claim, 7 U.S.C. § 6b(a), 7 U.S.C. § 9, and 17 C.F.R. § 180.1 were "redundant" and all required proof of the same three elements); *CFTC v. Weinberg*, 287 F. Supp. 2d 1100, 1106

(C.D. Cal. 2003) (finding that defendant's "misappropriation of funds entrusted to him for trading purposes" constituted 'willful and blatant fraudulent activity' that clearly violat[ed]" 7 U.S.C § 6b(a) (citation modified)); *CFTC v. McDonnell*, 332 F. Supp. 3d 641, 719 (E.D.N.Y. 2018) ("Misappropriation of customer funds constitutes fraud that violates [7 U.S.C. § 9(1)] and [17 C.F.R. §] 180.1(a).").

To establish liability for misrepresentations under 7 U.S.C. § 6b(a)(2) and 7 U.S.C. § 9(1), and their respective implementing regulations, the CFTC must prove "(1) the making of a misrepresentation, misleading statement, or a deceptive omission[,] (2) scienter[,] and (3) materiality." *S. Tr. Metals*, 894 F.3d at 1325 (citation modified).

As for misappropriation, courts have repeatedly recognized that misappropriation itself constitutes "willful and blatant activity" that violates 7 U.S.C. § 6b(a)(2) and 7 U.S.C. § 9(1). *See, e.g.*, *Weinberg*, 287 F. Supp. 2d at 1106 (misappropriation constituted "willful and blatant fraudulent activity that clearly violat[ed]" 7 U.S.C § 6b(a)) (citation modified); *CFTC v. Glob. Precious Metals Trading Co., LLC*, No. 13-21708, 2013 WL 5212237, at *4 (S.D. Fla. Sept. 12, 2013) ("Misappropriating customer funds also violates [7 U.S.C. §6]b(a)(2)(A) and (C)."); *McDonnell*, 332 F. Supp. 3d at 719 (misappropriation violates 7 U.S.C. § 9(1)); *CFTC v. McAllister*, No. 18-346, 2021 WL 7541402, at *7 (W.D. Tex. Aug. 18, 2021) (defendants "violated 7 U.S.C. § 9(1)[] and 17 C.F.R. § 180.1(a)[], by misappropriating customer funds to pay for . . . operating expenses, expenses related to other business ventures, or to purchase precious metals for other . . . customers").

Applying the aforementioned tests, the Court concludes that the CFTC is entitled to summary judgment on WWM's liability for its misrepresentations related to customer funds and misappropriation of those same funds, TAB's liability for WWM's violations under the common

46

enterprise theory of liability, and Plaut's liability for WWM's violations as WWM's controlling person. As to Dembro, however, the Court finds a genuine dispute as to each of the elements applicable to the CFTC's aiding and abetting claims against him.

a.    WWM's liability

The CFTC alleges that WWM[22] misleadingly represented that it would hold customer assets safely in segregated accounts. *See* CFTC MSJ at 12. The CFTC further asserts that WWM misappropriated those customer assets when it transferred customer money from WWM's bank accounts to TAB's bank account. *See id.* at 16. Because, as the CFTC correctly points out, WWM's misrepresentations and misappropriation of customer assets are closely intertwined, *see id.*, the Court analyzes them together. In doing so, the Court ultimately finds that there is no genuine dispute that (1) the representations alleged in Counts I and II were false or misleading, material, and made with scienter and that (2) WWM misappropriated customer assets. The CFTC is accordingly entitled to summary judgment on Counts I and II as brought against WWM.

The Court first sets forth the false or misleading statements at issue here. There is no dispute that WWM made the following statements in the following locations:

- WWM's Customer Agreement: "We will hold Customer funds on the Customer's behalf in a regulated bank account. *This account will be segregated from our money and assets*, in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines[,]" CFTC SUF ¶ 60 (quoting Customer Agreement);

---

[22] The conduct of WWM's agents, including its executives and employees, is imputed to WWM for the purposes of determining WWM's liability. *See* 7 U.S.C § 2(a)(1)(B) ("The act, omission, or failure of any official, agent, or other person acting for any individual, association, partnership, corporation, or trust within the scope of his employment or office shall be deemed the act, omission, or failure of such individual, association, partnership, corporation, or trust, as well as of such official, agent, or other person.").

- WWM's website, where a page titled "REGULATORY OVERSIGHT" stated: "[WWM] is licensed with and regulated by the British Virgin Islands Financial Services Commission ('BVI FSC') . . . . FSC firms are subject to strict regulatory scrutiny, including annual independent audits, annual risk assessments and compliance reporting and punitive sanctions for firms that fail to fully comply with FSC requirements. The regulations of the BVI FSC require that *customer assets are identified, accounted for, and appropriately segregated*[,]" *id.* ¶ 58 (quoting Ex. II) (emphasis added);

- WWM's website, where a page titled "ADVANTAGES OF WWM" stated: "Our high standards of regulation are approved by the FCA and FSC, which allows our firm to protect clients funds in order to provide a *safe and secure* online trading experience[,]" *id.* ¶ 59 (quoting Ex. JJ) (emphasis added); and

- Marketing materials, such as an "Introduction to WorldWideMarkets" pitch deck stating that WWM "ensure[d] the highest level of security for its' [sic] customers' funds . . . " and that WMM's "[f]ully regulated firm and highly accountable management mean[t] safety of funds," Ex. D at 8–9 & CFTC SUF ¶ 63.

"Whether a misrepresentation has been made depends on the overall message and the common understanding of the information conveyed." *CFTC v. Allied Markets LLC*, 371 F. Supp. 3d 1035, 1048 (M.D. Fla. 2019) (quoting *CFTC v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1328 (11th Cir. 2002)). Here, the Court finds that there is no genuine dispute that the overall message and common understanding of these representations was that WWM held customer funds in segregated accounts, which would keep those funds safe so that customers could withdraw their

funds whenever they wanted.  *See also* CFTC SUF ¶ 62 ("WWM's 'Withdrawal Terms of Service' represented that '[w]ithdrawal requests w[ould] be processed' within two business days.").[23]

The Court further finds that there is no genuine dispute that these statements were, at the very least, misleading because WWM did not hold customer funds safely in segregated accounts from at least in March 2012 through at least March 2018.  *See supra* Section I.A.5–6.   In fact, both Plaut and Dembro themselves testified that WWM did not hold those customer funds in segregated accounts during that period.   CFTC SUF ¶ 66 (citing Dembro Tr. at 266:3–7 ("[C]ustomer assets were not fully segregated in accounts") and Ex. NN ("Plaut Tr.") at 125:2–4 ("There is no segregated account . . . .")).   The 2017 Audit confirms this lack of segregation, showing that, as of December 31, 2015, WWM had only $288,572 in cash and cash equivalents, but $3,634,525 owed to customers.  2017 Audit at AJD002454 & CFTC SUF ¶ 67.  And WWM's failure to permit customers to withdraw funds in 2017 and 2018 further evinces the misleading nature of the representations regarding the safety of customer funds.  *See supra* Section I.A.6; *see also* CFTC SUF ¶ 64 (quoting Ex. Q (customer complaint from May 4, 2018, seeking processing of withdrawal requested several weeks prior and stating, "I notice (from your web site that WWM are still endeavouring to attract new customers with live trading accounts Etc.  Plus those funds that you take in 'on deposit' for live trading are 'Safe' in separate client's funds approved by the FCA and FSC.  I too was assured of my 'Safety of Funds.'")); ¶ 68 (citing Exs. Q, R, and W,

---

[23] Dembro repeatedly argues that the CFTC's misappropriation claims against Defendants are, in essence, violations "of the requirement of segregation of customer funds" under the CEA.  *See, e.g.*, Dembro Opp. at 27.  Not so. The Court agrees with the CFTC that "the charged fraud is WWM violated the CEA by transferring customer assets to TAB, which then used the money for anything it wanted, contrary to WWM's representations that it would hold the money 'safely' in accounts 'segregated from [WWM's] money and assets.'" CFTC Opp. to Dembro MSJ at 10 (quoting and citing CFTC SUF ¶¶ 58–63).

wherein customers complained to WWM that they had not been able to withdraw their money after repeated requests).

These misrepresentations are material as a matter of law. "[A] statement is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision." *CFTC v. Rosenberg*, 85 F. Supp. 2d 424, 447 (D.N.J. 2000) (quoting *Saxe v. E.F. Hutton & Co.*, 789 F.2d 105, 111 (2d Cir. 1986)). Information regarding the safety and use of investors' funds, like the misrepresentations made here, is information that, as a matter of law, a reasonable investor would consider important in making an investment decision. *See, e.g.*, *id.* (finding material, *inter alia*, misrepresentations regarding the type of account defendant opened for the investor); *CFTC v. Driver*, 877 F. Supp. 2d 968, 978 (C.D. Cal. 2012), *aff'd*, 585 F. App'x 366 (9th Cir. 2014) (granting summary judgment to CFTC with respect to, *inter alia*, misrepresentations regarding the use of investor funds). As Judge McNulty aptly explained, "[i]ndeed, the safety of customer assets and the representation that funds were purportedly held in segregated accounts was at the heart of the [Customer] Agreement" between WWM and its customers. Opinion on Motion to Dismiss at 26 (citing *Allied Markets*, 371 F. Supp. 3d at 1049 ("Defendants' misrepresentations to customers that their funds would be used for trading Forex, or their failure to inform customers that their funds were used to pay [the forex company's] business expenses . . . , are material—the use of such funds was at the heart of the agreement between Defendants and their customers.")).

The Court also concludes that WWM made these material misrepresentations with scienter. Scienter is "an intent to deceive, manipulate, or defraud, and it may be shown either by conscious behavior or recklessness." *CFTC v. Equity Fin. Grp. LLC*, 572 F.3d 150, 159 (3d Cir. 2009) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 (1976); then citing *Drexel Burnham*

50

*Lambert Inc. v. CFTC*, 850 F.2d 742, 748 (D.C. Cir. 1988)).  Here, WWM, at minimum, either "knew or recklessly disregarded an obvious risk" that its statements regarding the safe segregation of customer accounts were false or misleading when it continued making those statements to induce customers to trade with WWM[24] while simultaneously beginning to transfer customer funds from WWM's accounts to TAB's unsegregated account.  *See id.* at 160; CFTC SUF ¶¶ 102–03, 124–25, 128–29 (establishing that WWM's bank accounts had no substantial sources of funds other than WWM customer deposits, that WWM began wiring material amounts of cash from WWM's bank accounts to TAB's bank account beginning in approximately March 2012—transfers which Dembro referred to as a "customer debit bridge" in a presentation he sent to Plaut on May 16, 2012, and that by December 2012, substantially all deposits into TAB's bank account were composed of transfers from WWM's bank accounts).  The CFTC has accordingly established that WWM made material misrepresentations about the safe segregation of customer funds with scienter and is therefore entitled to summary judgment on the misrepresentation portions of Counts I and II.

And it is these same facts that militate the conclusion that WWM is liable for misappropriation.  That's because, in cases like the instant one, misappropriation under the CEA involves "use of an investor's money in violation of the terms agreed to by the investor," *CFTC v. Giddens*, No. 11-2038, 2013 WL 12244536, at *9 (N.D. Ga. Jan. 31, 2013), or in a manner

---

[24] *See* CFTC SUF ¶ 69 ("WWM Chief Marketing Officer William O'Leary explained that WWM's representations concerning regulatory compliance and safety of funds were 'important parts of the pitch.'"), ¶¶ 70–72 (Dembro presentation to students at Boston College "lists six 'basis [sic] of competition in the retail forex online trading industry,' with the first listed basis of competition being 'Regulatory status and safety of funds.'"), ¶ 73 ("According to WWM's Chief Legal Officer Ed Liva, the representation in the WWM [C]ustomer [A]greement concerning the use of segregated accounts was important to customers due to '[t]he additional benefit of safety of funds.'").

otherwise inconsistent with a defendant's representations to the investor, *see Allied Markets* LLC, 371 F. Supp. 3d at 1048. And, as noted *supra*, this type of misappropriation constitutes "willful and blatant activity" that violates 7 U.S.C. § 6b(a)(2) and 7 U.S.C. § 9(1). *See, e.g.*, *Weinberg*, 287 F. Supp. 2d at 1106 (misappropriation constituted "willful and blatant fraudulent activity that clearly violat[ed]" 7 U.S.C § 6b(a)) (citation modified)). When WWM wired from its accounts to the TAB account money that included some customer money[25] that it had promised customers would be in segregated accounts, it used the customers' money in a manner inconsistent with that promise. From January 1, 2012, through December 31, 2015, WWM transferred at least $3.6 million in money consisting, at least in substantial part, of customer money. *See id.* ¶ 128 (citing 2017 Audit). TAB further used the customer cash it had received from WWM to pay operating expenses and make cash distributions to Defendants. *Id.* ¶ 129. Given these facts, the Court finds that the CFTC has demonstrated, as a matter of law, that WWM misappropriated customer funds when it transferred customer money from WWM's bank accounts to TAB's bank account. *See, e.g.*, *Allied Markets LLC*, 371 F. Supp. 3d at 1048 (holding that forex company's use of "invested funds to pay [company's] and [d]efendants' expenses, as well as to pay 'returns' to other customers, when the invested funds were meant to be used only for trading, constitute[d]

---

[25] The Court is unconvinced by Dembro's argument that because WWM was entitled to freely transfer its profits to TAB, all the transfers WWM made from its accounts to TAB's were proper. *See* Dembro MSJ at 12–13. Dembro has, at best, disputed that *all* the money transferred from WWM to TAB consisted of misappropriated funds. But he cannot escape the inevitable conclusion that the transfers out of WWM's accounts necessarily included *some* customer assets, especially as WWM operated at a loss for the several year period in which these transfers occurred (and therefore, there were no profits to be transferred). *See* CFTC SUF ¶ 102 ("WWM's bank accounts had no substantial sources of funds other than WWM customer deposits. Withdrawals from WWM's bank accounts were substantially composed of (i) transfers to TAB's bank account and (ii) customer withdrawals."). In any event, the Court agrees with the CFTC that WWM knew that the transferred money came from customers given that money was labeled as a "customer debit bridge" by Dembro in a presentation he sent to Plaut on May 16, 2012. *See id.* ¶ 125.

misappropriation"). Because the Court has also found that the CFTC is entitled to summary judgment on the misrepresentation portions of Counts I and II as brought against WWM, summary judgment for the CFTC is therefore warranted on Counts I and II in their entirety as brought against WWM.

b.    <u>TAB's liability</u>

Summary judgment against TAB on Counts I and II is also warranted because TAB is liable for WWM's violations under the common enterprise theory of liability. If a common enterprise exists, the entities comprising that common enterprise are "jointly and severally liable for the acts of the common scheme." *CFTC v. Am. Bullion Exch. Abex, Corp.*, No. 10-1876, 2014 WL 12603558, at *8 (C.D. Cal. Sept. 16, 2014). In determining whether a common enterprise exists, "courts look to a variety of factors, including: [(1)] common control[,] [(2)] the sharing of office space and officers[,] [(3)] whether business is transacted through a maze of interrelated companies[,] [(4)] the commingling of corporate funds and failure to maintain separation of companies[,] [(5)] unified advertising[,] and [(6)] evidence that reveals that no real distinction existed between the [c]orporate [d]efendants." *Id.* (citation modified).

Here, none of the facts relevant to this analysis are in dispute—and they all demonstrate that WWM and TAB functioned as a common enterprise. To start, WWM and TAB were both owned and controlled by Plaut, who served as the CEO for both companies simultaneously. CFTC SUF ¶ 36. WWM was TAB's only customer. *Id.* ¶ 39. Moreover, TAB and WWM shared employees and executives, as well as office space and technology resources such as software development, IT resources, and the same New Jersey-located computer servers. *Id.* ¶¶ 6, 40–41. Consistent with this commingling, the 2017 Audit represented that that transactions between WWM and TAB "were not contemplated on an arm's length basis." *Id.* ¶ 42 (quoting 2017 Audit).

Summary judgment against TAB on Counts I and II is therefore appropriate under the common enterprise theory. *See CFTC v. Traders Glob. Grp. Inc.*, No. 23-11808, 2023 WL 7545316, at *11 (D.N.J. Nov. 14, 2023) (finding that companies operated as a common enterprise and were "therefore liable for each other's violations of [the CEA] and [r]egulations"), *opinion clarified on other grounds*, 2024 WL 4910456 (D.N.J. Jan. 10, 2024); *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 38–39 (D.D.C. 2015) (entering summary judgment for CFTC based on common enterprise theory).

### c.    Plaut's liability

Plaut, in turn, is liable for WWM's violations of Counts I and II as WWM's controlling person.  "Any person 'who, directly or indirectly, controls any person who has violated any provision of [the CEA]' is liable for the controlled person's violation if he 'did not act in good faith or knowingly induced, directly or indirectly, the act or acts constituting the violation.'" *Equity Fin. Grp.*, 572 F.3d at 160 (quoting 7 U.S.C. § 13c(b)).  To establish that a person controlled a corporation, the CFTC must show that the person "'actually exercised general control over the operation of the entity principally liable' and 'possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, even if such power was not exercised.'"  *CFTC v. Baragosh*, 278 F.3d 319, 330 (4th Cir. 2002) (quoting *Monieson v. CFTC*, 996 F.2d 852, 859 (7th Cir. 1993)).  And to establish that the controlling person "knowingly induced" a violation, the CFTC must demonstrate that the person "had actual or constructive knowledge of the core activities that make up the violation at issue and allowed them to continue." *Traders Glob. Grp.*, 2023 WL 7545316, at *11.

The CFTC has established both control and knowing inducement here.  Plaut had general control because, as explained *supra*, Plaut owned and controlled WWM as its controlling

shareholder and CEO.  *See* CFTC SUF ¶ 36.  Plaut also had specific control over, and knowingly induced, WWM's misrepresentations and misappropriation because he "provided the contents of the [WWM] website" on which WWM made several of the misrepresentations, *id.* ¶ 60; *see supra* Section I.A.3, and was the person at WWM who gave "the green light for the money movement" from WWM's bank accounts to TAB's that constitutes the misappropriation at issue here, Dembro Tr. 209:6–210:23; *see* CFTC SUF ¶¶ 137–39.  Given Plaut's undisputed specific and general control and knowing inducement, the CFTC is entitled to summary judgment on Counts I and II against Plaut as a controlling person.  *See Equity Fin. Grp.*, 572 F.3d at 160 (affirming district court's grant of summary judgment to CFTC against controlling persons).

### d.    Dembro's liability

The Court now addresses Dembro's liability for aiding and abetting WWM's misappropriation of customer funds.[26]  *See* Am. Compl. ¶¶ 124, 130.  7 U.S.C. § 13c(a) establishes liability for any individual who (1) "willfully aids, abets, counsels, commands, induces, or procures the commission of" a violation of the rules, regulations, or orders promulgated under the CEA[,] [(2)] "acts in combination or concert with any other person in any such violation[,]" or [(3)] "willfully causes an act to be done or omitted which if directly performed or omitted by him

---

[26] While the CFTC now urges the Court to revisit Judge McNulty's dismissal of Counts I and II to the extent they alleged Dembro's aiding and abetting liability with respect to WWM's alleged misrepresentations, *see* CFTC Mot. at 26 n.15, the Court sees no need to do so because it agrees with Judge McNulty's conclusion that Dembro's failure to correct statements that later became untrue was insufficient to establish aiding and abetting liability.  *See* Opinion on Motion to Dismiss at 33–35.  The CFTC has not presented any evidence that would warrant revisiting that conclusion.  Given that the misappropriation and misrepresentation theories are so closely intertwined, *see supra* Section II.B.a, the Court will, however, consider evidence regarding Dembro's knowledge of and involvement in WWM's misrepresentations to the extent it bears on the surviving misappropriation theory.

or another would be a violation." *Equity Fin. Grp.*, 572 F.3d at 161–62 (quoting 7 U.S.C. § 13c(a)).

As Judge McNulty helpfully explained:

> In enacting [§] 13c(a), Congress modeled the provision after the federal statute for criminal aiding and abetting, 18 U.S.C. § 2. *See In re Amaranth Nat. Gas Commodities Litig.*, 730 F.3d 170, 181 (2d Cir. 2013); *In re Richardson Secs., Inc.*, CFTC No. 78-10, 1981 WL 26081, at *5 (Jan. 27, 1981) ("The section was modeled after the federal criminal aiding and abetting statute, 18 U.S.C. § 2."). Therefore, various courts have held the elements required to establish aiding and abetting liability under the CEA are parallel to those required to establish criminal liability under 18 U.S.C. § 2. Those elements are that the defendant (1) "had knowledge of the principal's . . . intent to commit a violation of the [CEA]; (2) had the intent to further that violation; and (3) committed some act in furtherance of the principal's objective." *See Nicholas* [*v. Saul Stone & Co. LLC*], 224 F.3d [179,] 189 [(3d Cir. 2000)].

Opinion on Motion to Dismiss at 30. The Court now concludes that, while the CFTC has brought forth sufficient facts as to Dembro's knowledge of WWM's intent to violate the CEA, intent to further those violations, and commission of acts in furtherance of WMM's objective to survive Dembro's Cross-Motion for Summary Judgment, there are genuine disputes as to each of these elements precluding a grant of summary judgment to the CFTC.

But before delving into the facts supporting that conclusion, the Court must first address precisely what Dembro must have had knowledge of and have intended to do to be held liable for aiding and abetting WWM's misappropriation—an issue on which the CFTC and Dembro vehemently disagree. Quoting *In re Lincolnwood Commodities, Inc. of California*, CFTC No. 78-48, 1984 WL 48104, at *28 (Jan. 31, 1984), the CFTC argues that finding aiding and abetting liability under the CEA does not require "that the aider and abettor knew the principal's activity was unlawful." CFTC MSJ at 22. Dembro, for his part, appears to suggest that the CFTC must prove that Dembro knew that WWM was breaking the law. *See* Dembro Reply at 12. Because courts have consistently held that the elements of aiding and abetting liability under the CEA are parallel to those required to establish criminal liability under 18 U.S.C. § 2, *see, e.g.*, *Nicholas*,

224 F.3d at 189 (noting the same in addressing an aiding and abetting provision of the CEA similar to the one at issue here), and because there is a little caselaw on aiding and abetting liability in the CEA context, the Court must also look to cases examining the federal criminal aiding and abetting statute to determine the answer to this question.[27]

In doing so, the Court first notes that there is a manifest lack of clarity on this specific question—and aider and abettor liability more broadly. *See Alfred v. Garland*, 64 F.4th 1025, 1037–38 (9th Cir. 2023) ("[T]he current status of the law on the aider and abettor's mental state is far from clear. In fact, it is best described today as in a state of chaos." (quoting Baruch Weiss, *What Were They Thinking: The Mental States of the Aider and Abettor and the Causer Under Federal Law*, 70 FORDHAM L. REV. 1341, 1351 (2002))). Indeed, the comments to Third Circuit Model Jury Instruction 7.02 – Accomplice Liability: Aiding and Abetting (18 U.S.C. § 2(a)) (Jan. 2024) address the precise issue (in the criminal aiding and abetting context) highlighted by the parties here: that "[i]t is not clear . . . whether the Third Circuit used the word 'willfully' in . . . cases [analyzing 18 U.S.C. § 2(a)] simply to require a purpose or an intent to bring about the principal's commission of an offense, or also to require that the alleged accomplice must be aware

---

[27] After the Summary Judgment Motions were fully briefed, Dembro submitted a notice of supplemental authority bringing to the Court's attention the Supreme Court's decision in *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025), wherein the Supreme Court discussed aiding and abetting liability under 18 U.S.C § 2. D.E. 178. Dembro asserts that that Supreme Court's discussion "further support[s] summary judgment in his favor" and characterizes it as "amplify[ing] the elements required for a showing of aiding and abetting under federal law . . . ." *Id.* The CFTC submitted its own letter in response. D.E. 179. The Court agrees with the CFTC that "*Smith & Wesson* does not create new 'elements' for 18 U.S.C. § 2, as Dembro contends. Instead, it surveys analogous case law and synthesizes 'ancillary principles' from the facts of those cases." *Id.* at n.2. And none of those "ancillary principles" conflict with the principles addressed here; to the contrary, they are entirely consistent with the Court's discussion of aiding and abetting liability. *Compare Smith & Wesson*, 605 U.S. at 291–93, *with* Section II.B.3.d.

that the principal's conduct was against the law and have a 'bad purpose' to violate or disobey the law."

This Court is not aware of any decisions, other than CFTC administrative decisions, analyzing 7 U.S.C. § 13c(a) (the CEA aiding and abetting statute applicable here) that directly confront the question of whether an aider-and-abettor must know that principal's conduct is unlawful.  There are, however, a few out-of-circuit cases that this Court reads to suggest that knowledge that the principal's conduct is unlawful is not required because they did not make specific findings that the aider-and-abettor knew the conduct at issue was unlawful.  *See, e.g.*, *In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 178 (S.D.N.Y. 2014) (applying to private action analogue to 7 U.S.C. § 13c(a) a standard that "does not differ, in substance from the standard employed by the . . . Third Circuit[]" in finding that facts were "sufficient to permit an inference of [certain defendants'] intent to further [principal's] eventual violation of the CEA" and an inference that those "defendants knew that the [principal's scheme] would eventually result in misuse of customer funds" where those facts suggested that certain defendants knew about the misuse of funds by the principal and nevertheless continued to move money between accounts), *aff'd*, 611 F. App'x 34 (2d Cir. 2015); *CFTC v. Grossman*, No. 14-62061, 2015 WL 11197766, at *4 (S.D. Fla. Feb. 26, 2015) (CFTC stated a claim against defendant for aiding and abetting where the defendant knew of relevant misstatements, "intended to further [the principal's] enterprise" of defrauding retail commodities transaction investors, assisted in soliciting and enrolling investors, and participated in the crafting of documents that misrepresented relevant facts).  And, as the CFTC correctly points out, one CFTC administrative decision *has* explicitly held that knowledge of the unlawful nature of the principal's conduct is not needed to hold an aider-and-abettor liable: *In re Lincolnwood*, where the CFTC concluded that 7 U.S.C.§ 13(a) (and its precedent) did not

"suggest[] that knowing participation and intentional assistance require[d] the [CFTC] to establish that the aider and abettor knew the principal's activity was unlawful," 1984 WL 48104, at *28. The CFTC also points to another CFTC administrative decision that, somewhat more obliquely, supports this conception of the knowledge and intent requirements under 7 U.S.C.§ 13(a). *See In re Nikkhah*, CFTC No. 95-13, 2000 WL 622872, at *20 n.28 (May 12, 2000) ("Liability as an aider and abettor requires proof that (1) the [CEA] was violated (the case law often refers to the violation as the 'unlawful venture' that the alleged aider and abettor knowingly joins), (2) the named respondent had knowledge of the wrongdoing underlying the violation, and (3) the named respondent intentionally assisted the primary wrongdoer.").[28]

Given the aforementioned cases explicitly or implicitly suggest that an aider-and-abettor may be subject to liability under 7 U.S.C.§ 13(a) even where they did not know that the principal's conduct was unlawful, and the lack of clear Third Circuit caselaw rejecting this interpretation in the analogous federal criminal aiding and abetting context,[29] the Court will therefore adopt the CFTC's position that proving that an aider-and-abettor (1) had knowledge of the principal's intent to commit a violation of the CEA, (2) had the intent to further that violation, and (3) committed

---

[28] In response, Dembro characterizes these CFTC decisions as "obsolete" and asserts that the CFTC "inexcusably misstates the law of aiding and abetting," but does not explain why the CFTC decisions are "obsolete" or why they are not, at the very least, instructive here. *See* Dembro MSJ at 22. In fact, Dembro himself cites and quotes a CFTC administrative decision issued prior to, and discussed in, *In re Lincolnwood*, just two pages after he denigrated *In re Lincolnwood* as "obsolete." *See id.* at 24.

[29] The Court further notes that other Courts of Appeal have held that 18 U.S.C. § 2(a) does not require that an aider-and-abettor know that the principal's conduct be illegal. *See, e.g.*, *United States v. McDaniel*, 545 F.2d 642, 644 (9th Cir. 1976).

some act in furtherance of the principal's objective—the applicable standard here—does not require proof that the aider-and-abettor be aware that the principal's conduct was against the law.[30]

But, even applying the aforementioned clarification of the knowledge element, the Court finds that while there is a genuine dispute as to Dembro's knowledge of WWM's intent to violate the CEA by misappropriating funds, intent to further those violations, and commission of some act in furtherance of those violations, the CFTC has nevertheless adduced sufficient evidence to defeat Dembro's Cross-Motion for Summary Judgment with respect to these elements.

The Court begins with an overview of (some of the) evidence the CFTC has presented that would permit a reasonable jury to infer that Dembro is liable for aiding and abetting WWM's misappropriation. For one, Dembro does not dispute that he knew that WWM did not segregate customer funds from company money starting approximately March 2012. *See supra* Section I.A.5 (citing Response to SUF & Counterstatement ¶ 66). Nor does he dispute that he was familiar

---

[30] Dembro's principal argument to the contrary—that "when intent to violate a legal duty is an element of a crime," there can be no culpable intent if the person did not know their conduct was illegal, *see* Dembro Reply at 12 (quoting *United States v. Carbo*, 572 F.3d 112, 116 (3d Cir. 2009)—is unavailing. In *Carbo*, the Third Circuit distinguished typical mail fraud cases—where "the government need only prove that the defendant had the intent to deceive, and ignorance of the law is no defense"—from the honest services mail fraud statute (involving failure by a public official to disclose a conflict of interest) that the defendant in *Carbo* was charged with aiding and abetting. 572 F.3d at 116–17. In doing so, the court explained that "[b]ecause the violation of [a state law underlying the failure to disclose conflict charge] is critical to distinguishing between acceptable political deal-making and criminal deprivation of the public's right to the honest services of public officials—in other words, between normal politics and fraud—a defendant who does not know of the state law cannot be said to have known of the commission of the substantive offense." *Id.* at 118. *Carbo* is inapposite because it is not the case that the aiding-and-abetting claim here "might subject [a person] to . . . liability for ordinary conduct of daily life." *See id.* at 117. The CFTC has not brought a claim requiring proof of, for instance, specific legal duties imposed by BVI law or the CEA. *See supra* n.23. Instead, it alleges that Dembro knew of WWM's misappropriation and had intent to further it. This is therefore precisely the type of circumstance where, like the other forms of mail fraud *Carbo* distinguished from the type at issue there, ignorance of the law is no excuse.

with the Customer Agreement (having, at minimum, reviewed it in 2014 when he wrote a letter to the BVI regulator attaching and citing to in his letter the Customer Agreement, *see id.* ¶ 133), which represented to customers, "We will hold Customer funds on the Customer's behalf in a regulated bank account.  This account will be segregated from our money and assets, in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines," *see* Customer Agreement.[31]  There is also evidence that, in accordance with its representations to customers, in the early days of WWM, Dembro knew that WWM did in fact segregate customer funds and wrote in a November 2011 email that "customer funds must be kept in segregated accounts"— information that was included in a document that Dembro was informed would be disseminated to, at least, a subset of WWM's customers.  *See supra* Section I.A.4.[32]  Dembro further knew that WWM began wiring material amounts of cash from WWM's bank accounts to TAB's bank

---

[31] Dembro responds that the Customer Agreement specifies that the funds would be held in accordance with BVI guidelines and "[t]hus, [c]ustomers were informed and agreed that WWM held their funds in accordance with [those guidelines.]"  Dembro Reply at 31.  Not true.  Dembro ignores the clear representation also made in that portion of the Customer Agreement—that the "regulated bank account" in which customer funds were to be held would be "segregated from [WWM's] money and assets[.]"  That WWM tacked on, after using a comma, "in accordance with British Virgin Islands Financial Services Commission ('FSC') guidelines" does not change that the "overall message and the common understanding" of these sentences inexorably lead to the conclusion that WWM specifically informed customers that their funds would be segregated from WWM's.  *See Allied Markets*, 371 F. Supp. 3d at 1048.  In fact, elsewhere in his briefing, Dembro suggests that BVI regulations "did not require segregation of customer funds."  *See* Reply at 14.  If Dembro is correct that BVI regulations did not require segregation of customer funds, then the reading of the Customer Agreement that Dembro implicitly advances—that it only represented to customers that the funds would be segregated in the manner required by BVI—is absurd because if funds are not segregated at all then they cannot be segregated in any particular manner.  Reading in this absurd construction renders mentioning segregation at all, at the very least, misleading.

[32] *See also* CFTC SUF ¶ 122 ("At some point before October 27, 2011, Dembro drafted an 'accounting process and procedures guide' for WWM 'to use internally' and 'show potential regulators and auditors.'  Dembro's accounting process and procedures guide deemed customer cash a 'restricted' asset that should only be transferred after it had been earned as revenue." (quoting Ex. CCC)).

account beginning in approximately March 2012—transfers which Dembro tracked and referred to as a "customer debit bridge" in a presentation he sent to Plaut on May 16, 2012. *See supra* Section I.A.5. A jury could reasonably infer that Dembro labelling the cash transfers as a "customer debit bridge" means that he knew that they were customer funds and, further, that the transfers were contrary to WWM's representations to its customers.

A jury could also reasonably find that Dembro committed acts in furtherance of WWM's misappropriation when he (1) caused checks to be paid out of TAB's bank account to pay invoices for WWM's operating expenses, knowing that these customer funds had been improperly transferred to TAB's account, *see supra*; CFTC SUF ¶ 130; and/or (2) drafted portions of the 2017 Audit, which at least according to the witness testifying on behalf of WWM's auditor, did not disclose the source of nearly $4 million worth of "advances" of (primarily customer cash) from WWM to TAB and which was created in response to the BVI regulator's letter seeking information regarding the annual audits WWM was required to prepare and had failed to complete on an annual basis, *see supra* Section I.A.5.[33, 34]

---

[33] The Court finds that there is a genuine dispute as to Dembro's exact role in the audit, *see* Dembro Reply at 38, but also finds that it is nevertheless clear that Dembro, at minimum, "worked . . . very closely with [the auditor]" on the report and drafted some footnotes (which comprise a significant percentage of the report), *see* CFTC SUF ¶¶ 155–56. The Court also notes that Dembro disputes that the auditor in fact testified that the 2017 Audit did not disclose that customer funds were the sources of the advances, *see* Dembro MSJ at 33–34, but the Court finds that the evidence regarding that testimony is sufficient for the CFTC to clear the summary judgment hurdle. It will be up to the jury to decide between the parties' respective interpretations of the testimony.

[34] The Court will, however, grant summary judgment to Dembro on the three other acts the CFTC alleges Dembro committed in furtherance of WWM's misappropriation (one of which the CFTC has already abandoned) because the CFTC's evidence doesn't support an inference that these acts were committed in furtherance of the misappropriation. The Court will first grant Dembro summary judgment on the CFTC's allegation in its Amended Complaint that Dembro caused WWM's affiliate, WorldWideMarkets Online Trading, to use misappropriated customer funds to complete the wind-down of that affiliate because the CFTC confirms that it "is no longer relevant."

Based on these facts, the Court concludes that a reasonable jury could find that Dembro had knowledge of WWM's intent to misappropriate customer funds, intended to further that misappropriation, and committed some act in furtherance of the misappropriation, and therefore that Dembro is liable for aiding and abetting WWM's misappropriation of customer funds in violation of the CEA.[35]

The Court, however, further concludes that a reasonable jury could also reasonably find in Dembro's favor on some or all of these elements based on some of more discrete factual disputes identified throughout its discussion of Dembro's liability, *see, e.g.*, *supra* n.33, and/or simply by drawing different (yet still reasonable) inferences from the undisputed facts.

But, consistent with the Court's analysis of the CFTC's evidence, Dembro's argument that he is in fact entitled to summary judgment because scienter is "conclusively negated" by the Customer Agreement and the 2015 and 2017 Audits do not support affirmatively granting Dembro summary judgment.  *See* Dembro MSJ at 30–34.  The Court has already explained that the Customer Agreement was, at minimum, misleading such that it does not—and could not—conclusively negate that Dembro had the knowledge and/or intent required to be held liable for aiding and abetting WWM's misappropriation.  *See supra* n.31.  As for the 2015 and 2017 Audits, Dembro argues that because the two Audits prepared by a CPA firm—which cover WWM's

---

*See* CFTC Opp. to Dembro MSJ at 24 & n.4 (citing Am. Compl. ¶ 75).  And, with respect to the two acts on which the CFTC continues to rely—(1) Dembro's involvement in deciding which vendors should be paid in April 2018 and (2) his negotiations with a vendor to keep the WWM trading platform operational, the Court finds that they are not sufficiently connected to WWM's improper treatment of customer funds for a reasonable jury to infer that Dembro committed them in furtherance of WWM's violation, and therefore that Dembro is entitled to summary judgment on these acts.

[35] And even though the Court has determined that the CFTC need not prove that Dembro knew that WWM's misappropriation was actually illegal, the Court nevertheless finds that a reasonable jury could also infer from these facts that Dembro did know that WWM's conduct was unlawful.

operations from 2011 through the end of 2015—were certified and unqualified, they raise an inference against scienter, and, further, that Dembro was entitled to rely on the 2017 Audit (covering January 1, 2012, through December 31, 2015) "regarding the lawful operation of WWM." *See* Dembro MSJ at 31–34. But although it is true that unqualified opinions from outside auditors may, in some cases, raise an inference against scienter, all of the cases Dembro cites involve accounting fraud. *See id.* (citing *e.g.*, *In re Hansen Nat. Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) ("Plaintiff has alleged . . . that defendants engaged in improper accounting practices in violation of Generally Accepted Accounting Principles ('GAAP').") (citation modified). And, more fundamentally, the 2015 and 2017 Audits did not purport to opine on the legality of the relevant acts undertaken by WWM and Dembro here. Instead, the auditors stated that their task was "to plan and perform [its] audit to obtain reasonable . . . assurance about whether the financial statements [were] free of material misstatement." CFTC SUF ¶ 172. Accordingly, the auditors did not review the substance of the WWM Customer Agreement. *Id.* ¶ 173. And the witness testifying on behalf of the auditors testified that Dembro did not inform the auditors that customer funds were required to be segregated pursuant to representations the WWM had made to customers. *Id.* ¶ 174. The Court therefore agrees with the CFTC that the 2015 and 2017 Audits do not require finding that Dembro lacked the requisite scienter, given that they did not address the key legal question at issue here—whether WWM transfers of customer funds comported with the representations it had made to its customers in the Customer Agreement—and, as an accountant himself, Dembro knew or should have known that the Audits did not address that legal question.

Dembro's other arguments fail for similar reasons. He asserts that if the Customer Agreement and Audits do not conclusively negate the scienter element, they, when viewed with

other evidence of his reliance on various "experts," constitute sufficient evidence of a lack of scienter to warrant sending the case to a jury. *See* Dembro MSJ at 34–37. As explained above, the Court has already determined that disputes regarding the elements of Dembro's liability preclude summary judgment for either the CFTC or Dembro, so it need not specifically address this evidence. But the Court will nevertheless note that Dembro has not demonstrated that any of the "experts" upon which he purports to have relied—including Plaut, other WWM officers, and lawyers—actually appropriately opined on the propriety and/or legality of the transfer of customer funds in light of the representations WWM had made to its customers, and therefore that this evidence fails to significantly move the needle (if at all).[36]

For this reason, and for those stated above, the Court will **GRANT in part** and **DENY in part** Dembro's Cross-Motion for Summary Judgment and **GRANT in part** and **DENY in part** the CFTC's Motion of Summary Judgment.

## III. DEFAULT JUDGMENT MOTION

The CFTC moves for default judgment on the issue of liability only against the Plaut Defendants on Counts III, IV, and V. *See* Default Mot. For the reasons stated below, the Court will **GRANT in part** and **DENY in part** the CFTC's Default Judgment Motion.

### A. Legal Standard

A district court may enter default judgment against a properly served party who has failed to plead or otherwise defendant action filed against him. *See* Fed. R. Civ. P. 55(b)(2).

---

[36] Because the Court does not rely on this evidence in deciding the Summary Judgment Motions, the Court will not address whether Dembro could present an advice of counsel defense at trial. *See* CFTC Opp. to Dembro MSJ at 13–15. The parties may raise this issue at the appropriate time. The Court similarly declines to address disputes regarding the relevance to Dembro's liability of Plaut's health and Plaut's guarantee of certain funds. *See id.* at 11–13, 23.

Although courts do "not favor entry of defaults and default judgments," *United States v. $55,518.05 in U.S. Currency*, 728 F.2d 192, 194 (3d Cir. 1984), "the entry of a default judgment is left primarily to the discretion of the district court," *Hritz v. Woma Corp.*, 732 F.2d 1178, 1180 (3d Cir. 1984) (citing *Tozer v. Charles A. Krause Milling Co.*, 189 F.2d 242, 244 (3d Cir. 1951)).

Before granting default judgment, a court must determine whether (1) it has subject matter jurisdiction over the claims at issue and personal jurisdiction over the defendant, (2) the defendant was properly served, (3) the complaint states a sufficient cause of action, and (4) the plaintiff has proven damages. *Days Inns Worldwide, Inc. v. HH Pramukh, LLC*, No. 15-4318, 2016 WL 7231598, at *1 (D.N.J. Dec. 14, 2016) (citations omitted). Although the facts pled in the complaint are accepted as true for the purpose of determining liability, the plaintiff must prove damages. *See Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1149 (3d Cir. 1990).

A court must also consider "(1) whether the party subject to default has a meritorious defense, (2) the prejudice suffered by the party seeking default, and (3) the culpability of the party subject to default." *Doug Brady, Inc. v. New Jersey Bldg. Laborers Statewide Funds*, 250 F.R.D. 171, 177 (D.N.J. 2008) (citing *Emcasco Ins. Co. v. Sambrick*, 834 F.2d 71, 74 (3d Cir. 1987)).

"In a multiple-defendant case, default judgment against one defendant should be avoided if the default judgment could create inconsistent and unsupportable results as to the non-defaulting defendants." *W. Am. Ins. Co. v. Boyarski*, No. 11-2139, 2012 WL 4755372, at *2 (M.D. Pa. Oct. 5, 2012). But "[w]here judgment against a defaulting defendant would not affect the liability of non-defaulting defendants, default judgment may be appropriate." *Colony Nat'l Ins. Co. v. Control Bldg. Servs., Inc.*, No. 14-5651, 2015 WL 7296034, at *5 (D.N.J. Nov. 18, 2015); *see also Farzetta v. Turner & Newall, Ltd.*, 797 F.2d 151, 153–55 (3d Cir. 1986) (default judgment may be

entered where facts proved at trial of certain defendants would not "as a matter of logic preclude the liability of" defaulting co-defendants).

**B.      Analysis**

Because the Court finds that (1) it has subject matter jurisdiction over Counts III, IV, and V, personal jurisdiction over the Plaut Defendants, and that the Plaut Defendants were properly served, (2) the CFTC has stated a claim against the Plaut Defendants for each Counts III, IV, and V, (3) the Plaut Defendants have a meritorious defense with respect to the portions of Counts III, IV, and V that a jury could find barred by the statute of limitations but no other meritorious defenses, (4) the CFTC would be prejudiced without a default judgment, and (5) the Plaut Defendants are culpable for their failure to defend this action, the Court will **GRANT** the CFTC's Default Judgment Motion on Counts III, IV, and V with respect to the CFTC's claims for restitution and injunctive relief for the entire time period for which the CFTC has alleged violations and the CFTC's claim's for monetary relief and disgorgement based on conduct after December 27, 2016, but **DENY** the CFTC's Default Judgment Motion on Counts III, IV, and V with respect to the CFTC's claims for disgorgement and monetary relief based on conduct prior to December 27, 2016.

*1.      Jurisdiction and service*

The Court has subject matter jurisdiction over Counts III, IV, and V and personal jurisdiction over the Plaut Defendants.  Subject matter jurisdiction is present under 28 U.S.C. § 1331 because Counts III, IV, and V are brought under the CEA, a federal statute.  The Court also has personal jurisdiction over each of the Plaut Defendants because (1) Plaut is a resident of New Jersey and resided in New Jersey at all relevant times, Platt Decl. ¶ 4; Am. Compl. ¶ 15; (2) TAB's principal place of business at all relevant times was Woodcliff, New Jersey, Am. Compl. ¶ 14; and (3) WWM's principal place of business at all relevant times was Woodcliff, New Jersey, *id.* ¶ 13.

Given that "the paradigm forum for the exercise of general jurisdiction [for an individual] is the individual's domicile" and one of the "paradigm bases for general jurisdiction" for a corporation is its "principal place of business," *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014), exercising personal jurisdiction over each of the Plaut Defendants is therefore appropriate.

With respect to service of process, the Court is satisfied that the Plaut Defendants were properly served.  Plaut was properly served with process pursuant to Federal Rule of Civil Procedure 4(e)(2)(B) when a copy of the summons and Complaint were left with his wife at his residence on January 10, 2022.  *See* D.E. 11.  TAB and WWM, in turn, were properly served with process pursuant to Federal Rule of Civil Procedure 4(h)(1)(B) that same day when copies of the summons and Complaint were delivered to Platt's residence.  *See* D.Es. 12–13.  In fact, the Plaut Defendants did eventually defend the action for a time.  *See supra* Section I.B.

### 2.    Liability

Having determined that it has subject matter jurisdiction over Counts III, IV, V, personal jurisdiction over the Plaut Defendants, and that the Plaut Defendants were properly served, the Court moves on to examine whether the Amended Complaint states a sufficient cause of action for each of Counts III, IV, and V and concludes that it does.

### a.    Count III

The CFTC brings Count III for WWM's failure to register as an RFED as required by 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6).  An RFED is a person or entity "that is, or offers to be, the counterparty to a retail forex transaction" with retail customers.  17 C.F.R. § 5.1(h)(1).  A retail forex transaction, in turn, is "any account, agreement, contract or transaction described in section 2(c)(2)(B) or 2(c)(2)(C) of the Act" other than those "subject to the rules of a contract market [inapplicable here]."  17 C.F.R. § 5.1(m).  Section 2(c)(2)(C) of the CEA, for its part, includes "any agreement, contract, or transaction in foreign currency that is . . . offered to, or

entered into with, a person that is not an eligible contract participant." 7 U.S.C. § 2(c)(2)(C)(i)(I)(aa).  That category of eligible contract participants includes individuals with a liquid net worth exceeding $ 10 million.  7 U.S.C. § 1(a)(18)(A)(xi).  A retail forex customer is any customer trading foreign exchange that is not an eligible contract participant.  *See* 17 C.F.R. § 5.1(k).

An RFED is required to register with the CFTC in order to offer to be and act as a counterparty to retail forex transactions.  7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa); 17 C.F.R. § 5.3(a)(6).  An RFED's failure to register with the CFTC is a strict liability offense because this "registration requirement does not contain a 'state of mind' limitation to liability."  *See CFTC v. JBW Cap.*, 812 F.3d 98, 105 (1st Cir. 2016) (considering analogous CEA registration provision of commodity pool operators and holding that it was subject to strict liability); *see also CFTC v. Brit. Am. Commodity Options*, 560 F.2d 135, 139–40, 143 (2d Cir. 1977) (finding that CEA registration requirement for commodity trading advisors to be a "flat prohibition" of acting as a trading advisor unless registered and thus that the district court had erred in also requiring proof of "fraud or misconduct" before granting an injunction" and further explaining that "[r]egistration is the kingpin in this statutory machinery, giving the [CFTC] the information about participants [in CFTC-regulated markets] which it so vitally requires to carry out its other statutory functions of monitoring and enforcing the [CEA].").

The Court here concludes that the Amended Complaint pleads facts that establish that WWM was required to register as an RFED but failed to do so.  The CFTC alleges that WWM's primary business model was to act as a counterparty to forex transactions with retail customers by "continuously disseminat[ing] prices on various forex pairs from its servers in New Jersey" to its retail customers around the world. Am. Compl.  ¶¶ 13, 38, 44.  The CFTC further alleges that,

starting on May 9, 2011, through at least September 2018, WWM executed trades on its servers in New Jersey and then sent trade confirmations back to the customers. *Id.* ¶¶ 39–40, 69–70.[37]  And, the CFTC also alleges, despite acting as an RFED, WWM never registered with the CFTC as an RFED or any other capacity. *Id.* ¶ 13.  As such, the Court finds that the Amended Complaint states a claim for violations of the RFED registration requirement under 7 U.S.C. § 2(c)(2)(C)(iii)(I)(aa) and 17 C.F.R. § 5.3(a)(6).[38]

> b.  <u>Count IV</u>

The Court now turns to Count IV, which the CFTC brings for WMM's failure to maintain adjusted net capital of at least $20 million at all times as required by 17 C.F.R. § 5.7(a)(1).  All

---

[37] The Court has already determined that the CFTC's claims here concern domestic conduct. *See supra* Section II.B.2.  Accordingly, the CFTC has demonstrated that applying the CEA's RFED requirement to WWM is not an impermissible extraterritorial application of the CEA.  And because Dembro's only disputes in his Cross-Motion for Summary Judgment (and related briefing) regarding the RFED registration requirement (and the other two regulatory violations) concern the extraterritoriality issue of which this Court has already disposed, *see* Dembro Reply at 7, the Court finds that granting the CFTC's Default Judgment Motion on these violations does not impact Dembro's liability on Counts I and II.  The Court so finds because although WWM's failure to register with the CFTC as an RFED and commission of the other regulatory violations brought as Counts IV and V do bear on certain aspects of Dembro's liability on Counts I and II (e.g., whether the statute of limitations is tolled based on the CFTC's fraudulent concealment theory, which involves evidence regarding WWM's failure to register, *see supra* Section II.B.1.b.i), the Court has previously—after having fully considered Dembro's arguments—rejected the only basis on which Dembro has, or could, establish that WWM did not violate the CEA's registration and associated requirements.  As such, entering judgment for the CFTC on Counts III, IV, and V does not prevent Dembro from proceeding with his defense on Counts I and II.

[38] For the reasons explained *supra* Section II.B.3.b, TAB is liable for WWM's violation of the RFED requirement set forth in Count III, as well as the other regulatory requirements set forth in Counts IV and V, under the common enterprise theory of liability.  The Court also finds that Plaut is liable for those same WWM violations as WWM's controlling person.  As previously discussed *supra* Section II.B.3.c, Plaut had general control over WWM.  And in line with its finding as to Counts I and II, the Court further finds that the Amended Complaint pleads that Plaut had specific control over, and knowingly induced, the acts underlying WWM's registration and regulatory violations because he was aware of registration requirements based on another company he had founded and was part of the decision to structure WWM to avoid the CFTC's registration and regulatory requirements.  *See* Am. Compl. ¶¶ 31–32.

RFEDs must maintain, at minimum, adjusted net capital of $20 million.  17 C.F.R. § 5.7(a)(1).

"Adjusted net capital" consists of net capital less illiquid assets and capital charges covering the

potential market risks of highly liquid assets.  *See id.* § 1.17(c)(5).  Money an RFED holds for its

consumers may not be counted to arrive at the $20 million adjusted net capital threshold—i.e., an

RFED must have $20 million in adjusted net capital *in addition to* the money it holds for its

customers.  *See id.* § 5.8(e).  § 5.7(a)(1) applies to any RFED, whether or not it is registered with

the CFTC under § 5.3(a)(6).  That's because, unlike other regulations applicable to RFEDs, *see,*

*e.g.*, § 5.10(a)(1) ("Each retail foreign exchange dealer registered with the [CFTC] . . . shall

prepare, maintain and preserve [information including organizational charts, written policies and

procedures, balance sheets and income statements].",  § 5.7(a)(1)'s plain text does not limit its

applicability to RFEDs not registered with the CFTC.  *See* § 5.7(a)(1)(i) ("Each futures

commission merchant offering or engaging in retail forex transactions and each retail foreign

exchange dealer must maintain adjusted net capital equal to or in excess of the greatest of: [at least

$ 20 million].").   And, like the RFED registration requirement, the language of § 5.7(a)(1) does

not require a showing of any particular state of mind/scienter, so it is a strict liability violation.

*See In the Matter of Stanley Buckwalter*, CFTC No. 80-28, 1991 WL 83522, at *26 (Jan. 25, 1991)

(rejecting argument that "a scienter requirement should be read into the language" of a record-

keeping rule because "[o]n its face, the language of [the record-keeping rule] is not limited by any

reference to scienter"); *compare* § 5.7(a)(1), *with* § 5.2(b)(2) (prohibiting a person from "in or

connection with any retail forex transaction" "*willfully* to make or cause to be made to any person

any false report or statement . . . ." (emphasis added)).

　　Here, the CFTC has stated a claim against WWM for a violation of § 5.7(a)(1)'s adjusted

net capital requirement.  As explained *supra* Section II.B.1.2.a, the Amended Complaint pleads

that WWM was an RFED.  It further pleads that WWM did not hold adjusted net capital of at least $20 million.  Am. Compl. ¶¶ 31, 36.  The Amended Complaint therefore states a claim for violations of the RFED adjusted net capital requirement set forth in § 5.7(a)(1).

c.    Count V

In Count V, the CFTC alleges that WWM violated 17 C.F.R. § 5.8(a) by failing to hold a bank account in the United States or a "money center countr[y]."  § 5.8(a).  Under § 5.8(a), an RFED must "calculate its total retail forex obligation and shall at all times hold [certain highly liquid assets] equal to or in excess of the total retail forex obligation at one or more qualifying institutions in the United States or money center countries . . . ."  The "money center countries" are Canada, France, Italy, Germany, Japan, and the United Kingdom.  § 1.49(a)(1).  Because the plain language of § 5.8(a) does not limit its applicability to RFEDs registered with the CFTC, an RFED need not be registered to fall within the ambit of this requirement.  *See supra* Section III.B.2.b.  And, as with the registration and the adjusted net capital requirements discussed above, § 5.8(a) is a strict liability violation because its plain text does not specify any particular mens rea.

Considering the foregoing, the Court finds that CFTC has pled facts establishing a violation of § 5.8(a).  The CFTC alleges that WWM did not maintain a bank account in the United States or any money center country.  Am. Compl. ¶ 54.  Because § 5.8(a) requires, at minimum, that an RFED maintain a bank account in one of those places and the CFTC has alleged that WWM failed to meet that baseline requirement, the Court accordingly holds that the Amended Complaint states a claim against WWM for violating § 5.8(a).

3.    *Appropriateness of default judgment*

The Court now considers (1) whether the Plaut Defendants have a meritorious defense, (2) the prejudice suffered by the CFTC, and (3) the Plaut Defendants' culpability, *see Doug Brady*, 250 F.R.D. at 177 (citing *Emcasco*, 834 F.2d at 74), and finds that all factors support granting the

CFTC default judgment on Counts III, IV, and IV for its claims for (1) restitution and injunctive relief for the entire time period for which the CFTC has alleged violations and (2) disgorgement and monetary relief based on conduct after December 27, 2016 (but not before).

a.    The Plaut Defendants' defenses

"[A] defendant has established a meritorious defense when its 'allegations, if established at trial, would constitute a complete defense.'" *Mrs. Ressler's Food Prod. v. KZY Logistics LLC*, 675 Fed. App'x 136, 140 (3d. Cir. 2017) (quoting *$55,518.05 in U.S. Currency*, 728 F.2d at 195).

Here, the Plaut Defendants failed to answer the Amended Complaint, so the Court does not have the benefit of reviewing their answers in determining whether they have any meritorious defense. *See* Dkt. But the record does include the Plaut Defendants' Motion to Dismiss Amended Complaint and Dembro's Motion to Dismiss Complaint (a motion the Plaut Defendants' joined), as well as the Plaut Defendants' answers to the Complaint, *see* D.Es. 41, 43–44. In those filings, there are only two defenses "alleg[ing] facts beyond simple denials or conclusionary statements," see *$55,518.05 in U.S. Currency*, 728 F.2d at 195, that could potentially constitute a meritorious defense.

The first is the extraterritoriality defense discussed at length and adjudicated on the merits in connection with Dembro's Cross-Motion for Summary Judgment. *See supra* Section II.B.2. In doing so, the Court held that the focus of the CFTC's claims (including Counts III, IV, and V) are forex trades between WWM and its customers and that those trades were domestic transactions because irrevocable liability attached in the United States. *Id.* Because the Court has already decided that the CEA is not being applied here in an impermissibly extraterritorial manner, any defense based on extraterritoriality, *see, e.g.*, D.E. 44 (WWM's answer to the Complaint asserting

that it was not required to register with the CFTC because it did not operate in the United States), is not—and cannot be—meritorious.

The second potential defense is the statute of limitations defense also discussed at length and adjudicated in part on the merits with Dembro's Cross-Motion for Summary Judgment. But that adjudication was only partial because the Court found that genuine disputes of material fact precluded it from determining, as a matter of law, that Defendants actively misled the CFTC such that the CFTC was prevented from recognizing the validity of its claims within the applicable five-year statute of limitations (as required for tolling under the fraudulent concealment doctrine). *See supra* Section II.B.1.b.i. Consistent with that previous finding, the Court finds that Plaut Defendants have meritorious defenses with respect to the portions of Counts III, IV, and V that a jury could find barred by the statute of limitations and will therefore decline to grant the CFTC default judgment on those portions of Counts III, IV, and V. More specifically, the Court finds, as to Counts III, IV, and V, that the Plaut Defendants have no meritorious defenses to the CFTC's claims for restitution and injunctive relief for the entire time period for which the CFTC has alleged violations (because the fraudulent concealment doctrine does not apply to those types of relief, *see supra* Section B.1), but do have a meritorious defense to the claims for disgorgement and monetary relief based on conduct prior to December 27, 2016 (because the five-year statute of limitations applicable to those forms of relief may bar those claims).

b.    Prejudice to the CFTC

The Plaut Defendants had completely stopped defending this action by March 2023, *see* Dkt., and the Clerk's entry of default was entered against all the Plaut Defendants by July 2023. *See* D.Es. 93 & 99. The Plaut Defendants have therefore "fail[ed] over an extended period of time to answer any claim or correspondence from" the CFTC. *Hritz*, 732 F.2d at 1182. In that extended

period of time, the Plaut Defendants failed to answer the Amended Complaint and stopped participating in discovery (including by failing to attend their scheduled depositions). *See supra* Section I.B; D.E. 108. Accordingly, their failure to participate in this action over this extended period of time "has obstructed [the CFTC's] ability to pursue relief." *Days Inns Worldwide, Inc. v. Mataji3 Corp.*, No. 23-2985, 2025 WL 1039483, at *5 (D.N.J. Apr. 8, 2025). The prejudice factor therefore militates in favor of granting default judgment to the CFTC.

### c.    The Plaut Defendants' culpability

For default judgment purposes, culpability does not require intentional and malicious actions on the part of a defaulting defendant, but merely "[r]eckless disregard for repeated communications from plaintiffs and the court." *Hritz*, 732 F.2d at 1183. As of the date of this decision, over two years have passed since TAB's and WWM's former counsel withdrew from representing TAB and WWM and they have not secured replacement representation since then. "Default judgment is an appropriate sanction for corporate defendants that fail to retain counsel pursuant to a court order . . . [because such] behavior—coupled with . . . meritless defenses . . . —raises a strong inference that [the corporate defendant] has abused the judicial process . . . for the purpose of postponing disposition until it had become judgment proof." *Barnabas Health, Inc. v. Touchstone Tech. Consulting Ops. Inc.*, No. 21-12508, 2023 WL 5218111, at *4 (D.N.J. Aug. 10, 2023) (quoting *Mendelsohn, Drucker, & Assocs., P.C. v. Titan Atlas Mfg., Inc.*, No. 12-453, 2013 WL 1842124, at *5, *7 (E.D. Pa. May 2, 2013)). As for Plaut, he has failed to either defend this action *pro se* or hire new representation after the withdrawal of his counsel. *See* Dkt. And there is not sufficient evidence that "anything other than [Plaut's] willful negligence caused h[is]

failure to file an answer" to the Amended Complaint or otherwise defend this action.[39] *Prudential Ins. Co. of Am. v. Taylor*, No. 08-2108, 2009 WL 536403, at *1 (D.N.J. Feb. 27, 2009). The Court therefore finds that the Plaut Defendants' culpability weighs in favor of granting default judgment.

### 4.  Damages

The CFTC has requested that the Court postpone determinations on appropriate remedies until each Defendant's liability on each claim has been resolved. *See* Default Mot. at 21. The Court finds that request appropriate and will not discuss damages here.

## IV.  CONCLUSION

For the foregoing reasons, the Court will: (1) **GRANT in part** and **DENY in part** the CFTC's Motion for Summary Judgment; (2) **GRANT in part** and **DENY in part** Dembro's Cross-Motion for Summary Judgment; and (3) **GRANT in part** and **DENY in part** the Default Judgment Motion. An appropriate Order accompanies this Opinion.

Dated:  December 31, 2025

/s/ Evelyn Padin
Evelyn Padin, U.S.D.J.

---

[39] Before Plaut's attorneys withdrew because Plaut had stopped paying them, those attorneys filed a letter referencing issues with Plaut's health. *See* D.E. 72. But there is no indication that these health issues led Plaut to stop paying his attorneys (which, in turn, led to their withdrawal) and then to fail to secure replacement counsel or proceed *pro se* to continue to defend this action in the nearly three years since these health issues were raised. And Plaut's former attorneys did not cite the health issues as creating the breakdown in their communications with Plaut's counsel. *See* D.E. 84. The Court is therefore unconvinced that Plaut's health issues warrant concluding he is any less culpable for his failure to defend this action. For those same reasons, the Court also agrees with the CFTC that there is no evidence that Plaut is incompetent (which would render default judgment inappropriate, *see* Federal Rule of Civil Procedure 55(b)(2)). *See* Default Mot. at 12.